Defendants' attempted monopolization of pediatric hem-onc physician services in Hawai`i, the

HPH Defendants and Doe Defendants instigated, orchestrated, coerced, and enforced a boycott

of Plaintiff Hawaii Children's Blood and Cancer Group by physicians, patients, and JABSOM;

and Doe Defendants, including physicians not named as defendants herein conspired with the

HPH Defendants to boycott Plaintiff Hawaii Children's Blood and Cancer Group by referring all

hem-onc related matters to the HPH Defendants' physicians, and by referring no hem-onc related

matters to Plaintiff Hawaii Children's Blood and Cancer Group's physicians.

      89.    The HPH Defendants and co-conspirator physicians and Doe Defendants

acted in concert to exclude Plaintiff Hawaii Children's Blood and Cancer Group's physicians

from competing with the HPH Defendants in the market for pediatric hem-onc physician services

in physician clinical, teaching, and research services, and from participation on the JABSOM

regular faculty.

      90.    Defendants conspired and acted in concert to eliminate Dr. Woodruff from

ever competing against Defendant KMS in the market for pediatric hem-onc physician services

in physician clinical, teaching, and research by

      a.   falsely accusing Dr. Woodruff of violating Medicare laws and

   regulations to the federal government and publishing false and defamatory allegations

   that she committed fraud calculated to reach the ears of referring physicians not

   controlled or employed by the HPH Defendants, government entities, and other third

   parties with the result that she was prevented from continuing to practice her profession;

      b.   cooperating to fix employment terms and to enforce no-switching

   agreements, impairing the employment market. *See Quinonez v. National Asso. of Sec.*

35

*Dealers, Inc.*, 540 F.2d 824, 828 (5th Cir. 1976) (listing numerous cases holding such agreements violate the antitrust laws).

91.     The KMS-employed physicians conspired with KMCWC to serve their own personal ends of obtaining highly desirable faculty appointments, research grants and assignments, and outside employment to increase their professional statures and reputations, and their income from sources outside their employment with Defendant KMS.  (Accordingly, *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), does not apply in this case.)

92.     The HPH Defendants employed their facilities and affiliations with third parties, and every other avenue leading pediatric hem-onc patients to KMCWC to prevent Plaintiff Hawaii Children's Blood and Cancer Group from receiving new patient referrals and to redirect the Plaintiff Hawaii Children's Blood and Cancer Group's existing patients to KMS-employed physicians to establish and facilitate the boycott of Plaintiff Hawaii Children's Blood and Cancer Group.

93.     An unlawful price effect in violation of section 480-4(a) resulted from the HPH Defendants' exclusion of Plaintiff Hawaii Children's Blood and Cancer Group because the quality of care was lowered when the HPH Defendants terminated Team Care, but they did not reduce prices.

94.     The effect of the HPH Defendants' action is the illegal denial of consumer choice.  The HPH Defendants foreclosed patient choice by unlawfully tying the services of KMS-employed physicians to hospital in-patient and outpatient services and using the boycott and naked coercion to enforce the exclusion of Plaintiff Hawaii Children's Blood and Cancer Group's physicians.

95.     The HPH Defendants' conduct violating section 480-4(a) was a foreseeable consequence of the fraudulent conduct and conspiracy Defendants Deloitte & Touche and Dennis M. Warren, Esq. engaged in targeting Drs. Woodruff and Wilkinson.

96.     As a result of the HPH Defendants' and their co-conspirators' violations of H.R.S. §480-4(a) to extract supracompetitive profits from pediatric cancer care, including the orchestration, maintenance, and enforcement of a boycott of Plaintiffs' services, and conspiring to exclude Plaintiffs from Team Care and exclude them from competition, Plaintiffs have been injured in their business and property and lost profits as a result of Defendants' conduct and practices forbidden by the antitrust laws, and have sustained special and general damages in amounts to be proven at trial, including past and future lost income, entitling it to have their damages trebled, and receive an award of reasonable attorneys' fees and costs of suit, as provided for in H.R.S. § 480-13(a)(1).

### COUNT III
(Unlawful Attempt to Control Prices and Refusals to Deal, Violation of H.R.S. §§480-4(b), 6)

97.     Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 96 above as though fully set forth herein.

98.     The HPH Defendants supply and charge separately for commodities employed in pediatric hem-onc care, including, but not limited to ordinary supplies, medications, and diagnostic tests.

99.     The HPH Defendants fix, control, and maintain the prices of these commodities and control the standard of their quality. In some cases, the HPH Defendants charge more than other entities for essentially identical commodities simply because they controlled pediatric cancer care.

100.     Refusals to deal with Plaintiff Hawaii Children's Blood and Cancer Group

37

by boycotting physicians and organizations and Doe Defendants furthers the HPH Defendants' control over the aforementioned commodities, constituting a violation of H.R.S. §480-4(b).

101.    On information and belief, the HPH Defendants caused patients to be threatened with diminished care or exclusion from receiving needed commodities and services if they selected Dr. Woodruff or Plaintiff Hawaii Children's Blood and Cancer Group's physicians to provide their pediatric hem-onc physician services.

102.    Refusing to sell any commodity to any other person or persons is unlawful under H.R.S. §480-6, when the refusal is for the purpose of compelling or inducing the other person or persons to agree to or engage in acts prohibited by Chapter 480, such as refusing to deal or cooperating in or engaging in a boycott as set forth above.

