*Dennis M. Warren, KH's Outside Counsel for purposes of this Disclosure.* Mr. Warren has been responsible for coordinating the Disclosure effort. Mr. Warren can be reached as follows:

    Dennis M. Warren, Esq.
    Law Offices of Dennis M. Warren
    725 30th Street, Suite 102
    Sacramento, CA 95816
    (916) 447-9999

### Identification of Potential Problem

Beginning in the summer of 1998, KH's CBO assumed responsibility from KMS for billing for KMS' physician services. KH's Vice-President of Revenue Management, Rick Robel, who at the time was also designated as KH's Compliance Officer, headed up, and continues to head, this on-going effort.

At that time, a compliance project integration effort was developed and implemented. This was approximately one year *prior to* KH's entering into its August 1999 CIA. The project's overall purposes were, and are, to assess the level of documentation and billing compliance of KMS physicians by hospital department, provide education, training, audit, and policy and procedure support to upgrade these key compliance functions, and to create a more efficient and uniform billing and fiscal tracking system for physician services.

As part of this ongoing physician documentation and billing related compliance effort, a decision was made in May 2001 for Deloitte & Touche ("Deloitte") to perform an audit of patient files of the KMCWC HemOnc Department. Deloitte acts as KH's Independent Review Organization ("IRO") under its Corporate Integrity Agreement. KH also regularly uses the staff from Deloitte's Chicago office to conduct audits, trainings, and provide other compliance related support.

A full sample of all claims for patients participating in government-funded health care programs for the time period from February 1997 through August 31, 1999, was initiated. This consisted of services rendered to sixty-two (62) different patients. The audit was performed on-site in Hawaii. The audit's purpose was to determine if claims were submitted prior to the CBO taking over HemOnc billing responsibility on September 1, 1999 for the four (4) invasive Procedures in question that had, or may have been, performed, all or in part, by a nurse practitioner, rather than by a physician. This analysis had not been previously performed.

The audit produced a number of conclusions. Two are particularly important for purposes of this Disclosure. First, patient chart documentation during this time period was maintained in such a

A20517

Kapi'olani Health, KMCWC Hematology/Oncology Department
Voluntary Disclosure Submission
Page 5 of 24

---

manner as to make it difficult, if not impossible, in most instances, to determine who performed a procedure. This was, in large part, due to the form being used for chart notes at the time. Second, in a small number of instances, chart documentation had been made by the Nurse Practitioner and appeared to support the conclusion that the procedure had been performed by the nurse practitioner, rather than a physician. (See Exhibit 3, KMCWC HemOnc Department Audit, Summary of Findings, February 1997 to September 1, 1999.)

Concurrent with the Deloitte audit, the CBO staff was in the process of developing a standardized HemOnc charting template for use with a new electronic medical records system known as Karelink and/or Clinicomp. During the course of a meeting with one of the newer HemOnc physicians, Darryl Glaser, Glaser commented that the nurse practitioner was doing the majority of the Procedures performed in the HemOnc Department.

Glaser's comment pointed to the possibility that HemOnc physicians were submitting claim requests to KH's CBO for billing to third party payors for Procedures performed by the HemOnc nurse practitioner, rather than a physician. In light of the March 10th billing policy, a decision was made to conduct an investigative inquiry into this issue, including interviews of HemOnc and CBO staff; an audit of select patient charts for services rendered after the issuance of the March 10, 1999 billing policy; and a review of relevant records. No current authority would allow the invasive Procedures to be billed to third party payors if performed by a nurse practitioner in the HemOnc Department hospital setting.

### Investigative Efforts

KH's investigative efforts are described briefly below:

1. **Interviews.** The following individuals were interviewed, in some cases, on multiple occasions:

    A. KMCWC Employees:

    (1) Susan Young, Former Director of Pediatrics and Transport

    (2) Dianne Fochtman, Pediatric Oncology Nurse

    (3) Carol Kotsubo, Pediatric Oncology Clinical Nurse Specialist

    (4) Mary Gaughran, HemOnc Charge Nurse

    (5) Millie Inchinose, Pediatric OR Charge Nurse

    (See Exhibit 4 for individual interview summaries for each of these persons.)

