instructed whom about what."[19] A detailed description of her subsequent understandings regarding billings follows below.

E. Subsequent Friday division meetings of the HemOnc staff revisited the meaning of the policy. These were attended by various physicians, Kathleen Correia, CBO Manager, Jeri Leong, Outside Coding Consultant, Carol Kotsubo, Pediatric Oncology Clinical Nurse Specialist, and Susan Young, Former Director of Pediatrics and Transport.

(1) For example, the Proposed Agenda for the July 9, 1999, meeting contains the following entry under item number 3 "Coding Review (refer to samples):"

Cannot bill for Lumbar Puncture and Bone Marrow Aspiration if procedure is performed by nurse practitioner.

**One Dr did a good job in documenting that "this was done by me; bill it!"**

(See Exhibit 12, Proposed Agenda, July 9, 1999, KMCWC HemOnc Department Meeting.)

(2) Susan Young, Former Director of Pediatrics and Transport, states that the physicians wanted "clarification" on the issue, but she believes that the issue of billing for invasive Procedures performed by the nurse practitioner was "crystal clear." It appeared to her that the physicians understood but didn't want it to be that way. The physicians expressed the opinion that they were legally liable for the invasive Procedures, and therefore, should be able to bill, even if they didn't participate.[20]

(3) Carol Kotsubo, Pediatric Oncology Clinical Nurse Specialist, states that at one meeting, Dr. Friedman, then President of KMS, seemed to back off the CBO policy and seemed to indicate that the physicians wouldn't have to perform the invasive Procedure in order to bill. She feels that this created some confusion.[21] No one else has made reference to any comments by Friedman. Friedman no longer works for KMS and/or KH.

Friedman had been, however, very clear in an August 27, 1999 letter to all KMS physicians about their billing-related responsibilities, as follows:

---

[19] Summary of Interview of Dr. Woodruff
[20] Susan Young – Interview Summary
[21] Carol Kotsubo – Interview Summary

A20525

Kapi'olani Health, KMC    Hematology/Oncology Department
Voluntary Disclosure Submission
Page 13 of 24

---

Since the clinician is ultimately responsible for the accuracy of all bills submitted under their name, it is imperative that each of you becomes a knowledgeable participant in this process. This is not a pleasant task as most of you are interested in providing quality care and not in learning arcane rules and regulations. Unfortunately, if you do not become knowledgeable about these rules and regulations there is a grave danger that your ability to practice quality medicine will be compromised.

I urge each of you to attend the meetings held with the CBO concerning billing. I urge each of you to learn and understand the billing and documentation standards in your area. I urge each of you to strive to submit your bills in a timely manner. I urge each of you to assist KMS CBO in making sure your are fairly compensated for your services. Most importantly, I urge you to assist us in making sure we remain in compliance with all state and federal billing regulations.

The CBO is here to serve the KMS membership. If you disagree with the way billings are being handled or submitted it is imperative that you let us know about your concerns. In the end you have the final say and the final responsibility for anything submitted under your name. Please let me know if you ever have a concern about the accuracy or legality of any submitted by our organization. We will never submit a bill if you question its accuracy.

(See Exhibit 13, Letter to all KMS Physicians from KMS President Richard Friedman, dated August 27, 1999.)

3.  **Instructions By Division Director To Interpret Billing Policy.** Thereafter, Division Director Wilkinson encouraged the physicians in his Department to develop their own "interpretation" of the new billing policy that would allow the submission of claims when a nurse practitioner performed the *invasive* aspect of the Procedure in violation of the March 10 policy.

    A.  Wilkinson states that Robel was "very clear in stating that the MD must perform the invasive Procedure or they couldn't bill. Rick's position was that MDs must have been inserting the needle to perform the procedure. I didn't like that. There was no reason to have 2 performers in the room."[22]

        (1) Wilkinson also states that he later made attempts at meetings to change Robel's position but "he was very clear. I felt we had not resolved the

---

[22] Dr. Wilkinson – Interview Summary

A20526

Kapi'olani Health, KMC Hematology/Oncology Department
Voluntary Disclosure Submission
Page 14 of 24

---

issue. I wanted him to change the rules/law. We have exposure and should be able to bill. Rick just wanted to be squeaky clean."[23]

B. Wilkinson states that his position was that the "MD had to be present or assisting. I urged the MDs that they must participate in order to bill." He told the other physicians that participation in an invasive Procedure would include "throwing on a glove and touch the patient or the needle."[24]

(1) In this regard, it's noteworthy that Carol Kotsubo recalls Dr. Woodruff stating at one of the Friday division meetings that she (Woodruff) could just run in and touch the patient to bill for an invasive procedure performed by the nurse practitioner.[25] Woodruff does not recall making this comment.

