Kapi'olani Health, KMC     Hematology/Oncology Department
Voluntary Disclosure Submission
Page 20 of 24

---

Report Number 0102-KAP-1005-102 Regarding Wilkinson Compliance Hotline Report dated February 11, 2001.)

Wilkinson's report to the Hotline addresses a significantly different issue than subsequently investigated by KH and the primary subject of this Disclosure. His report *inaccurately* states that invasive Procedures performed by the HemOnc nurse practitioner are *not* being billed. In fact, the investigation reveals that Procedures performed by the HemOnc nurse practitioner *were* being billed without KH's knowledge based, in part, on Wilkinson's advice to his colleagues. Wilkinson himself estimated that 85% of the Procedures being performed in the HemOnc unit were performed by the nurse practitioner.

During follow-up discussions by the Compliance Office on Wilkinson's report, Wilkinson did express concern that patients' families were recognizing that when the nurse practitioner does the procedure there is no charge, but when a physician does the procedure, there is a charge. The primary focus of concern around this issue by Wilkinson and the HemOnc physicians, both before and after Wilkinson's report, was on figuring out how Procedures performed by the nurse practitioner could be billed.

*Woodruff.* On February 21, 2001, ten days after Wilkinson's report to the Compliance Hotline, Woodruff sent an e-mail memorandum to KH Compliance Officer Bob Ching. This communication was also prompted by the February 10 Physician Compliance Training. Woodruff's memorandum suggests that KMS should hire the HemOnc nurse practitioner and also establishes Woodruff's understanding that no billings may be made for Procedures performed by the nurse practitioner. The text of the memorandum reads as follows:

> Dear Mr. Ching,
>
> When I attended Corporate compliance last week, it was asked in Module 1 for any suggested policy changes from employees that would ultimately increase our compliance with the laws. I have a suggestion: KMS should hire our nurse practitioner in Pediatric Hematology-Oncology, Dianne Fochtman, at least as a part-time employee.
>
> Dianne is currently a Kapiolani employee. In Peds Hem-Onc, she is trained not only in physical assesment [sic] but in doing the 2 common produres [sic] we do: bone marrow studies and spinal taps with chemotherapy. Currently, she does many of these procedures on our patients. The problem is, is that when she does these procedure, the doctors cannot charge for these services. We all understand that the doctors could charge for these services if she were an employee of the doctors (KMS). [Note: This represents a misunderstanding of the "incident to" rule by Woodruff.] This has been

A20533

suggested numerous times over the years as I understand, but there seems to be some sort of hold up on the part of KMS.

So, currently, the MD tries to assist Dianne in the procedures, so the pt./insurance can be billed. However, reality is, that while we are often participating, our clinic is so busy that another routine chemo patient does not get seen. (Bad). Or, the clinic is so busy, or the MD running the clinic has so many other responsibilities (such as conferences, etc.) that the MD cannot participate, and thus Dianne does it (legally, of course), and the pt. cannot be charged. This leads to 2 new problems: 1) we lose on billing that we could otherwise rightfully be collecting on and 2) we are essentially offering these pts a discount on their procedure b/c they will never be billed.

It seems to me that it would be so easy for the hospital, which pays Dianne, to divert some of her salary over to KMS to pay her, and thus she would be a KMS employee. This happens routinely on a KMS/UH scale with the doctors on faculty.

(See Exhibit 18, Copy of Woodruff E-mail Memo to Compliance Officer Bob Ching, dated February 21, 2001, and related Exhibit 19, Copy of Woodruff E-mail Memo to Dr. Neal Winn, et al., dated April 5, 2001.)

Like the Wilkinson report, the Woodruff memo *inaccurately* presents the facts relating to Woodruff billing for Procedures performed by the nurse practitioner. Her memo states that "the problem" is that when the nurse practitioner "does these procedures, the doctors cannot charge for these services…So, currently, the MD tries to assist Dianne in the procedure, so the pt./insurance can be billed." Woodruff does not disclose in this memo to KH's Compliance Officer that she has developed her own personal interpretation of the March 10, 1999 billing policy that would allow the nurse practitioner to do all *invasive* aspects of the Procedures, and still allow the physician to bill for the invasive procedure.

By early April, the non-applicability of the "incident to" billing exception as applied to the nurse practitioner was clarified. It was determined that the HemOnc Department, located within an acute care hospital, did not meet the "place of service" requirement for the use of this rule. Wilkinson and the HemOnc physicians decided at their May 1, 2001 budget meeting that the physicians would not, as a result, hire the nurse practitioner as a KMS employee.

