180 North Stetson
Chicago, IL 60601
USA

Tel: 312 XXX 3402
Fax: 312 297 3402
...s.deloitte.com

Exh D - Part 8

# Memo

**Deloitte & Touche**

To:        Hem/Onc File

From:    Carmen Wolf, Ken Blickenstaff

Subject:  Susan Young Interview Summaries 5/30/2001 & 6/12/2001

**Interview #1- 5/30/2001**

The following is a summary of the interview of Susan Young held 05/30/01 at approximately 9:45 a.m. The purpose of the interview was to obtain information concerning the billing documentation and the actions of the Nurse Practitioner (NP) assigned to the PAU.

Ms. Young has been an employee of the hospital for 2 ½ years.

Ms. Young stated that she is the supervisor of Ms. Fochtman, the NP. She stated that she has nothing to do with the billing of the NP services. In addition, it is her understanding that the NP cannot bill for procedures. Her understanding was that the NP could only perform procedures under the direct supervision of the physician, specifically a physician should be in the room at all times during the procedure, and that the physician supervising the NP should be credentialed by the institution prior to supervising the NP performing the procedure.

Ms. Young has stated that on May 29, 2001, it was brought to her attention that there were concerns about clear and concise documentation as to who was performing the procedures, the NP or the physician. Ms. Young stated that in addition to concerns regarding clear and concise documentation, a quality of care issues that was brought to her attention was that physicians were unavailable when called and there was sometimes a failure to respond.

Ms. Young stated that concerning the supervision of the NP, Dr. Friedman, the previous Medical Director, had written supervision expectation for the NP. When we asked her if she had copies of those expectations, she stated that she did not have copies. She also stated that no policies or procedures were currently in place defining the supervision of the NP.

This interview concluded at approximately 10:00 a.m.

**Interview #2- 6/12/2001**

The following is a summary of the interview of Susan Young held on June 12, 2001. The purpose of the interview was to obtain information concerning actions of the Nurse Practitioner (NP) assigned to the P.A.U. unit.

Deloitte
Touche
Tohmatsu

A20573

Re: Susan Young

## P.A.U. Unit TYPICAL DAY

- Hours of Operation are Monday-Friday with some Saturday Hours. M-F Staff start around 7 a.m. and day typically ends around 5 p.m. Saturday Hours vary but usually morning times to accommodate school age children.

- Purpose of the unit is to provide outpatient treatments to children with cancer and blood disorders. Procedures performed include chemotherapy, blood transfusions, bone marrow aspirations and bone marrow biopsies.

- Staffing model includes:

  Charge Nurse – Coordinates patient care

  Unit secretary- Schedules patients, submits unit charges

  3-4 nurses (depending on patient load)- Perform treatments and assess patients. This
  - includes Dianne Fochtman the N.P. who performs procedures, coordinates care of children off therapy and schedules procedures. Dianne may help out with other hands on care as needed.

**Oversight by Susan of Dianne Fochtman**

- Susan stated that she has not observed Dianne perform procedures. Susan was then referred to an example of one of Dianne's yearly evaluations. When asked how the numbers of procedures Dianne reports (Dianne writes an addendum to her annual evaluation each year which highlights her accomplishments) she has performed in a given year is accumulated, Susan stated that she did not know.

- Also attached to Dianne's annual evaluations are attestations by the Hem/Onc physicians that Dianne is competent to perform procedures, write chemotherapy orders.

- When asked Susan if she was aware of these attestations she said yes. She stated she never really reviewed them in the context of whether they related to services that might be outside the scope of practice for a Nurse Practitioner.

- According to Susan, Dianne reports directly to Susan with dotted line reporting to Henny since she works in Henny's areas of responsibility.

- Susan stated that Dianne is well known in the "oncology world". She has contacts all over the U.S., speaks at national and local meetings and has had articles published.

- Susan has never had the occasion to administer either verbally or in writing any disciplinary action against Dianne before June 4, 2001.

- Susan confirmed that she compiled the document titled "Pediatric Ambulatory Meeting July 18." She confirmed that the year of this meeting was 2000.

- I then referred her to section "Advanced Practice" page 5 and asked her to explain what was meant by "chemo orders (changed)" She stated that this referred to her discussion with the group that since chemotherapy orders were no longer allowed to be written by advanced practice nurses as of the JCAHO May 5 visit, that a task force had been formed as part of quality council to address how the process for obtaining orders from the physicians could be streamlined. The task force was working on the development of pre-printed orders.