103.    The HPH Defendants' conduct violating H.R.S. §§ 480-4(b) and 480-6 was a foreseeable consequence of the fraudulent conduct and conspiracy Defendants Deloitte & Touche and Dennis M. Warren, Esq. engaged in targeting Drs. Woodruff and Wilkinson.

104.    Defendants' violations of H.R.S. §§ 480-4(b) and 480-6 have damaged consumers and Plaintiff Hawaii Children's Blood and Cancer Group has been injured in its business and property, and sustained special and general damages in amounts to be proven at trial, including past and future lost income, entitling Plaintiff Hawaii Children's Blood and Cancer Group to have its damages trebled, and receive an award of reasonable attorneys' fees and costs of suit as provided for in H.R.S. § 480-13(a)(1).

**COUNT IV**
(Unfair Competition, Violation of H.R.S. § 480-2)

105.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 104 above as though fully set forth herein.

38

106.    As set forth more fully above, the HPH Defendants compete with Hawaii Children's Blood and Cancer Group in the market for pediatric hem-onc physician services.

107.    The HPH Defendants and the Doe Defendants have and are presently engaged in various policies and practices wrongfully interfering with new and existing pediatric hem-onc patients seeking care from Plaintiff Hawaii Children's Blood and Cancer Group.

108.    The HPH Defendants and the Doe Defendants have and are presently engaged in various policies and practices wrongfully interfering with Plaintiff Hawaii Children's Blood and Cancer Group's relationships with referring physicians, third party grantors, JABSOM, and third parties seeking to employ Plaintiff Hawaii Children's Blood and Cancer Group's physicians for their skills and experience.

109.    The HPH Defendants have employed these unfair methods of competition to secure and maintain Defendant KMCWC's monopolies in the markets for pediatric hem-onc in-hospital and outpatient services and commodities, and to increase their market share in pediatric hem-onc physician services by eliminating Plaintiffs and thereby obtaining a monopoly.

110.    The HPH Defendants' use of unfair methods of competition has caused actual and potential harm to Plaintiffs in their business and property, and to consumers, constituting injury of a type that the antitrust and unfair competition laws were designed to guard against.

111.    The HPH Defendants' and Doe Defendants' conduct has been substantially injurious to consumers because it has increased the cost of obtaining pediatric hem-onc care in Hawai`i, has destroyed Team Care, and prevents patients from accessing the highest quality of care which was available before Defendants embarked on their course of unlawful conduct.

112.    The HPH Defendants' oppression of Plaintiffs is offensive to established public policy against the flagrant oppression of the weak by the strong and against unnecessarily driving up the cost of high quality health care and unjustifiably restricting access to scarce health care resources.

113.    The HPH Defendants have therefore engaged in unfair methods of competition in the markets for pediatric hem-onc physician services and pediatric care.

114.    The HPH Defendants' conduct violating H.R.S. § 480-2 was a foreseeable consequence of the fraudulent conduct and conspiracy Defendants Deloitte & Touche and Dennis M. Warren, Esq. engaged in targeting Drs. Woodruff and Wilkinson.

115.    <u>As a direct and proximate result of the HPH Defendants' unfair methods of competition, Plaintiffs have suffered injuries to their business and property and lost profits, and incurred special and general damages in amounts to be proven at trial; and Plaintiff Hawaii Children's Blood and Cancer Group has lost economic advantage and opportunity due to the HPH Defendants' interference with existing patients and new patient referrals attempts to access care from Plaintiffs.</u>

116.    Plaintiffs are entitled to have their damages trebled, and receive an award of reasonable attorneys' fees and costs of suit as provided for in H.R.S. § 480-13(a)(1).

## COUNT V
(Monopolization of /Attempt To Monopolize Pediatric and Neonatal Acute In-Hospital and Outpatient Care in Pediatric Hematology/Oncology, Violation of H.R.S. § 480-9)

117.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 116 above as though fully set forth herein.

118.    Defendants HPH and KMCWC acquired monopoly power in the market for providing hospital facilities and services for pediatric and neonatal hematology-oncology

patients in in-hospital and outpatient care, as set forth above.

119.    The HPH Defendants and Doe Defendants and JABSOM agreed to require as a prerequisite for faculty appointment that pediatric hem-onc physicians be employees of Defendant KMS, thereby fixing employment terms impairing the employment market among non-KMS-employed pediatric hem-onc physicians like Dr. Woodruff, materially and substantially impairing them from practicing the profession they spent years in training to pursue. *See Quinonez v. National Asso. of Sec. Dealers, Inc.*, 540 F.2d 824, 828 (5th Cir. 1976) (listing numerous cases holding such agreements violate the antitrust laws).

120.    To enforce no-switching agreements against Dr. Woodruff for practicing as a Hawaii Children's Blood and Cancer Group physician, and to prevent her from practicing her profession in Hawaii, the HPH Defendants

a.    Excluded Dr. Woodruff from the KMCWC on-call schedule for pediatric hem-onc physicians so that the all referrals to the pediatric cancer center coming through the hospital or any other HPH–controlled entities would be referred to the KMS-employed pediatric hematology-oncology physicians.

b.    Excluded Dr. Woodruff from participating in rounds on any patient that the KMS-employed hem-onc physicians assert is their patient.

c.    Required JABSOM's Department of Pediatrics to exclude Dr. Woodruff from faculty;

d.    Caused the termination of Dr. Woodruff's research projects and preventing her from receiving new grants because she was no longer faculty and therefore no longer qualified to receive research funds;

e.    Required the Cancer Research Center of Hawaii to decline to hire Dr.