A20518

Kapi'olani Health, KMC Hematology/Oncology Department
Voluntary Disclosure Submission
Page 6 of 24

---

    B.    KMS Employees:

        (1)    Desiree Medeiros, M.D.

        (2)    Kelley Woodruff, M.D.

        (3)    Darryl Glaser, M.D.

        (4)    Randy Wada, M.D.

        (5)    Wade Kyono, M.D.

        (6)    Robert Wilkinson, M.D.

(See Exhibit 5 for individual interview summaries for each of these persons.)

    C.    KH CBO Employees:

        (1)    Kathleen Correia, CBO Manager

(See Exhibit 6 for interview summary for this individual.)

    D.    KH Employees:

        (1)    Amy Schearer, Clinical Information System Analyst

        (2)    Tracy Methered, Clinical Information System Analyst

(See Exhibit 7 for interview summary for these persons.)

    E.    Non-Employee Physicians:

        (1)    Stephen S. Sameshima, M.D.

        (2)    Brian Tabata, M.D.

(See Exhibit 16 for interview summaries for each of these persons.)

2.    **Chart Audits.** Two audits were performed by Deloitte. The first audit examined all billing to government programs for the four Procedures for the time period from February 1997 to August 31, 1998. (See Exhibit 3.) The second involved forty-eight (48) services for the time period from January 21, 2000, through May 3, 2001, as described in detail below. (See Exhibit 9, Procedures Performed by Nurse Fochtman Based on Fochtman Procedure Logs, Summary of Findings, January 4, 2000 to May 25, 2001; and Exhibit 10,



A20519

KMCWC HemOnc Department Audit, Analysis of Select Patient Files and Billing Data, Summary of Findings, January 4, 2000 to May 25, 2001.)

3.  **Document Review.** A review of relevant financial, compliance, policy and procedure, and other relevant records was undertaken as part of the review, as described in greater detail below.

### Investigative Findings

The results of KH's investigative inquiry follow in three segments: *Summary*, *Factual Setting*, and *Discussion*. These segments are based, in large part, on interviews with witnesses which are referenced by appropriate footnote.

*Summary.* Based upon witness interviews and the documentation evaluated to date, KH believes that the following conclusions appear warranted:

1)  It is clear that there was no "misunderstanding" regarding the March 10, 1999 KH billing policy that four *invasive* Procedures—each involving the insertion of a needle into a patient—must be performed by a physician in order to be billed. Wilkinson, the HemOnc Department Director, has repeatedly reaffirmed that he clearly understood this policy and the fact that this was a *billing* policy.

2)  Because of his disagreement with this policy, Wilkinson encouraged the physicians in his Department to develop their own "interpretation" of the policy that would allow the submission of claims when a nurse practitioner performed the *invasive* aspect of the procedure in violation of the March 10 policy.[1] This action by the HemOnc Division Director contributed to HemOnc physicians, particularly Kelley Woodruff, submitting invalid claims to KH's Central Billing Office for payment by third party payors. Wilkinson's actions were not the result of a well-reasoned professional position based on a reasonable interpretation of existing authority or by analogy to other billing practices.

3)  Wilkinson made no attempt to have his personal interpretation of the policy, or that of the other HemOnc physicians, approved by KH. Instead, these unauthorized "interpretations" were not disclosed and remained largely hidden from KH's Central Billing Office until this investigation. As a result, KH was unable, in many instances, to detect, and protect itself from, the submission of invalid claim requests submitted by HemOnc physicians.

4)  Dr. Medeiros, although negligent in not attempting to verify the legitimacy of her interpretation of the new policy, made a good faith effort to define the policy in a

---
[1] Summary of Interview of Dr. Wilkinson, Hematology/Oncology Division Director

A20520

Kapi'olani Health, KMC - Hematology/Oncology Department
Voluntary Disclosure Submission
Page 8 of 24

---

reasonable manner.[2] Medeiros adopted PATH-like guidelines, applicable to residents, in determining whether to submit requests for billings, as described below.