(2) Wilkinson states that "he may have said" to the physicians "that if they could justify in their own mind that they participated somehow in the Procedure, they should be able to bill."[26]

(3) He also recalls telling the physicians that they must "justify billings. You must write the note, must write something to justify billing."[27]

(4) Wilkinson states that "all the MDs knew what Rick [Robel] said. They knew my position. No one came to me to say what they were doing. We had an open dialogue on the issue. I was annoyed. It is easy for a bureaucrat to come in here and tell us what to do, but there is subtle pressure to produce more."[28]

C. Once it was clear that the policy would not change, Wilkinson made no effort to retract his prior billing suggestions to the MDs or to implement the official KH billing policy in his Department. Instead, the unauthorized "interpretations" were not disclosed and remained hidden from KH's CBO until this investigation. *As a result, KH's CBO was, in many instances, unable to detect, and protect itself from, the submission of invalid claims submitted by HemOnc physicians.*

4. **Physicians Thereafter Adopt Their Own Individual Interpretations of the New Policy.** After the March 10, 1999, meeting, the physicians did not follow the new billing policy. Medeiros states that the physicians, at subsequent meetings, did not arrive at a

---

[23] Id.
[24] Summary of Interview of Dr. Wilkinson, Hematology/Oncology Division Director
[25] Summary of Interview of Carol Kotsubo, Pediatric Oncology Clinical Nurse Specialist
[26] Dr. Wilkinson – Interview Summary
[27] Id.
[28] Id.

Kapi'olani Health, KMCW Hematology/Oncology Department
Voluntary Disclosure Submission
Page 15 of 24

---

consensus on billing, but agreed to better document in order to be able to bill."[29] Each physician adopted their own individual interpretation of what a physician must do in order to bill for the four invasive Procedures. None of the physicians attempted to clear or obtain authorization for their interpretation of the policy. The manner in which the physicians then documented the invasive Procedures did not allow coders, as a general rule, to understand what role the physician or nurse practitioner had played in the invasive Procedure.

A. *Wilkinson.* Although Wilkinson provided guidance to all the other physicians on this issue, he performed all of his own invasive Procedures and did not submit claims for services rendered all or in part by the nurse practitioner.

B. *Medeiros.* Medeiros states that her understanding was that the physician had to either do the invasive Procedure or some part of it to bill. Later she returned to a less strict interpretation because "others" in the Department were billing more liberally than her. She changed her billing pattern consistent with this after the March 10 meeting as follows:

    (1) Bills if she inserts the needle into the patient and does the invasive Procedure;

    (2) Bills if she has an "active role" in the invasive Procedure that would including collecting and labeling the specimen;

    (3) Bills if she is in the room and supervising for the *whole* invasive Procedure but does not bill if she comes into the room after the Procedure has begun;

    (4) Does not bill if she is not present.[30]

C. *Woodruff.* Woodruff states she understood the policy to be that "the physician must perform key elements/key portions or perform it herself in order to bill."[31] She can't recall who provided her this information or the basis for it. Additionally, she:

    (1) Recalls the issue was discussed "continuously" at division meetings in an effort to interpret what was the key element. She states that Robel did not

---

[29] Summary of Interview of Dr. Desiree Medeiros
[30] Id.
[31] Dr. Woodruff – Interview Summary

A20528

Kapiʻolani Health, KMC / Hematology/Oncology Department
Voluntary Disclosure Submission
Page 16 of 24

---

        define what key elements are and asks "is he [Robel] to judge what key elements are?"[12]

(2)    States that she was told that she could bill invasive Procedures done by the nurse practitioner if she directly supervised the nurse practitioner and she did not bill if she did not directly supervise the nurse practitioner. She was then told that she had to "participate in a meaningful way;" and was then told to participate in a "major way" to be able to bill.[13] She can't remember who provided her with these policy interpretations.