### Corrective Action

KH and KMS corrective action efforts have been, and are, designed to remedy the underlying problem identified in this Disclosure; initiate appropriate physician disciplinary action which will, it is believed, heighten physician awareness regarding the need for billing policy and

procedure compliance; further educate KMS physicians on relevant issues; and reassess the current operation, structure, and staffing of the HemOnc Department. These efforts include the following:

1. **Initial Stop Action on Billings and Policy Clarification.** Once the potential billing issue in this matter was identified, all claims for the Procedures in question were stopped pending the results of the investigation. HemOnc physicians were informed that the March 10, 1999, policy required all Procedures to be performed only by physicians. The HemOnc nurse practitioner was restricted from performing any of the Procedures upon a return to the HemOnc Department, after an administrative leave resulting from a separate matter.

2. **Disciplinary Action.**

   A. *Wilkinson.* Counsel for Wilkinson was informed during the week of August 13, 2001, that Wilkinson had the option to either resign, both as HemOnc Division Director and as an employee of KMS, or face immediate termination. Counsel was also informed that the Wilkinson case would be referred to KMCWC's Medical Executive Committee which would decide whether to proceed with an independent investigation and/or otherwise follow its peer review procedures.

   B. *Woodruff.* Counsel for Woodruff was informed during the week of August 13, 2001, that Woodruff had the option to either resign as an employee of KMS or face immediate termination. Counsel was also informed that the Woodruff case would be referred to KMCWC's Medical Executive Committee which would decide whether to proceed with an independent investigation and/or otherwise follow its peer review procedures.

   C. *Medeiros and Glaser.* Medeiros and Glaser will both receive formal memos counseling them regarding their conduct relating to the March 10, 1999, policy as described above.

   D. *Nurse Practitioner Fochtman.* Fochtman will receive a Final Warning regarding her conduct relating to the March 10, 1999 violation.

3. **HemOnc Nurse Practitioner Position Elimination.** This position is being eliminated in the HemOnc Department and may be replaced with a clinical nurse oncology specialist who will assist in educating and preparing patients for Procedures but not perform the Procedures.

4. **KMS Physician Trainings.** A series of mandatory trainings are being scheduled for late August and September for all KMS physicians. These trainings are designed to:

A20535

---

- A. Examine the legal implications of formal billing policies and procedures established by KH's CBO, including the potential institutional and individual physician liability exposure; the potential consequences of physicians developing their own, unapproved "interpretations" of such policies and procedures; and the appropriate courses of action a physician may follow to question, clarify, or challenge a billing policy and procedure.

- B. Discuss the potentially dangerous "disconnect" by physicians of viewing issues as solely "clinical," "operational," or "technical" in nature, and thereby overlooking the serious legal implications of any action that has billing, compliance, and/or quality of care consequences.

- C. Explain the basic processes and options available to KH and KMS to investigate potential compliance and legal issues.

5. **HemOnc Department Assessment.** An assessment is underway of the organization structure, resources, and policies and procedures of the HemOnc Department to identify any potential environmental factors that may have contributed to the occurrences of the incidences discussed in this Disclosure and determine whether adjustments or changes should be made to avoid other potential compliance issues in the Department or to improve and enhance its overall performance.

6. **Repayment of Funds.** The total funds received from third party carriers, of all types, from February 1997 through July 31, 2001 for the four (4) Procedures was $64,859.14. This figure can be broken out as follows:

| Payor Type | Amount | Percentage of Total |
|---|---|---|
| Medicaid | $9,772.61 | 15.07% |
| MedQuest Programs | $3,717.92 | 5.73% |
| Medicare/TRIcare | $7.00 | 0.01% |
| Private Payors (27) | $51,361.61 | 79.19% |

KH/KMS' intention is to repay the designated amounts directly to the fiscal intermediary for each of the payor types listed within the next thirty (30) days, absent other instructions from the Office of the Inspector General.

## Certification

As the authorized representative of Kapi'olani Health with respect to this Disclosure matter, I state, to the best of my knowledge, that the contents of this Voluntary Disclosure contain truthful

information and are based on good faith efforts by Kapi'olani Health, and those involved in the voluntary submission effort, to bring this matter to the government's attention for purposes of resolving any potential liabilities to the government and to assist the Office of Inspector General in its inquiry and verification of the disclosed matter.