- When asked to describe her interaction with Dianne, Susan stated Dianne is "more remote"(as compared to Carol Kotsubo. Dianne "kind of does her own thing".

- She stated that she and Rose Mary Bucher were present at the meeting when Dianne was notified she was being placed on administrative leave Monday June 4, 2001. Susan's observation of

A20574

Re: Susan Young

Dianne was that she was "shocked about the administrative leave and teary-eyed stating that she did not understand why."

- Susan attended the 6/8/2001 Hematology/Oncology division meeting. She stated that the physician's first question to her was "Is Dianne's leave a paid leave?" When she answered that, she stated that the MD's told her they felt as if they had been "left out in the cold." The group requested that she relates to administration their feelings regarding this issue. They were upset about the lack of communication from Dr. Winn. Their understanding of the purpose of compliance program would be that everyone would "work together to resolve issues" and that was not happening.

## Division Meetings

- Hematology/Oncology Division meetings are held each week on Friday at 1:30p.m.

- Dr. Bob Wilkinson is responsible, as the medical director, for setting the agenda for these meetings.

- Susan attends approximately 2 division meetings per month. Her role in these meetings is to represent nursing administration and nursing's role in the operational processes on the units.

- Susan cannot recall if she attended the 3/10/99 meeting.

- However, she recalls that she was at division meetings when the issue of whether Dianne could perform procedures herself was discussed. Herself meaning unsupervised. Susan stated that the physicians wanted clarification as to what constituted supervision.

- She recalls that Dr. Friedman attended a division meeting in May 2000. Susan recollects that the purpose of Dr. Friedman's attendance was to clarify the definition of supervision though she doesn't believe there was anything documented in writing.

- The issue of billing for procedures performed by Dianne was "crystal clear". Susan stated, "appeared to me that they understood" but they (the physicians) didn't want it to be that way. The physicians expressed that they were liable for the procedures, and therefore, should be able to bill even if they didn't participate.

## Operating Room

Director of the O.R. asked to have a meeting – December 1999 (Susan, Rosemary, Henny, Dianne)

- The O.R. nursing staff wanted to know who was going to supervise Dianne when she came to the O.R. to perform procedures.

- We then related to Susan that Dianne had recently related, in an interview with D&T, that she performs procedures in the O.R. but does not document procedure notes. Susan stated she was not aware of documentation practices – she does not review. It is her position that Henny is responsible for reviewing documentation.

## Physician Billing for Procedures

It is Susan's understanding that if:

- N.P. performs procedure – the physician does not bill

- N.P. performs – MD supervises – does not bill

A20575

Re: Susan Young

- MD performs – bill

- N.P. performs but N.P. must step in - She stated she does know but would advice if asked that the MD's consult with Rick Robel. She believes that Rick has spoken with the MD's about billing several times.

PRODUCED PURSUANT TO PROTECTIVE ORDER FOR HIPAA DOCUMENTS IN WOODRUFF VS. HAWAII PACIFIC HEALTH, KAPIOLANI MEDICAL SPECIALISTS, KAPIOLANI MEDICAL CENTER FOR WOMEN AND CHILDREN, ROGER DRUE, FRANCES A. HALLONQUIST, NEIL WINN, M.D., SHERREL AMMAR, M.D., DELOITTE & TOUCHE LLP, DENNIS M. WARREN, ESQ., CIVIL NO. 02-1-0090-01 (BIA), IN THE CIRCUIT COURT OF THE FIRST CIRCUIT, STATE OF HAWAII

A20576

Deloitte & Touche LLP
180 North Stetson
Chicago, IL 60601
USA

Tel: 312 946 3402
F: 312 297 3402
: deloitte.com

# Memo

# Deloitte & Touche

To:      Hem/Onc File

From:    Carmen Wolf, Ken Blickenstaff

Subject: Dianne Fochtman Interview Summaries- 5/30/2001 & 6/22/2001

**Interview #1- 5/30/2001**

The following is a summary of the interviews of Dianne Fochtman, NP held 5/30/01 at approximately 8:30 a.m. The purpose of the interview was to obtain information concerning billing documentation and other actions of the Nurse Practitioner (NP) assigned to the PAU.

Ms. Fochtman has been employed as a Pediatric Oncology Nurse Practitioner by the institution for the past nine years. Her education includes a Master of Science in Nursing from UCLA.

Ms. Fochtman stated that in her role as NP, she performs the following procedures both with and without the supervision of a physician: diagnostic lumbar puncture, bone marrow aspiration, and bone marrow biopsy. Under the supervision of a physician she does administer chemotherapy into the central nervous system.