41

Woodruff on the CRC's paid clinical staff and as regular paid faculty "until Dr. Woodruff

drops her this lawsuit against the HPH Defendants"; and

      f.   Coerced and induced Kaiser Permanente to deny Dr. Woodruff part-

time employment on its clinical staff.

      g.   Attempted to prevent the Hawaii State Department of Health from

hiring Dr. Woodruff for a part-time clinical position.

      121.   The purpose of the HPH Defendants' unlawful imposition of restrictions

in the movement of the physician labor force is to protect its monopoly in the markets for

pediatric and neonatal in-hospital and outpatient care in Hawaii.

      122.   The effect of the HPH Defendants' unlawful imposition of restrictions in

the movement of the physician labor force is the denial of consumer choice in Hawaii, the

reduction of salutatory competition in pediatric hem-onc physician services which has increased

the cost of obtaining pediatric hem-onc care in Hawai`i, the destruction of Team Care which

assured patients of receiving the highest quality care possible for the lowest price, and the

imposition of unlawful restrictions on Dr. Woodruff's free exercise of her rights to engage in

commerce and to practice the profession she was trained for and loves.

      123.   The HPH Defendants' and Doe Defendants' conduct has been

substantially injurious to consumers because it has increased the cost of obtaining pediatric hem-

onc care in Hawai`i, has destroyed Team Care, and prevents patients from accessing the highest

quality of care which was available before Defendants embarked on their course of unlawful

conduct.

      124.   The HPH Defendants' malicious oppression of Dr. Woodruff is offensive

to established public policy against the flagrant oppression of the weak by the strong and against

unnecessarily driving up the cost of high quality health care and unjustifiably restricting access to scarce health care resources.

125.   The HPH Defendants' unlawful interference with Dr. Woodruff's free exercise of the right to practice in Hawai`i was a foreseeable consequence of the fraudulent conduct and conspiracy Defendants Deloitte & Touche and Dennis M. Warren, Esq. engaged in targeting Drs. Woodruff and Wilkinson.

126.   The HPH Defendants' monopolies in pediatric and neonatal hem-onc in-hospital and outpatient care enable it, with the Doe Defendants and the entities named above, to control the movement of physician labor in the relevant market for pediatric hem-onc physician services and interfere with the free exercise of the rights of those engaged in those markets, impairing consumer choice and reducing competition in the market for physician services unjustifiably, and unlawfully hindering Dr. Woodruff in pursuing her medical specialties with the result that Dr. Woodruff has been injured in her business and property, and has suffered lost income from employment and economic and professional opportunities which the HPH Defendants employed their monopolies to effect, as a result of which Dr. Woodruff has sustained general and special damages in amounts to be proven at trial, and entitling her to have her damages trebled, and receive an award of reasonable attorneys' fees and costs of suit as provided for in H.R.S. § 480-13(a)(1).

### COUNT VI
(Monopolization of /Attempt To Monopolize the Practice of Pediatric Hematology/Oncology, Violation of H.R.S. § 480-9)

127.   Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 126 above as though fully set forth herein.

128.   On information and belief, most of the KMS and KMCWC directors and officers also hold directorships in HPH and other HPH-controlled entities.

43

129.    Defendants HPH and KMCWC acquired monopoly power in the market for providing hospital facilities and services for pediatric hematology/oncology patients in in-patient and outpatient care, as set forth above.

130.    The HPH Defendants' monopoly power imposes upon them an additional independent duty to refrain from taking arbitrary actions that tend to increase or preserve that monopoly power.

131.    The cost of duplicating the facilities and services owned and controlled by the HPH Defendants, and providing alternative medical education, is so prohibitive that even large entities refuse to enter into competition with Defendants. The HPH Defendants thus imposed impossibly high costs on Hawaii Children's Blood and Cancer Group to compete with them in the markets for pediatric hem-onc physician services.

132.    Defendants Deloitte &Touche and Warren and Doe Defendants conspired with HPH Defendants to maintain HPH Defendants' monopoly constituting a violation of H.R.S. §§480-4 and 480-9.

133.    Defendants' conduct constitutes monopolization of the market for pediatric hematology/oncology physician services and overt acts undertaken to preserve that monopoly and exclude Plaintiffs from competition, injuring Plaintiffs in their business and property, as a result of which Plaintiffs have sustained special and general damages in amounts to be proven at trial, including past and future lost income, entitling them to have their damages trebled, and receive an award of reasonable attorneys' fees and costs of suit as provided for in H.R.S. § 480-13(a)(1).

134.    Defendants' conduct constitutes an attempt to monopolize the medical specialty of pediatric hematology/oncology and pediatric acute care over which they have a high

44

probability of success due to the HPH Defendants' monopoly in the market for pediatric in-patient care and outpatient services, injuring Plaintiffs in their business and property, as a result of which Plaintiffs have sustained special and general damages in amounts to be proven at trial, including past and future lost income, entitling them to have their damages trebled, and receive an award of reasonable attorneys' fees and costs of suit as provided for in H.R.S. § 480-13(a)(1).

### COUNT VII
(Unlawful Publication of Misleading/Confusing Information, Violation of Chap. 481A)

135.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 134 above as though fully set forth herein.