5) Dr. Woodruff appears to have adopted an interpretation of the new policy apparently designed to avoid compliance with it and made no effort to verify the legitimacy of her interpretation. For example, Woodruff states that she would be allowed to bill for an *invasive* procedure performed by a nurse practitioner if she (Woodruff) was present during the invasive procedure; did **not** participate in the invasive procedure itself; and merely labeled the resulting specimen or checked medication.[3] Under these circumstances, she would then make a chart entry saying that she "participated in" the invasive procedure.[4] Woodruff bills approximately 2/3 of all the invasive Procedures in question in the HemOnc Department.

   a. Although witnesses report that the nurse practitioner performed "85-95%" of all the invasive Procedures in question,[5] it has been difficult to identify patient-specific case illustrations which establish that Woodruff did not participate in the invasive procedure, yet documented her participation and submitted a bill.

   b. Procedure logs have been obtained, however, that were maintained by the nurse practitioner between January 4, 2000 and May 25, 2001. Based upon the nurse practitioner's explanation of the entries on these logs, the logs tend to establish that the nurse practitioner performed 101 invasive Procedures exclusively by herself, *without* the assistance of a physician, which were billed under a HemOnc physician's provider number, as described above. Of these 101 Procedures, 85 were billed under Woodruff's name.

   c. Additionally, based on an explanation provided by the nurse practitioner of the charting and co-signing procedures used by she and the HemOnc physicians,[6] it appears that 29 claims were submitted by Woodruff during years 2000 and 2001 where the invasive Procedures were performed by the nurse practitioner; charted by Dr. Woodruff as if she participated in the invasive procedure; and submitted by Woodruff to the CBO for billing. All of these were, fortunately, caught by the CBO and not billed.

1) The available documentation and interviews of witnesses relating to the patient "CN" case appear to overwhelmingly establish that Woodruff was not present during; did not

---

[2] Dr. Desiree Medeiros Interview Summary
[3] Dr. Woodruff – Interview Summary
[4] Summary of Interview of Dianne Fochtman, NP
[5] Summary of Interview of Carol Kotsubo, Pediatric Oncology Clinical Nurse Specialist; Dr. Wilkinson; and Dr. Glaser
[6] Summary of Interview of Dianne Fochtman, NP

A20521

supervise; and did not participate in the invasive procedure performed by the HemOnc nurse practitioner in the KMCWC OR on April 23, 2001. Despite this, Woodruff-dictated chart entries do not disclose the performance of the procedure by the nurse practitioner. The chart entries, as dictated and in keeping with Woodruff's pattern and practice in dictation, would lead any reviewer to conclude that Woodruff had personally performed the procedure. Woodruff subsequently submitted her dictation and a request for billing to KH's CBO for this procedure.

2) Dr. Wilkinson did not submit claims for nurse practitioner performed invasive Procedures, since he performs these invasive Procedures himself.[7]

3) Dr. Glaser was employed by KMS approximately one and one half years after the March 10, 1999 billing policy was announced. He followed PATH supervision guidelines in determining how to bill invasive Procedures performed by the nurse practitioner until recently, when he learned that this is improper.[8] Dr. Glaser was negligent in this conduct because of his failure to follow-up on initial inquiries he made regarding the standard he should be using to bill nurse practitioner services.

*Factual Setting.* The four *invasive* Procedures at issue are:

| | |
|---|---|
| 94650 | Chemotherapy into CNS |
| 85095 | Bone Marrow Aspiration |
| 85102 | Bone Marrow Biopsy |
| 62270 | Lumbar Puncture, Diagnostic |

The time window under examination is from February 1997 through July 31, 2001. February 1997 is the start date when KMS began doing its own billings for HemOnc services. KH's CBO took over these responsibilities from KMS effective August 31, 1999. The total amount paid for the four invasive Procedures during this time period is $64,859.14. (See Exhibit 2.)

The March 10, 1999, CBO billing policy clarifying that a physician must perform the four Procedures in order to be billed was designed to clarify what appeared to be confusion on this point prior to KH's CBO take-over of KMS billing responsibilities. Prior to the CBO's first meeting with the HemOnc Department physicians in early 1999, about 25 charge slips prepared by the HemOnc physicians were delivered to the CBO. These charge slips appeared to be for Procedures performed by the HemOnc nurse practitioner. There was no indication on the charge slips or documentation that the physician was involved, in any way, in the Procedure. The only signature on the notes was that of the nurse practitioner. This led the CBO to question the physicians' understanding regarding this billing issue and the development of the March 10 billing policy, discussed in detail below. No current authority would allow these invasive

---

[7] Dr. Wilkinson – Interview Summary
[8] Dr. Glaser Interview Summary

Kapiʻolani Health, KMC   Hematology/Oncology Department
Voluntary Disclosure Submission
Page 10 of 24

---

Procedures to be billed to third party payors if performed by a nurse practitioner in the HemOnc Department hospital setting.