(3)    States that she does not bill if the nurse practitioner does the invasive Procedure or if she, Woodruff, "is not participating in critical aspects."[14] **In defining what participation would be required of the physician to bill for an *invasive* Procedure, however, Woodruff gives illustrations that have no relationship to the actual *invasive* procedure being billed.** *For example, she considers being present and merely labeling a specimen or checking medication sufficient to bill. Carol Kotsubo also reports that Woodruff, at a Friday division meeting, stated that she (Woodruff) could bill for an invasive Procedure performed by the nurse practitioner if she (Woodruff) just "ran in and touched" the patient.*[15] *This is the same language that HemOnc Division Director Wilkinson admits using in explaining to HemOnc physicians the level of participation that would be required to bill for an invasive Procedure.* (See sections 3B and 3B(1), above.)

D.    *Glaser.* Glaser was not hired until after the March 10th meeting and readily admits that he did not follow-up an initial inquiry he made regarding the standards for billing.[16] In the absence of direct guidance on the issue, he followed PATH guidelines until recently, when he learned that he would actually have to perform the invasive Procedure to bill.[17]

5.    **Change in Physician Documentation Patterns.** In response to the announcement in March 1999 that documentation would need to take a certain format in order for invasive Procedures to be billed, the physicians did attempt to improve their documentation habits.

---

[12] Id.
[13] Summary of Interview of Dr. Woodruff
[14] Id.
[15] Summary of Interview of Carol Kotsubo, Pediatric Oncology Clinical Nurse Specialist
[16] Dr. Glaser Interview Summary
[17] Id.

A20529

Kapi'olani Health, KMC Hematology/Oncology Department
Voluntary Disclosure Submission
Page 17 of 24

A. In the fall of 1999, a Policy and Procedure for Teaching Physician Documentation for NICU, ER, and Inpatient Peds, based on written guidance from the Association of American Medical Colleges, was issued by the CBO. It outlines required physician documentation language depending on the level of involvement of medical students and residents. The CBO began applying these standards of reviewing proposed billings for the Procedures since the CBO considered the nurse practitioner the equivalent of a medical student for documentation and billing purposes. Under these standards, no claim may be submitted for any service performed by a medical student. (See Exhibit 14, Policy and Procedure for Teaching Physician Documentation for NICU, ED and Inpatient Peds, October 20, 1999 version, November 8, 1999 version, and March 1, 2000 version.)

B. Medeiros would, as a general rule, enter her own notes and sign the chart if she performed the invasive Procedure. If the nurse practitioner performed all or part of the invasive Procedure, Medeiros would generally write "I personally participated" in the invasive Procedure.[38] She did this based on the explanation of her billing standard outlined above.

C. It appears that Woodruff would, as a general rule, enter her own notes and sign the chart if she performed the invasive Procedure.[39] If the nurse practitioner performed all or part of the invasive Procedure, Woodruff would generally write that she "participated" in the invasive Procedure.[40] She did this based on the explanation of her billing standards outlined above. She also engaged in the unique documentation procedure of having the nurse practitioner co-sign charts, apparently signifying her involvement in the invasive Procedure.

D. Neither the "personally participated" note of Medeiros, nor the "participated" note of Woodruff meet the guidelines the CBO established. Despite this, CBO Manager Kathleen Correia reports that this *was found acceptable and used as a basis for billing* because it was so much better than the documentation by the physicians that preceded it, unless it appeared in the notation that it was written by the nurse practitioner.[41] If the procedure note was written by, or co-signed by, the nurse practitioner, the CBO would not honor the request to billing from the physician.

---

[38] Dr. Desiree Medeiros – Interview Summary
[39] Dr. Woodruff – Interview Summary
[40] Summary of Interview of Dianne Fochtman, NP
[41] Kathleen Correia – Interview Summary

A20530

Kapi'olani Health, KMC Hematology/Oncology Department
Voluntary Disclosure Submission
Page 18 of 24

---

    E.    As explained above, Wilkinson did his own invasive Procedures and Glaser was mistakenly using PATH standards for supervision, and related PATH language, until recently.

6. **Indirect Evidence that Dr. Woodruff Submitted Claims for Invasive Procedures Performed by the Nurse Practitioner Which Were Charted by Woodruff as if She had Participated in the Invasive Procedure.**

    A.    Procedure schedule sheets were examined that had been maintained by the HemOnc nurse practitioner for the time period from January 4, 2000, through May 25, 2001. Based on the nurse practitioner's explanation of her notation system, 101 Procedures were performed during this time period *by her*, but billed under the name and provider number of a HemOnc physician. Eighty-five (85) of these procedures were billed by Woodruff. (See Exhibit 9.)