Dated: September 7, 2001

_Sharon On Leng_ / S, AM

Sharon On Leng, Esq.
General Counsel
Authorized Representative

Dated: September 4, 2001

_[signature]_

Dennis M. Warren, Esq.
Outside Legal Counsel
Authorized Representative

A20537

# CORPORATE INTEGRITY AGREEMENT
## BETWEEN THE
## OFFICE OF INSPECTOR GENERAL OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES
## AND
## KAPI'OLANI HEALTH

I. **PREAMBLE**

Kapi'olani Health ("KH") hereby agrees to enter into this Corporate Integrity Agreement (the "CIA") with the Office of Inspector General of the United States Department of Health and Human Services ("OIG") to ensure compliance by its subsidiaries which either participate as providers of services or who administrates benefits to the Federal health care programs, physicians with staff privileges, employees, contractors and third parties with whom KH may choose to engage to act as billing or coding agents or consultants for KH (hereinafter collectively referred to as "covered individuals"), with the requirements of Medicare, Medicaid and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) (hereinafter collectively referred to as the "Federal health care programs"). KH's compliance with the terms and conditions in this CIA shall constitute an element of KH's present responsibility with regard to participation in the Federal health care programs. Contemporaneously with this CIA, KH is entering into a Settlement Agreement with the United States, and this CIA is incorporated by reference into the Settlement Agreement.

Home Care Hawaii, ("HCH"), one of KH's subsidiaries that participates in the Federal health care programs, shall not be subject to this CIA since KH has represented to OIG that it is in the process of divesting itself of its interest in HCH. However, HCH shall become subject to this CIA if KH fails to divest itself of its interest in HCH by December 20, 1999.

Prior to the execution of this CIA, KH voluntarily established a compliance program ("Compliance Program"), which provides for corporate integrity policies and procedures and which, as represented by KH, is aimed at ensuring that its participation in the Federal health care programs is in conformity with the statutes, regulations, and other directives applicable to the Federal health care programs. Therefore, pursuant to this CIA, KH hereby agrees to maintain in full operation the Compliance Program for the term of this CIA. The Compliance Program may be modified by KH as appropriate, but

1

**EXHIBIT A**

A20538

at a minimum, shall always comply with the integrity obligations enumerated in this CIA.

## II. TERM OF THE CIA

Except as otherwise provided, the period of compliance obligations assumed by KH under this CIA shall be five (5) years from the date of execution of this CIA. The date of execution will be the date of the final signature on the CIA.

## III. CORPORATE INTEGRITY OBLIGATIONS

Pursuant to this CIA, and for the term of this CIA, KH will make the following integrity obligations permanent features of its Compliance Program, which shall be established in accordance with the provisions below:

### A. Corporate Compliance Officer and Committee

1. *Compliance Officer.* KH has represented to OIG that, pursuant to its Compliance Program, it has created a Compliance Officer position, a Compliance Manager position, a Compliance Specialist position and Compliance Network Representatives. Accordingly, KH shall formally maintain the appointment of individuals to serve as the Compliance Officer, Compliance Manager, Compliance Specialist and Compliance Network Representatives. At a minimum, the Compliance Officer must continuously be charged with the responsibility for the day-to-day compliance activities in furtherance of the integrity obligations assumed herein, as well as for any reporting obligations established under this CIA. The Compliance Officer must report directly to the Chief Executive Officer ("CEO") of KH and shall have unrestricted access to the Board of Directors of KH. The Compliance Officer shall be a member of the management and shall make regular (at least quarterly) reports regarding compliance matters directly to KH's CEO and/or to the Board of Directors of KH. When the identity of the Compliance Officer changes, KH shall notify the OIG, in writing, within 15 days of such change.

2. *Compliance Committee.* KH has represented to OIG that, pursuant to its Compliance Program, it has created a Compliance Committee. Accordingly, KH shall formally maintain a Compliance Committee, which shall be responsible for, at a minimum, compliance with the integrity obligations in this CIA. KH shall ensure that the Compliance Committee is continuously composed of representatives of multiple disciplines and segments of KH's operations. At a

2

A20539

minimum, the Compliance Committee shall include the following KH employees: Compliance Officer, Chief Financial Officer, Vice President of Human Resources, Director of Risk Management, Vice President of Compliance and Revenue Management, Compliance Manager, Director of Internal Audits, Chief Medical Officer of Kapi'olani Medical Specialists, and Vice-President of Hospital Operations for Kapi'olani Medical Center for Women and Children ("KMCWC") and Kapi'olani Medical Center at Pali Momi ("KMCPM"). The Compliance Officer shall report directly to the CEO at least on a monthly basis. The Compliance Committee will support the Compliance Officer in fulfilling his/her responsibilities. The names and positions of the Compliance Committee members shall be included in the Implementation Report.