Ms. Fochtman stated that she is supervised by a physician in PAU under a rotating basis. Supervision can consist of the physician standing by in the room, being outside the room, or being somewhere else in the hospital.

Ms. Fochtman stated that when she performs procedures in the OR, she may also be supervised by an anesthesiologist or surgeon for procedures that do not include infusion of chemotherapy. Ms. Fochtman also noted that approximately two years ago she was ordered to stop performing procedures in the OR without an oncologist at the bedside. She believes the OR manager at the time felt that the NP performing procedures without the supervision of an oncologist at the bedside was against the institution's medical bylaws. When this occurred, Ms. Fochtman stated that the procedures were then moved to the recovery room where the anesthesiologist would sedate the patient, the NP would perform the procedure, and then the patient would be moved to the OR for the surgical procedure. Per Ms. Fochtman, the OR manager left the institution about a month ago and since then, Ms. Fochtman has been performing the procedures in the OR. Of note is that Ms. Fochtman states that not only is informed consent not consistently obtained for her diagnostic procedures in the OR, but also when she does do procedures in the OR, she does not document a progress or procedure note nor is she noted on the anesthesia record. Ms. Fochtman noted that at one time, there was no informed consent obtained but that the OR nurses were upset and bringing it to her attention so she started to intermittently obtain informed consents. If one were to look for evidence of the procedure being done, there would only be an informed consent and that would be only if one was

Deloitte
Touche
Tohmatsu

A20577

Page 2
Re: Dianne Fochtman

obtained. Ms. Fochtman did note that if chemotherapy were to be infused, an oncologist would come into the OR to perform direct supervision or to perform the procedure himself or herself.

Ms. Fochtman explained that when procedures are performed on PAU, an anesthesia record is completed by the anesthesiologist except for the top portion containing the surgeon's name, procedure, date, vital signs, and weight, which is filled out by the NP. The NP fills out this portion of the record prior to the anesthesiologist obtaining the form and it includes an oncologist's name whether they participate in the procedure or not.

While most procedures are performed under general sedation, Ms. Fochtman stated that there are times when the procedure is done under conscious sedation. In these cases, Ms. Fochtman stated that she administers the conscious sedation to the patient and then performs the procedure with an RN at the bedside to monitor the patient. When asked what is done if the patient requires additional sedation during the procedure, Ms. Fochtman stated that either she will administer additional sedation or she will instruct the RN to administer the additional sedation.

Ms. Fochtman denied any participation in any meetings where billing for NP procedures were discussed, but did state that she was aware that there were issues. Ms. Fochtman stated that she was aware that she could not bill for procedures and that because of this there were physicians who would bill for her procedures whether they participated or not. Per the discussion with Ms. Fochtman, she stated that prior to two years ago she actively charted procedure notes on the progress record but there came a point that the coders would no longer bill for procedures that had evidence of NP involvement. Ms. Fochtman stated that the physician response to this was to not have any evidence of NP involvement noted on the progress note; therefore, she stopped writing procedure notes and/or signing any part of the chart even if she did do the procedure. When asked if she was instructed by any physician or hospital personnel to change her charting, Ms. Fochtman stated that she was not directed to do this by anyone specifically; she made this change on her own accord and there is no written policy & procedure on the subject. Ms. Fochtman stated that recently she started to document again but did not have any direction to do so. Ms. Fochtman stated that presently there is no written policy & procedure document for her regarding charting or billing. Regarding physician charting, Ms. Fochtman stated that physicians now co-sign procedure notes and that Dr. Woodruff wrote "I participated in this procedure" but never wrote "I performed this procedure."

Ms. Fochtman stated that until two years ago she wrote and initiated medical orders and the physicians would then check and sign them. For the past two years, Ms. Fochtman stated that the physicians have written the orders and she signs them. Also, she stated that she is able to sign as part of a double check system in place for chemo orders.

Ms. Fochtman stated that she performs physical exams on scheduled oncology patients prior to administration of chemotherapy. She stated that although the exams are given, neither she nor the physician bills for the exam.

This interview concluded at approximately 9:45 a.m.

**Interview #2- 6/22/2001**

The following is a summary of the interview of Dianne Fochtman ("Dianne") held on June 22, 2001, at 1:30 p.m. This interview was in follow up to an interview conducted by Deloitte & Touche at the Direction of Counsel for the purpose of obtaining information concerning actions of the Nurse Practitioner (NP) assigned to the PAU unit.