136.    As set forth above, the HPH Defendants and Doe Defendants published false and misleading information, and described KMS-employed physicians as the "Kapi`olani Blood and Cancer Group physicians" in order to mislead and confuse patients and referring physicians and others involved with directing patients for pediatric hem-onc care.

137.    The HPH Defendants and Doe Defendants interfered with the free flow of information in the market for pediatric hem-onc services in order to further their goal of excluding Plaintiff Hawaii Children's Blood and Cancer Group from competition with the HPH Defendants' physicians in the markets for clinical pediatric hem-onc physician services, medical education, and research, and to monopolize pediatric hem-onc care.

138.    The publication of false and misleading information designed to pass off goods or services as those of another, cause the likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services, or confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another, is unlawful under section 481A-3.

45

139.    The free flow of information is essential to choices by patients, physicians, medical students and residents, the University of Hawaii, grantors, and the third party payors because a lack of adequate information and false and misleading information renders these consumers unable to evaluate the services available from competing pediatric hem-onc physicians. False and misleading information disseminated by Defendants influences all of the foregoing consumers in choosing a pediatric hem-onc physician, and such has the capacity to deceive a substantial segment of such consumers.

140.    As a result of the HPH Defendants publication of false and misleading information designed to pass off the services of the KMS-employed physicians for the Hawaii Children's Blood and Cancer Group physicians, patients, referring physicians, physicians seeking consultations, third party grantors, and others have been misled as to the quality and nature of the services they were seeking or received, and as to the availability of the Hawaii Children's Blood and Cancer Group physicians to provide the services they were seeking or received.

141.    Defendants' conduct constitutes an attempt to monopolize the medical specialty of pediatric hematology/oncology and pediatric acute care over which they have a high probability of success due to the HPH Defendants' monopoly in the market for pediatric in-patient care and outpatient services, as a result of which Plaintiffs have suffered injury to their business and property and sustained special and general damages in amounts to be proven at trial, including past and future lost income, entitling them to have their damages trebled, and receive an award of reasonable attorneys' fees and costs of suit as provided for in H.R.S. § 480-13(a)(1).

46

142.    As a direct and proximate result of the HPH Defendants' and Doe Defendants violations of section 481A-3, Plaintiff Hawaii Children's Blood and Cancer Group has suffered injury to its business and property, and has lost economic advantage and opportunity incurring special and general damages in amounts to be proven at trial, including an award for the reasonable attorneys' fees and costs of suit incurred as provided for in H.R.S. § 480-13(a)(1).

## COUNT VIII
(Violation Of Right Of Due Process)

143.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 142 above as though fully set forth herein.

144.    Hawai`i's Health Care Quality Improvement Act of 1989 and established public policy require professional peer review to be fair, and peer review decisions are subject to judicial review. *Silver v. Castle Memorial Hospital*, 53 Haw. 475, 480 (1972).

145.    Hawai`i's compelling interest in public supervision of actions by Defendant KMCWC on medical staff membership is heightened because the State has no public hospital on Oahu providing care to pediatric hematology and oncology patients.

146.    Pursuant to Hawai`i's clearly stated public policy, the definition of peer review is very broad, comprising any action by a health care entity that adversely affects the circumstances under which a physician is permitted by that entity to provide medical care. H.R.S. §671D-4.

147.    The employment of a physician by a hospital or medical group is encompassed by the statutory definition of clinical privileges, which "includes privileges, membership on the medical staff or panel, and the other circumstances pertaining to the furnishing of medical care under which a physician or other licensed health care practitioner is permitted to furnish such care by a health care entity." *Id.*

47

148.    KMS and KMCWC are both health care entities as that term is defined in Chap. 671D of the Hawaii Revised Statutes. Both entities conduct peer review and are thus subject to the statutory due process requirements in peer review, and Dr. Woodruff's employment contract expressly incorporated a provision for peer review.

149.    The public's overriding interest in quality health care is the same regardless of the particulars of the arrangement between the health care entity and the physician under which the physician is permitted to provide medical care in the health care entity's facilities. The HPH Defendants thus may not diminish or avoid their fiduciary duty simply by structuring their organization so that physicians must be employed by an HPH entity in order to provide medical care under certain medical specialties.

150.    Even if Defendant KMS were determined to be independent of Defendant KMCWC, the statute expressly encompasses medical groups that conduct formal peer review. *Id.*

151.    Peer review decisions must be non-arbitrary because arbitrary action that has no relation to the advancement of medical science or the elevation of professional standards is offensive to the true interests of justice and public policy. *Silver*, 53 Haw. at 480; *and see Falcone v. Middlesex County Medical Soc.*, 170 A.2d 791, 799 (N.J. 1961).

152.    The HPH Defendants also violated the fiduciary duty imposed upon them by the public's overriding interest in quality health care.

153.    Defendants Deloitte & Touche, Dennis M. Warren, Esq., Neal Winn, M.D., Roger Drue, and Frances A. Hallonquist acted in concert with and to further the wrongful acts of the HPH Defendants to deny Dr. Woodruff of her statutory and common law rights to due proces with the knowledge and intention of denying her those rights to further the fraudulent

48

nature and object of their investigation and allegations.