Although this Disclosure document refers to nurse Dianne Fochtman as the HemOnc "nurse practitioner," the current investigation discovered that she failed to complete one or more requirements necessary to be licensed in Hawaii in that license category. A nurse practitioner is, under Hawaii law, a specialty category of an "advanced practice registered nurse." As a result, Fochtman was acting, during all or part of the time period covered by this Disclosure, as a nurse practitioner when, in fact, she was licensed *only* as a registered nurse.

In light of this discovery, KH has carefully reviewed the issues of quality of care and patient health relating to Fochtman's conduct and has concluded that no issue is present regarding these issues.

***Discussion.*** Based upon witness interviews and documentation evaluated to date, KH believes the following conclusions appear warranted:

1. **Meeting Announcing Official KH Billing and Documentation Policy Regarding Nurse Practitioner Performed Services.** A meeting was convened on March 10, 1999, to discuss a new billing and documentation policy relating to nurse practitioner invasive Procedures.

    A. Those in attendance included:

    (1) Witnesses place Drs. Wilkinson, Medeiros, Woodruff, and Wada, and nurse practitioner Dianne Fochtman at the meeting.[9] Glaser was not yet employed by KMS. Wilkinson and Medeiros confirm their attendance.[10] Woodruff can't remember.[11] The nurse practitioner states that she never has been at any meeting where billing for nurse practitioner invasive Procedures was discussed.[12] The nurse practitioner also states that she knows many times the physicians had been discussing billing and her involvement in invasive Procedures but was told not to attend by Dr. Wilkinson.[13]

---

[9] Kathleen Correia – Interview Summary
[10] Summary of Interview of Dr. Wilkinson, Hematology/Oncology Division Director
[11] Summary of Interview of Dr. Woodruff, Dr. Woodruff – Interview Summary
[12] Summary of Interview of Dianne Fochtman, NP
[13] Dianne Fochtman Interview Summary

A20523

    (2)    Rick Robel, Vice President of Revenue Management, Kathleen Correia, CBO Manager, Carol Kotsubo, Pediatric Oncology Clinical Nurse Specialist, Jeri Leong, Outside Coding Consultant.[14]

B.    The physicians were told in writing and orally that chart notes must contain evidence that the physician, not the nurse practitioner, personally performed the four invasive Procedure/s in question in order for claims to be generated.[15] (See Exhibit H, Proposed Agenda, March 10, 1999, KMCWC HemOnc Department Meeting.)

C.    —The physicians were told in writing and orally that coders have been and would not bill if charts reflect that invasive Procedure/s were performed by the nurse practitioner. Instead, services would be noted in the system with a Nurse Practitioner Modifier for tracking purposes only. (See Exhibit N.)

2. **Clarity of Understanding of Physician of New Billing and Documentation Policy.** The physicians conferred after Robel and other KH related personnel left the March 10th meeting.

A.    The physicians were upset because the new policy would require them to change their pre-existing billing patterns for services rendered by the nurse practitioner. Medeiros, for example, states, "before the meeting, I thought if I was in the vicinity I could bill."[16]

B.    Wilkinson states that Robel was "very clear in stating that the MD must perform the Procedure or they couldn't bill. Rick's position was that MDs must have been inserting the needle to perform the invasive Procedure."[17] Wilkinson states that "all the MDs knew what Rick [Robel] said."[18]

C.    Medeiros states that she couldn't understand exactly what Rick said but understood that the physician had to either do the invasive Procedure or some part of it to bill.

D.    Woodruff states she does not remember the March 10 meeting specifically because "there were so many clarifications that it is hard to remember who

---

[14] Kathleen Correia – Interview Summary
[15] Id.
[16] Dr. Desiree Medeiros – Interview Summary
[17] Dr. Wilkinson – Interview Summary
[18] Id.