        The nurse practitioner explained that she places a check mark next to any procedure listed on the schedule she performs. If the physician had to intervene to assist her, she writes "unsuccessful" on the schedule sheets. She considers that she performed a procedure if the physician's only contribution is to supervise, make suggestions, or check medications, but does not intervene in the procedure itself.[42]

    B.    Additionally, based on the explanation provided by the nurse practitioner of the charting and co-signing procedures used by she and by the physicians, it appears that 29 claims were submitted by Dr. Woodruff during years 2000 and 2001 where the invasive Procedures were performed by the nurse practitioner; charted by Dr. Woodruff as if she participated in the invasive Procedure; and billed by Woodruff. All of these were caught by the CBO and not billed. (See Exhibit 15, KMCWC HemOnc Department, Non-Billed Woodruff Requests for Billings, January 19, 2000 to May 25, 2001.)

7. **Patient Specific Case Involving Charting and Billing by Dr. Woodruff Where Woodruff Apparently Did Not Participate In, Perform, or Supervise the Procedure.** The available documentation and interviews of witnesses relating to the patient "CN" case appear to overwhelmingly establish that Woodruff was not present during; did not supervise; and did not participate in the invasive procedure performed by the HemOnc nurse practitioner in the KMCWC OR on April 23, 2001.

Despite this, Woodruff-dictated chart entries do not disclose the performance of the procedure by the nurse practitioner. The chart entries, as dictated and in keeping with Woodruff's pattern and practice in dictation, would lead any reviewer, instead, to

---

[42] Dianne Fochtman Interview Summary

A20531

conclude that Woodruff had personally performed the procedure. Woodruff subsequently submitted her dictation and a request for billing to KH's CBO for this procedure. The procedure was ultimately not billed because Woodruff had failed to include a valid diagnosis on the request for billing. (See Exhibit 16, Patient "CN" Case, Summary of Findings and Interview Summaries.)

8.  **Apparent Non-Submission of Nurse Practitioner Invasive Procedures for Billing.** Entries on procedure schedule sheets maintained by the nurse practitioner document her performance of 314 invasive Procedures for the time period from January 4, 2000, to May 25, 2001. A comparison of these entries to billing records establishes that 213 were not billed.

Of these 213, 46 (approximately 21%) were not billed primarily because the chart was in Nurse Practitioner's handwriting. The remaining 167 were not billed because no charge slip for the service was submitted or the charge slip shows only an office visit occurred on that day. (See Exhibit 9.)

### Wilkinson and Woodruff as Alleged "Whistleblowers"

During separate employee disciplinary interviews with Wilkinson and Woodruff by KH Vice President for Human Resources Gail Lerch and KMS' President Neal Winn, both Wilkinson and Woodruff characterized themselves as "whistleblowers" who are now being retaliated against by the institution. An analysis of this allegation for each physician follows.

*Wilkinson.* On February 10, 2001, Wilkinson attended KH's Compliance Office sponsored Physician Compliance Training conducted by presenters from Deloitte. After the training, Wilkinson approached Compliance Office member Judy Fadrowsky concerning "inconsistent billing practices" in the HemOnc Department. Fadrowsky asked Wilkinson if he would be willing to call the Compliance Hotline with his concerns. He indicated he would. On Sunday, February 11, 2001, Wilkinson called the Compliance Hotline. The text of his report follows:

> Dr. Wilkinson stated charges for bone marrow and spinal taps are inconsistent. Dr. Wilkinson stated charges for bone marrow and spinal taps have been inconsistent in the Children's Blood and Cancer Center. Dr. Wilkinson stated when a doctor performs these Procedures, the patient is billed, however, when these Procedures are performed by a nurse practitioner, the patient is not billed, which is actually a discount (details withheld). Dr. Wilkinson believes these discounts are amounting to approximately $40,000 a year, and have been occurring since 1997 (exact date unknown). Dr. Wilkinson stated when he realized what was occurring, he felt it was best to report the issue before the OIG found the department to be inconsistent. (See Exhibit 17, Compliance

A20532