B. <u>Written Standards</u>

KH has represented to OIG that, pursuant to its Compliance Program, it has created a written Code of Conduct as well as written Policies and Procedures regarding the operations of KH's Compliance Program in a booklet titled "Standards of Business Conduct, A Guide for Kapi'olani Health Employees." Accordingly, KH shall formally maintain the written Code of Conduct and Policies and Procedures regarding the operation of KH's Compliance Program with the following minimum requirements:

1. *Code of Conduct.* The Code of Conduct shall be distributed to all covered individuals within ninety (90) days of the effective date of this CIA. KH shall make the promotion of, and adherence to, the Code of Conduct an element in the performance of managers, supervisors, and all other covered individuals. The Code of Conduct shall, at a minimum, set forth:

> a. KH's commitment to full compliance with all statutes, regulations, and guidelines applicable to Federal health care programs, including its commitment to prepare and submit accurate billings consistent with Federal health care program regulations and procedures or instructions otherwise communicated by the Health Care Financing Administration ("HCFA") (or other appropriate regulatory agencies) and/or its agents;
>
> b. KH's requirement that all covered individuals shall be expected to comply with all statutes, regulations, and guidelines applicable to Federal health care programs and with KH's own policies and

3

A20540

procedures (including the requirements of this CIA);

c. the requirement that all covered individuals shall be expected to report suspected violations of any statute, regulation, or guideline applicable to Federal health care programs or of KH's own policies and procedures;

d. the possible consequences to both KH and to any covered individual of failure to comply with all statutes, regulations, and guidelines applicable to Federal health care programs and with KH's own Policies and Procedures or of failure to report such non-compliance; and

e. the right of all covered individuals to use the Confidential Disclosure Program, as well as KH's commitment to confidentiality and non-retaliation with respect to disclosures.

Within ninety (90) days of the effective date of the CIA, each covered individual shall certify, in writing, that he or she has received, read, understands, and will abide by KH's Code of Conduct. New covered individuals shall receive the Code of Conduct and shall complete the required certification within two (2) weeks after the commencement of their employment or contract or within ninety (90) days of the effective date of the CIA, whichever is later.

KH will annually review the Code of Conduct and will make any necessary revisions. These revisions shall be distributed within thirty (30) days of initiating such a change. Covered individuals shall certify on an annual basis that they have received, read, understand and will abide by the Code of Conduct.

2. *Policies and Procedures.* At a minimum, the Polices and Procedures shall address compliance with all Federal and state health care statutes, regulations, and guidelines, including the requirements of the Federal health care programs. In addition to other requirements as determined by the Board of Directors, the Policies and Procedures shall specifically address what types of services and items can be reimbursed by the Federal health care programs. Also, KH shall formally maintain its written Policies and Procedures that include disciplinary guidelines and methods for covered individuals to make disclosures or otherwise report on compliance issues to KH's management through the Confidential Disclosure Program required by section III.E. KH shall assess and

4

A20541

update as necessary the Policies and Procedures at least annually and more frequently, as appropriate. A summary of the Policies and Procedures will be provided to OIG in the Implementation Report. The Policies and Procedures will be available to OIG upon request.

Within ninety (90) days of the effective date of the CIA, KH shall distribute any changes to its Policies and Procedures to all appropriate covered individuals whose positions are impacted by the changes. Compliance staff or supervisors should be available to explain any and all Policies and Procedures.

## C. Training and Education

KH has represented to OIG that, pursuant to its Compliance Program, it has conducted a systems-wide training program for its employees. KH shall formally maintain the annual compliance training and education of its employees. Pursuant to this CIA, general training and education must meet the provisions of section III.C.1 for all covered individuals of KH. However, specific training and education, subject to the provisions of section III.C.2, shall be required only at the following KH subsidiaries: (i) KMCWC; (ii) KMCPM; and (iii) Kapi'olani Medical Specialists ("KMS").

1. *General Training.* Within ninety (90) days of the effective date of this CIA, KH shall provide at least one (1) hour of training annually to each covered individual (excluding any physician who is not an employee of KH). General training shall still be made available to physicians who are not employees of KH and attendance logs of training by such physicians shall be maintained by KH and made available to the OIG upon request. This general training shall explain:

   a. CIA requirements;

   b. Compliance Program (including the Policies and Procedures as they pertain to general compliance issues); and

   c. Code of Conduct.

These training materials (including attendance logs) shall be maintained by KH and made available to the OIG upon request.

New covered individuals shall receive the general training described above within

5

A20542