A20578

Page 7
Re: Dianne Fochtman

## Procedures

Dianne was asked to recall the 3/10/99 division meeting. Dianne cannot recall being in attendance but has been in many meetings with Rick Robel. Dianne stated that "many times they had been discussing billing and my involvement in procedures and I was told not to attend." When asked who instructed her not to attend, Dianne stated "Dr. Wilkinson told me not to come." It was her understanding that at one point that coders were not billing for procedures at all. Physician staff was saying that they had to bill, that Dianne performing procedures was the same as CRNA's performing procedures with anesthesiologists.

Dianne was then asked to give us her understanding of when it was appropriate for physicians to bill for procedures in which she was involved. Dianne stated: 1) if the MD performed the procedure, the physician should bill; 2) if the MD does part of the procedure and the nurse practitioner does part of the procedure, the physician could bill; and 3) if the MD supervises but does not participate, the physician could bill, based on the standard of care nationally. When asked how she knows what the national standards of care are, she said that she had discussed this with people she knows in California as recently as April of this year. She also stated that she attended a conference "some years ago" where this methodology was described.

When asked about billing if the MD is not there for a procedure, she wanted to know what "not there was." She stated that in this institution it is not clear and it has never been clear as to whether the procedure can be billed. She believes that the hospital should be able to bill for procedures she performs. She has brought this up numerous times and administrators say that they will investigate, but they never get back to her. "As a hospital employee, they never figured out how to bill for my services." When asked what hospital administrator was asked to investigate this, she said, "Dr.Woodruff called the compliance hotline."

We then asked Dianne to describe how she documents procedures performed. Dianne stated that for the past two years, she either wrote the procedure note or signed the procedure note written by the MD. "Charting is geared toward physician billing." Previous to two years ago, documentation was traditionally done by a P.A.U. nurse at the end of a shift. For example, if a procedure was performed, the PAU nurse would simply put in the note "LP done"; there was no separate procedure note.

She then stated, "If a procedure was performed by me, I would write a procedure note and sign it. If the MD supervises, sometimes I write the note, other times they write the note. If I write the note, they co-sign; if they write the note I co-sign."

Dianne stated that she has never been asked to change the way she documents and she has never been asked to stop documenting.

Dianne was asked to give her understanding of what supervision means. Dianne stated that at a minimum "the physician must be available at a moment's notice." However, if the physicians are on campus, that could qualify as supervision but that doesn't happen.

Dianne stated that she does 95% of the P.A.U. procedures. She estimated that she does 175 spinal taps and 100 bone marrow biopsies per year. That percentage has remained consistent since 1993-1994. Dr. Medeiros wanted to do her own procedures until her pregnancy.

Dianne said that she maintains weekly schedule sheets with patient names, procedures, and locations. Dianne also schedules the procedures with anesthesia. On the schedule sheet she checks off which ones she did. She said that for procedures where the physician has to intervene to assist her, she writes "unsuccessful" on the schedule sheets. She believes that she has schedules back to 1995.

When asked her to clarify her checkmarks, she stated that if the MD comes in to check the medication, she does give the procedure a checkmark. However, if the MD supervises or makes any suggestions, she still considers that a procedure that she performed.

A20579

Re: Dianne Fochtman

When we asked Dianne about procedures she does in the OR, she said that she couldn't say when she started doing them. She stated that she currently does not do them "real frequent." She stated that an O.R. manager interpreted the medical staff by-laws to mean that she could not do procedures in the O.R. unless an oncologist was there. Later that interpretation was changed so that there only had to be a supervising physician present and then a debate began as to whom could supervise her. As a result of the debate, it was decided that an anesthesiologist is okay to supervise except for chemotherapy. Dr. Britton said he could be a covering physician and he has agreed to supervise her.

Dianne stated that she documents on the progress notes when she is back on the floor when she does procedures in the O.R. If she does the procedure in the recovery room, it is documented on the P.A.U. chart and she is unaware if any of this is billed. She believes there are inpatient cases performed in the O.R. where there is no documentation that the procedure was performed in the OR. She then said if the patient goes back to the inpatient floor she may then sometimes go back and document on the inpatient chart.

When asked if anyone had specifically directed her to stop documenting procedures, Dianne stated, "I think it was suggested that it would be easier to bill if you couldn't tell who did the procedure."

Dianne was asked whether at the division meetings she ever felt uncomfortable about performing procedures. Her response was yes, when Dr. Wilkinson said on at least one occasion "to just not have her do any procedures."

Just before concluding the interview, Dianne asked whether she needed an attorney. Ken explained to her that it was not our position to give her advise about that issue.

This interview was concluded at approximately 2:30 p.m.

A20580