154.    Defendants' acts, as set forth above, wrongfully deprived Dr. Woodruff of her rights to due process, and were arbitrary, capricious, unreasonable, discriminatory and unlawful and deprived Dr. Woodruff of, or interfered with, her rights as protected by the Due Process clause of Article 1, § 5 of the Constitution of the State of Hawai`i, Chap. 671D of the Hawaii Revised Statutes, Dr. Woodruff's contract rights set forth in the KMCWC Bylaws, the Kapi`olani Health Standards of Conduct, and common law.

155.    Pursuant to Chap. 671D, Haw. Rev. Stat., Defendants' acts in depriving Dr. Woodruff of her due process rights were arbitrary as a matter of law, and violated their fiduciary duty as a Hawai`i health care entity, and they are thus not entitled to the limited defenses provided in the statute.

156.    Defendants HPH, KMCWC, and KMS are liable, as health care entities under Chap. 671D, for depriving Dr. Woodruff of her due process rights. Defendants Winn, Drue, Hallonquist, Warren and Deloitte & Touche are liable to Dr. Woodruff for their participation in the conspiracy to deprive her of her common law and statutory due process rights which they knew or should have known could prevent her from ever practicing her profession of pediatric hematology/oncology again.

157.    As a direct, proximate and foreseeable result of Defendants' actions as set forth above, Dr. Woodruff has been hindered and prevented from pursuing her medical specialties, has suffered embarrassment and humiliation and injury to her professional reputation, anguish and anxiety, and sustained special and general damages in amounts to be proven at trial, including past and future lost wages and income.

49

158.    Defendants' actions were wilful, wanton, reckless or done with a conscious indifference to the consequences so as to entitle Dr. Woodruff to an award of punitive damages in amounts to be proven at trial.

### COUNT IX
(Defamation)

159.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 158 above as though fully set forth herein.

160.    Defendant Winn published the Winn Defamatory Statements to one or more of Dr. Woodruff's medical colleagues.

161.    Dr. Winn knew or should have known that the Winn Defamatory Statements were either false when made or made with reckless disregard as to their truth or falsity, and that it was false and/or misleading to imply that such statements were based on a fair and thorough investigation of the facts, constituting defamation *per se*.

162.    Defendant Winn knowingly and intentionally re-published the Winn Defamatory statements, constituting malice.

163.    The Winn Defamatory Statements were not subject to any qualified privilege, and were made in the course of his employment by HPH and KMS.

164.    On November 30, 2001, Dr. Woodruff demanded that Dr. Winn cease publishing the Winn Defamatory Statements.

165.    Defendant Warren published the Warren Defamatory Statements to a number of KMS staff members in an open meeting; and in a report to the Office of Inspector General, DHHS, with the purpose and intent of misleading the OIG about the nature and extent of the HPH Defendants' fraud.

50

166.    Defendant Warren knew or should have known that Warren's Defamatory Statements were either false when made or made with reckless disregard as to their truth or falsity, and that it was false and/or misleading to imply that such statements were based on a fair and thorough investigation of the facts, constituting defamation *per se*.

167.    The Warren Defamatory Statements were not subject to any qualified privilege, and were made in the course of his employment/agency by Defendants.

168.    Defendant Warren knew that the Warren Defamatory Statements would be repeated and republished throughout the hospital and beyond.

169.    On information and belief, Defendant Hammar published the Hammar Defamatory Statements to one or more of Dr. Woodruff's medical colleagues.

170.    Defendant Hammar knew or should have known that the Hammar Defamatory Statements were either false when made or made with reckless disregard as to their truth or falsity, and that it was false and/or misleading to imply that such statements were based on a fair and thorough investigation of the facts, constituting defamation *per se*.

171.    The Hammar Defamatory Statements were not subject to any qualified privilege, and were made in the course of his employment by HPH and KMS.

172.    Defendant Hammar knew or should have known that the Hammar Defamatory Statements would be republished, yet he made the statements with reckless disregard for the consequences.

173.    Deloitte &Touche published defamatory statements and other information in a report that was eventually provided to the Office Of Inspector General, DHHS ("D&T Defamatory Statements"), with knowledge of Defendant Warren's intention to mislead the OIG, and thus were co-conspirators in Defendant Warren's fraud.

174.    Deloitte &Touche knew or should have known that the D&T Defamatory Statements were either false when made or made with reckless disregard as to their truth or falsity, and that it was false and/or misleading to imply that such statements were based on a fair and thorough investigation of the facts, constituting defamation *per se*.

175.    O'Brien, Defendant KMCWC, and the Doe Defendants knew or should have known that O'Brien had no grounds for suspending Dr. Woodruff's privileges.

176.    The Doe Defendants made false allegations against Dr. Woodruff to the medical staff in support of the suspension which the medical staff determined were not credible and did not constitute a violation in any event.

177.    O'Brien's order that resulted in Dr. Woodruff being marched off of the KMCWC campus under guard constituted defamation *per se*. because the order conveyed the impression that Dr. Woodruff was a wrongdoer and that her privileges were properly and lawfully suspended or terminated, which O'Brien knew to be false, and constituted a malicious act committed with wilful, wanton, reckless or a conscious indifference to the consequences to Dr. Woodruff's reputation and her ability to continue practicing her profession.

178.    Defendants' publication of the Defamatory Statements wrongfully and falsely labeled Dr. Woodruff and damaged her professional reputation with her medical colleagues and humiliated her.  The HPH Defendants and the Doe Defendants knew that the Defamatory Statements would receive widespread republication throughout the medical community and the community of pediatric cancer patients' families, and other third parties, with the result that Dr. Woodruff would be damaged in her professional reputation.

179.    Dr. Woodruff has also been required to repeat and republish the information that KMS demanded her resignation or would terminate her in her attempts to obtain malpractice insurance.

180.    The Defamatory Statements are false.  Dr. Woodruff is informed and believes and thereon alleges that the Defamatory Statements have been repeated and republished by HPH Defendants either without privilege or in abuse of any privilege that may exist. Defendants are liable for damages for publishing and republishing the Defamatory Statements.

181.    As a direct, proximate and foreseeable result of Defendants' actions as set forth above, Dr. Woodruff has sustained special and general damages in amounts to be proven at trial, including past and future lost wages and income, and injury to reputation.

182.    Defendants' actions were wilful, wanton, reckless or done with a conscious indifference to the consequences so as to entitle Dr. Woodruff to an award of punitive damages in amounts to be proven at trial.

### COUNT X
(Retaliatory Discharge)

183.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 182 above as though fully set forth herein.

184.    Defendants Winn and Drue terminated Dr. Woodruff's employment with KMS in retaliation for, and the termination was proximately caused by, Dr. Woodruff's expressions of concern about HPH Defendants' failure to bill for the services of the Nurse Practitioner, which was somehow related to compliance issues Defendants had not properly or effectively addressed previously, thereby constituting a violation of 18 USCS § 1513(e).

185.    Defendants Deloitte & Touche and Warren conspired with Defendants Drue and Hallonquist to cover up the compliance issues or shift the blame for the irregularities

from HPH and KMS management to Dr. Woodruff in violation of public policy within the meaning of *Parnar v. American Hotels*, Inc., 65 Haw. 370 (1982).

186.    By reason of the Defendants' acts and omissions as set forth above, Dr. Woodruff has lost opportunities, lost wages and benefits, and experienced pain, suffering, and mental and emotional distress. Dr. Woodruff has been damaged thereby and is entitled to damages in such amounts as shall be shown at trial.

187.    The unlawful conduct and omissions of Defendants Winn and Drue and the HPH Defendants in terminating Dr. Woodruff's employment and the conduct of Defendant Deloitte &Touche and Defendant Warren was willful, wanton, reckless, or made with a conscious indifference to the consequences so as to entitle Dr. Woodruff to an award of punitive damages in an amount to be shown at trial.

## COUNT XI
(Promissory Estoppel)

188.    Dr. Woodruff repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 187 above as though fully set forth herein.

189.    KMS assured Dr. Woodruff that HPH Defendants intended her employment by KMS to be for as long as she wished to continue practicing her specialty and maintained her licensure and privileges in good standing; and that accepting employment with KMS would not adversely affect her ability to practice her medical specialties of hematology and pediatric oncology in Hawai`i, or thwart her enjoyment of the associated economic and professional benefits.

190.    KMS expressly incorporated the KMCWC Medical Staff Bylaws into Dr. Woodruff's employment contract, which modified the contract with promises of due process and fair treatment should KMS undertake any adverse action affecting the circumstances under

54

which she was permitted to provide medical care to KMS patients.

191.    HPH promised Dr. Woodruff in the KH Training Manual and the KH Standards of Conduct that any disciplinary action concerning compliance issues would be undertaken on a fair and equitable basis

192.    HPH Defendants' representations to Dr. Woodruff, as set forth above, were promises that Dr. Woodruff relied upon in accepting their offer of a full-time pediatric hematology/oncology position with KMS.

193.    HPH Defendants intended for Dr. Woodruff to rely on their representations.

194.    Dr. Woodruff did rely upon HPH Defendants' representations in accepting and continuing her employment by KMS.

195.    HPH Defendants' representations therefore ought, in equity, to be enforced.

196.    By reason of their conduct and omissions as set forth above, HPH Defendants materially breached their promises and representations to Dr. Woodruff.

197.    Dr. Woodruff has lost economic opportunities and experienced pain, suffering and mental and emotional distress as a result of detrimentally relying upon HPH Defendants' representations.  Dr. Woodruff has been damaged thereby in amounts to be proven at trial.

## COUNT XII
### (Breach of Contract)

198.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 197 above as though fully set forth herein.

199.    The HPH Defendants breached Dr. Woodruff's permanent contracts of

employment with Defendants KMS and KMCWC.

200.    Defendants have falsely contended that Dr. Woodruff's employment contract was an "at-will contract" that permitted them to terminate her employment at any time for any reasons. Dr. Woodruff's employment contract was excepted from the at-will doctrine for the following reasons:

a.    Defendants expressly incorporated Dr. Woodruff's due process rights under the KMCWC Medical Staff Bylaws into her employment contract and promised in the KH Standards of Conduct that any discipline related to compliance issues would be undertaken on a fair and equitable basis.

b.    Dr. Woodruff's employment contract was also subject to statutory protections provided by the due process requirements in Chap. 671D because adverse actions affecting her employment with KMS affect the circumstances under which she is permitted to provide medical care to KMS patients and in KMCWC.

c.    The doctrine of additional consideration recognized by the court in *Kinoshita* applies in Dr. Woodruff's case because she transferred her practice to HPH and KMS as additional consideration when she accepted her employment contract, as additional consideration for permanent employment. *See id.*

d.    The public policy exception recognized by our court in *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 380 (1982) also applies in Dr. Woodruff's case because excluding her from competition deprives the public of access to her skills and expertise; and because depriving Dr. Woodruff of her due process rights in terminating the circumstances under which she is permitted to provide medical care violates a clear mandate of public policy.

56

201.   HPH Defendants promised Dr. Woodruff raises and promotions as an employee of KMS, and that she would not be terminated from her employment with KMS or KMCWC except if she did not maintain her licensure and privileges in good standing, which promises constitute a contract of employment in law.

202.   HPH Defendants expressly incorporated the KMCWC Bylaws into Dr. Woodruff's employment contract with KMS, and issued the KH Standards of Conduct, thereby creating an environment of established policies, to be fairly and consistently applied and establishing procedures relating to discipline, creating an environment of job security and fair treatment – "instinct with an obligation."

203.   KMS thereby became bound by the terms of the KMCWC Bylaws, which required that KMS provide Dr. Woodruff with notice and a hearing prior to deciding upon any course of action that might adversely affect the circumstances under which she was providing medical care to pediatric hematology and oncology patients for KMS and/or in the KMCWC.

204.   Defendant Winn materially breached Dr. Woodruff's contracts of employment when he demanded that she resign her position or be terminated before she had been provided any semblance of due process in the issues he raised.  In January 2002, Dr. Woodruff was fulfilling the requirements of her employment contract with KMCWC and her employment contract with KMS.

205.   When Defendants Winn and Drue, and KMS terminated Dr. Woodruff's contract of employment with KMS on January 8, 2002, they unjustifiably breached that contract and violated 18 USCS § 1513(e) which prohibits interference with the lawful employment or livelihood of any person for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense.

57

206.    When Defendant Drue and KMCWC terminated Dr. Woodruff's contract of employment with KMCWC on approximately January 13, 2002, they unjustifiably breached that contract and violated 18 USCS § 1513(e).

207.    The HPH Defendants also materially breached the KMCWC Bylaws when they deprived Dr. Woodruff of pre-deprivation notice and a hearing.

208.    By reason of the wrongful and unlawful conduct as set forth herein, Dr. Woodruff has suffered damages in amounts to be proven at trial, including a reasonable amount for attorneys' fees and costs

## COUNT XIII
### (Breach of Implied Covenant of Good Faith and Fair Dealing in the KMCWC Bylaws)

209.    Plaintiffs' repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 208 above as though fully set forth herein.

210.    An implied covenant of good faith and fair dealing exists in the KMCWC Bylaws that is imposed upon all parties in the performance of their obligations thereunder. Such a duty exists for the HPH Defendants in their obligations to perform their obligations under the KMCWC Bylaws.

211.    HPH Defendants' wrongful conduct described above constitutes a breach of the duty of good faith and fair dealing owed to Dr. Woodruff under the KMCWC Bylaws.

212.    By reason of HPH Defendants' conduct as set forth herein, Dr. Woodruff has suffered damages in amounts to be proven at trial.

## COUNT XIV
### (Tortious Interference with Economic Advantage)

213.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 211 above as though fully set forth herein.

214.    HPH Defendants knew that they would obtain a monopoly on the practice

58

of pediatric hematology/oncology by persuading Drs. Wilkinson and Woodruff to accept employment with KMS; and that Dr. Woodruff would be prevented from continuing to practice her medical specialties in Hawai`i, or would only be able to enter private practice again at great economic cost, if KMS thereafter terminated her employment at any time, unless KMS restored her prior practice and referral system to her upon termination.

215.    HPH Defendants made no provisions for restoring Dr. Woodruff's private practice and referral system to her or compensating her for her potential economic losses when they deprived her of any semblance of due process in connection with Dr. Winn terminating her employment with KMS.

216.    As a matter of law, HPH Defendants were not privileged to terminate Dr. Woodruff's employment with KMS without paying adequate compensation and/or restoring her to the position she was in before she accepted KMS' offer of employment, because Defendants deprived Dr. Woodruff of due process in determining whether she committed acts of professional misconduct sufficient to justify her termination and the loss of her fundamental right to practice her medical specialties in Hawai`i and to enjoy the associated economic and professional benefits.

217.    Defendants' deprivation of Dr. Woodruff's rights to due process was wrongful.

218.    As a result of the Defendants' intentional interference with Dr. Woodruff's right to practice her medical specialties, Dr. Woodruff has been damaged in the amount to be proven at trial.

219.    Defendants' conduct was willful, wanton, reckless or done with a conscious indifference to the consequences so as to entitle Dr. Woodruff to an award of punitive

59

damages against Defendants in amounts which shall be proven at trial.

## COUNT XV
### (Prima Facie Tort)

220.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 218 above as though fully set forth herein.

221.    Defendants' wrongful conduct described above was unwarranted and unjustified under the circumstances, and intentionally caused Dr. Woodruff harm, or was undertaken intentionally without regard to the harm Dr. Woodruff might suffer as a result.

222.    By reason of Defendants' wrongful conduct, Dr. Woodruff has suffered damages in amounts to be proven at trial.

223.    The Defendants' conduct was willful, wanton, reckless or done with a conscious indifference to the consequences so as to entitle Dr. Woodruff to an award of punitive damages against Defendants in amounts to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants and in favor of Plaintiffs as follows:

A.    For injunctive relief, as set forth in Count I above;

B.    That this Court adjudge and decree that Defendants and co-conspirators have entered into unlawful contracts, combinations, or conspiracies which unreasonably restrain trade in interstate commerce, in violation of H.R.S. §§ 480-4(a) and 480-6.

C.    That this Court adjudge and decree that Defendants have unlawfully acquired or attempted to acquire and maintain a monopoly in the market for pediatric hem-onc physician services, constituting violations of H.R.S. §480-4(a)

60

D.      For special and general damages in an amount to be proven at trial for lost opportunities, lost income, and damage to reputation;

E.      For treble damages pursuant to Haw. Rev. Stat. §480-13;

F.      For punitive damages in an amount to be shown at trial;

G.      For their attorneys' fees and costs of suit pursuant to Haw. Rev. Stat. §§480-13, 481A-4, and 607-14; and

H.      For any and all other relief that this Court may deem is just and proper.

Dated:  Honolulu, Hawai`i, February 15, 2005

Respectfully submitted,

_____
ARLEEN D. JOUXSON
RAFAEL G. DEL CASTILLO

Attorneys for Plaintiff
Kelley Woodruff, M.D. and
Hawaii Children's Blood and Cancer Group

61

ARLEEN D. JOUXSON-MEYERS          7223-0
RAFAEL G. DEL CASTILLO            6909-0
JOUXSON-MEYERS-MEYERS & DEL CASTILLO
Jouxson-Meyers & del Castillo
A Limited Liability Law Company
302 California Ave., Suite 209
Wahiawa, Hawai`i 96786
Telephone: (808)621-8806; Fax: (808)422-8772

Attorneys for Plaintiffs
Kelley Woodruff, M.D. and
Hawaii Children's Blood and Cancer Group

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| KELLEY WOODRUFF, M.D. and HAWAII CHILDREN'S BLOOD AND CANCER GROUP, <br><br> Plaintiffs, <br><br> vs. <br><br> HAWAI`I PACIFIC HEALTH; KAPI`OLANI MEDICAL SPECIALISTS; KAPI`OLANI MEDICAL CENTER FOR WOMEN AND CHILDREN; ROGER DRUE; FRANCES A. HALLONQUIST; NEAL WINN, M.D.; SHERREL HAMMAR, M.D.; DELOITTE & TOUCHE LLP; DENNIS M. WARREN, ESQ.; JOHN DOES 1-99; JANE DOES 1-99; DOE ENTITIES 1-20; AND DOE GOVERNMENTAL UNITS 1-10, <br><br> Defendants. | Civil No. 02-1-0090-01 (BIA) <br> (Other Civil Action) <br><br> DEMAND FOR JURY TRIAL |

DEMAND FOR JURY TRIAL

Plaintiffs Kelley Woodruff, M.D. and Hawaii Children's Blood and

Cancer Group, by and through their attorneys, Jouxson-Meyers & del Castillo, hereby

demand a trial by jury on all issues so triable in the above-entitled action.

DATED:  Honolulu, Hawai`i, February 15, 2005

_____
ARLEEN D. JOUXSON
RAFAEL G. DEL CASTILLO
Attorneys for Plaintiff
Kelley Woodruff, M.D. and
Hawaii Children's Blood and Cancer Group

| STATE OF HAWAI'I<br>CIRCUIT COURT OF THE<br>FIRST CIRCUIT | SUMMONS<br>TO ANSWER SECOND AMENDED<br>CIVIL COMPLAINT | CASE NUMBER<br><br>02-1-0090-01 (BIA) |
|---|---|---|

| PLAINTIFF                                    vs. | DEFENDANT |
|---|---|
| KELLEY WOODRUFF, M.D. and HAWAII CHILDREN'S BLOOD AND CANCER GROUP | Hawai`i Pacific Health; Kapi`olani Medical Specialists; Kapi`olani Medical Center for Women and Children; Roger Drue; Frances A. Hallonquist; Neil Winn, M.D.; Sherrel Hammar, M.D.; Deloitte & Touche LLP; Dennis M. Warren, Esq.; John Does 1-99; Jane Does 1-99; DOE Entities 1-20; and DOE Governmental Units 1-10 |

PLAINTIFF'S ADDRESS (NAME, ADDRESS, TEL. NO.)

Kelley Woodruff, M.D.
HAWAII CHILDREN'S BLOOD AND CANCER GROUP
c/o JOUXSON-MEYERS & DEL CASTILLO
302 California Ave.
Suite 209
Wahiawai, Hawai`i 96786

    You are hereby summoned and required to serve upon Plaintiffs' attorney, whose address is stated above, an answer to the Second Amended Complaint, which is attached. This action must be taken within 20 days after service of this Summons upon you, exclusive of the day of service.

    If you fail to make your answer within the twenty day time limit, judgment by default will be taken against you for the relief demanded in the Second Amended Complaint.

    **This summons shall not be personally delivered between 10:00 p.m. and 6:00 a.m. on premises not open to the general public, unless a judge of the above-entitled court permits, in writing on this summons, personal delivery during those hours.**

    **A failure to obey this summons may result in an entry of default and default judgment against the disobeying person or party.**

| DATE ISSUED<br>FEB 1 7 2005 | CLERK<br><br>N. ANAYA | FIRST CIRCUIT COURT<br>SEAL<br>CIRCUIT COURT CLERK |
|---|---|---|
| **I do hereby certify that this is a full, true, and correct copy of the original on file in this office.** | | |

1C-P-306