Deloitte & Touche LLP
180 North Stetson
Chicago, IL 60601
USA

312 946 3402
312 297 3402
www.us.deloitte.com

# Memo



To:       Hem/Onc File

From:    Carmen Wolf, Ken Blickenstaff

Subject: Dr. Glaser Interview Summaries 5/30/2001 & 6/14/2001

**Interview #1- 5/30/2001**

The following is a summary of the interviews of Dr. Glaser held 5/30/01 at approximately 10:00 a.m. The purpose of the interview was to obtain information concerning the billing documentation and other actions of the Nurse Practitioner (NP) assigned to the PAU.

Dr. Glaser had been employed by the hospital full-time since 11/1/00. Prior to that he worked for the hospital part-time (30%) for 1-1.5 years.

Dr. Glaser states that he currently does interact with the NP while covering both the inpatient and outpatient settings. It is the understanding of Dr. Glaser that the NP can perform procedures without direct physical supervision of a physician but that those procedures should not be billed by a physician.

Dr. Glaser states that when working with the NP, if the NP performs the procedure independently he does not write a procedure note or bill for the procedure. If Dr. Glaser is present for the procedure, he states that NP writes the procedure note and he signs the note and bills for the procedure. Dr. Glaser states the NP is not supervised in the OR and therefore no note or bill is generated by a physician.

When discussing his understanding of "incident to" billing, Dr. Glaser stated that "until one week ago I thought that I could bill for a procedure if I had presence throughout or actively participated in the procedure and was told by a KMS billing person that you have to participate in a key component of the procedure to bill and that you have to follow the medical student rules".

In discussing the ability of the NP to write and implement orders, Dr. Glaser stated that the NP was unable to write her own orders and that she was only able to double check chemo orders within the double check system that is in place for chemo orders.

This interview concluded at approximately 10:30 a.m.

**Interview #2- 6/14/2001**

The following is a summary of the interview of Dr. Glaser held on June 14, 2001, at 8:30 a.m. This interview was in follow-up to an interview conducted by Deloitte & Touche at the Direction of Counsel

Deloitte
Touche
Tohmatsu

for the purpose of obtaining information concerning actions of the Nurse Practitioner (NP) assigned to the PAU unit.

## Procedures

Dr. Glaser stated that Diane does perform procedures for him. When asked if Diane ever performed procedures that he had intended to perform, he stated "she always tells me before she starts a procedure."

He then stated that about one month ago during a meeting about implementation of a new computerized documentation system for the P.A.U. unit, a KMS billing person informed him that in order to bill he must perform the key portion. His definition of key portion is "I would define as actually doing the procedure." Previous to this meeting he stated that we was applying P.A.T.H. rules in such as way that "if I was in the room, I would co-sign the note or add an addendum to Diane's note. When I documented, I submitted a charge slip to bill for the procedure." He stated that when Diane would perform the procedure "some patients don't get billed."

He prefaced his next statement with "don't tell Dr. Woodruff that I told you this, but she (Dr. Woodruff) tracked procedures done by Dianne for about one month." He said that Dr. Woodruff did this to show how many procedures for which they were losing the revenue because they couldn't be billed. He could not recall the volume and doesn't recall actually seeing anything in writing from Dr. Woodruff.

When asked to estimate how many procedures are performed by the group in a year, including Dianne's, he stated, "I have done three chemos through CNS this week, so maybe about 150 per year, but that seems like a lot."

We then asked him to relate to us his understanding of when, based on what he did during a procedure, it was appropriate to bill. He stated, "I understood that the MD could bill if present throughout the entire procedure. I got this from asking people; I thought P.A.T.H. rules applied. I was clearly wrong."

We then asked him if billing issues were discussed at the Friday division meetings. He stated, "yes." He stated the following people are present during the Friday division meetings:

- Dianne Fochtman
- Dr. Wilkinson
- Dr. Madeiros
- Dr. Woodruff
- Dr. Wada
- Dr. Shimitzu
- Carol Kotsubo
- Sometimes Susan Young
- Sometimes Henny (she attends more often than Susan)
- Dr. Winn came to a meeting about one month ago
- the Social worker
- Emily Chang – data management National Protocols.

Regarding billing he thought all MD's all understood the same thing, i.e. "all on same page." He never heard Dr. Woodruff say, "I just need to touch the patient and I'll bill" or "I just need to touch the needle and I'm going to bill."

A20590(a)

Page 3
Re: Dr. Glaser

He believes that he found out the correct way to bill by accident as result of the computerized documentation meeting about one month ago.

He stated that when he first started, November 1999, he contacted "KMS billing" via email to request a meeting to get information on the correct way to bill. He received a response but "just never got around to setting up the meeting." He requested feedback to find out whether he was billing Evaluation/Management services at the appropriate level.

When asked if he had observed that Dianne change her documentation patterns, he stated, "generally no." He stated that the "only documentation that she really does is for procedures." He stated he does not recall any instance where Dianne did not document a procedure she performed. He stated, "if she documents a procedure, I don't bill." He then stated, "sometimes I might document for her but I would note that she performed the procedure and I would not bill." He stated he would "never write/document as if he had performed a procedure if he had not." He stated that he does document and differentiate procedures "I personally performed; I was present through entire procedure."

He stated, "at this point, if not present, I don't bill." If Dianne performs procedure and he is present, he does not bill. If he performs the procedure and Dianne is present, he bills. If both perform the procedure and he performs the "key portion," he bills.

Dr. Glaser defines "key portion" as the "technical act; thing that requires training." He gave examples for each procedure (lumbar puncture, bone marrow aspiration, bone marrow biopsy, and administration of chemo into CNS) as insertion of the needle into the correct spot being the key portion.

This interview concluded at approximately 9:30 a.m.

A20591

Deloitte & Touche LLP
180 N. Stetson
Chicago, 60601
USA

112 946 2581
312 297 2581
www.us.deloitte.com

# Memo

**Deloitte & Touche**

Date: June 1, 2001

To: Hem/Onc File

From: Bob Quillinan, Camille Greco

Subject: Summary of Interview of Drs. Wada and Kyono

The following is a summary of the interviews of Drs. Wada and Kyono held 5/30/01 held at approximately 10:50 a.m. and 1:30 p.m. respectively. The purpose of the interview was to obtain information concerning the billing documentation, and actions of the Nurse Practitioner (NP) assigned to the PAU.

Dr. Wada has been with the hospital since 8/96 with the majority of time spent on research and Bone Marrow Transplant.

Dr. Wada states that he has no work interactions with the NP and performs all his own procedures. Dr. Wada also states that he is not a part of the inpatient/outpatient physician coverage rotation.

Dr. Kyono has been with the hospital since 1997 and is also primarily research oriented.

Dr. Kyono states that he does all his own procedures and has minimal interaction with the NP. Dr. Kyono states that any interaction he does have with the NP does not include coverage for procedures. Dr. Kyono states that he is not a part of the inpatient/outpatient physician coverage rotation except to occasionally cover the inpatient service for a vacationing physician. At these times, Dr. Kyono states he does his own procedures.

These inteviews concluded at 11:00 a.m. and 1:45 p.m. respectively.

Deloitte
Touche
Tohmatsu

A20592

Deloitte & Touche LLP
180 N. Stetson
34 th floor
Chicago, IL 60601
USA

12 946 2769
Fax: 312 297 2769
www.us.deloitte.com

# Memo

**Deloitte & Touche**

To:       Hem/Onc File

From:   Carmen Wolf, Ken Blickenstaff

Subject: Dr. Wilkinson- Interview Summaries 5/30/2001 & 6/14/2001

**Interview #1- 5/30/2001**

The following is a summary of the interviews of Dr. Wilkinson held 5/30/01 at 1:00 p.m. The purpose of the interview was to obtain information concerning billing documentation and other actions of the Nurse Practitioner (NP) assigned to the PAU.

Dr. Wilkinson has been with the hospital since 1994 and has been the Hematology/Oncology Division Director since 1997. Dr. Wilkinson also has a private practice.

Dr. Wilkinson stated that he was present at the 3/10/99 meeting, where billing guidelines for procedures performed by the NP and physicians within the Hem/Onc Department were discussed. Dr. Wilkinson stated that while this was discussed at this meeting, there have been several subsequent meetings regarding the same topic. Dr. Wilkinson stated that after the 3/10/99 meeting, it was his understanding that "the physician should do the procedure whenever possible and that if the physician did not physically do the procedure, the physician could not bill". Dr. Wilkinson stated that it was "Rick Robel's directive that you had to do the procedure to bill."

It was during this interview that the "billing buckets" diagram was drawn for his analysis. The buckets include: 1) physician performs the procedure; 2) physician performs the procedure with the nurse practitioner; 3) physician supervises the procedure performed by the nurse practitioner; and 4) the physician is not present. Dr. Wilkinson further stated that 1) is always billable and that it is the issue that Rick Robel discussed. For 2), he said that a physician needs to perform a "key portion" to bill for a procedure. Dr. Wilkinson stated that he felt a key portion of the procedure means to obtain a good diagnostic specimen and that it covered the entire scope of the patient care continuum. However, it remains unclear as to what his definition of a key portion of a procedure is. He stated that 3) is "difficult" to analyze in certain instances because a supervising physician may need to become involved in a procedure due to complications in which case the physician could bill. Finally, in scenario 4) he said physicians cannot bill.

As Division Director, Dr. Wilkinson stated that he instructed physicians to participate in the procedure so that the procedure could be billed. But in encouraging participation, Dr. Wilkinson stated the he told other physicians to participate by "throwing on a glove and touch the patient or the needle". Dr. Wilkinson states that while he made this comment, it was meant only as an illustration.

Deloitte
Touche
Tohmatsu

A20593

Re: Dr. Wilkinson

Regarding the NP, Dr. Wilkinson stated that he did feel comfortable with her level of competency in performing procedures but shared a concern with other physicians that the NP was at times too aggressive in proceeding with procedures without waiting for assigned physicians. He also stated that many times, the physicians would have performed the procedure themselves had the NP not gotten there first.

To meet supervision requirements for the NP, Dr. Wilkinson stated that these requirements can not only be met by a physician being present in the room during the procedure, but could be met if the physician is present anywhere in the building.

This interview concluded at approximately 1:45 p.m.

**Interview #2- 6/14/2001**

The following is a summary of the follow-up interview of Dr. Wilkinson conducted on June 14, 2001 at 9:00 a.m. The purpose of the interview was to obtain information concerning actions of the Nurse Practitioner (NP) assigned to the P.A.U. unit.

**Procedures**

Dr. Wilkinson clarified that his involvement in procedures is for all intents and purposes limited to the patients who are inpatient on the Wilcox unit. He does not cover the P.A.U. unit. Dianne works in the P.A.U. unit, and his direct interaction with her for procedures is quite limited. Dianne does schedule the inpatient procedures, which involves scheduling a time with anesthesia. He stated, "I prefer to do my own cases." He may authorize Dianne to perform a case for him if anesthesia is waiting and he is going to be delayed. He stated, "Never are we both in the room at the same time; either she performs or I perform."

We then inquired about the 3/10/99 meeting. He related that all physician members should have been there, but doesn't recall if they were or not. He recalls that the billing issue regarding procedures was revisited several times subsequent to the 3/10/99.

His understanding at the time regarding supervision was "The MD must be on campus when Dianne performs procedures. The MD must know the procedure is being done." He doesn't believe supervision was the topic of discussion at the 3/10/99 meeting.

Dr. Wilkinson's recollection is that the issue discussed at the meeting was "when could the MD bill?" He stated his position was that the "MD had to be present or assisting. I urged the MD's that they must participate in order to bill."

Dr. Wilkinson recalls that Rick Robel was "very clear in stating that the MD must perform the procedure or they couldn't bill. Rick's position was that MD's must have been inserting the needle to perform the procedure. I didn't like that. There is no reason to have 2 performers in the room"

Ken then asked Dr. Wilkinson if he ever discussed or instructed his colleagues that if they could justify in their own mind that they participated somehow in the procedure, they should be able to bill. His response was "I may have said that."

Ken then asked, "Did you ever ask/clarify that position with Rick?" His response was "Yes, but he was very clear. I felt we had not resolved the issue. I wanted him to change the rules/law. We have exposure and should be able to bill. Rick just wanted to be squeaky clean."

A205 93 (a)

Page 3
Re: Dr. Wilkinson

Dr. Wilkinson stated, "all the MD's knew what Rick said. They knew my position. No one came to me to say what they were doing. We had an open dialogue about this issue. I was annoyed. It is easy for a bureaucrat to come in here and tell us what to do, but there is subtle pressure to produce more."

Ken asked him to clarify what he meant by "pressure," he stated that there are budgets that have to be met. Dr. Friedman and Bob Hee would question why billings were not up. At one point he was questioned as to why billings were down 10%.

Ken then focused the discussion on documentation for procedures, specifically Dianne's documentation if she performed a procedure. Dr. Wilkinson stated, "This is an evolving issue." He stated he would expect that the procedure note contained the following pieces of information:

- Date and time
- Type of sedation
- How performed
- Results
- Therapy
- How tolerated

He would expect that Dianne's notes would be thorough since in his opinion, nurses document things much better than MD's. "Her note should be extensive." When asked if there was ever a discussion that Dianne should modify her documentation for billing purposes, he stated, "discussed vaguely." He recalls telling the MD's that they must "justify billing. You must write the note; must write something to justify billing." He believes this discussion happened shortly after the March 10, 1999 meeting.

He was then asked if he knew how many procedures are performed in total in a year. He estimated about 250. He stated he believes that "Dianne performs about 85% of all procedures." When asked if there is any formal tracking of this, he stated that Dianne does all the tracking and scheduling and she might know exactly how many are done.

He stated that Dianne keeps track of all the division's quality monitoring. Last year KMS administration asked the division to identify some quality measures and they identified three measures:

1. Bone Marrow aspirations/biopsies- MD's to review results within 72 hours.
2. Type of Sedation used for procedures.
3. Informed Consents

He stated they had an issue in that informed consents were being signed retroactively and this needed to change.

This interview was concluded at approximately 10:00 a.m.

A20594

Deloitte & Touche LLP         Tel: (312)946-3402
180 N. Stetson                Fax: (312)297-3402
Chicago, IL 60601             www.us.deloitte.com
USA

# Memo

**Deloitte & Touche**

Date: June 22, 2001

To: Hem/Onc File

From: Carmen Wolf

Subject: Kathleen Correia – Interview Detail Summary

The following is a summary of the interview of Kathleen Correia on June 21, 2001 at approximately 3:00 p.m. The purpose of the interview was to obtain information concerning actions of the Nurse Practitioner (NP) assigned to the P.A.U. unit.

## Interview Introduction

Kathleen Correia is the manager of the central billing office of KMS. She started working for KMS in February 1999.

This interview began with an explanation of the interview which would reference chemotherapy orders, conscious sedation protocol, and procedures.

## Billing

In December 1998, Rick Robel inherited the responsibility for KMS billing. Cheryl Wicker, a KMS employee, notified Rick that the NP in the PAU was performing procedures and they were receiving charge slips from the physicians for those procedures. In that time period, a contract coder, Jeri Leong, developed a charge slip for the Hem/Onc department and had an employee named Bea who was performing the coding. At that time, if there were questionable procedures and the NP performed them per the documentation, "the billings were held."

On March 10, 1999, Rick Robel, Jeri Leong, and Kathleen attended the Hem/Onc division meeting. The purpose on the meeting was to discuss billing for procedures and E/M Codes. Kathleen recollects that Drs. Medeiros, Woodruff, and Wilkinson, and Dianne Fochtman were all present for that meeting. At that time, the CBO would give feedback to the physicians about the volumes of procedures that had been billed per month. Kathleen stated that the physicians, in particular, Dr. Medeiros, would question the number of procedures billed stating that she had done more procedures than the CBO had billed.

Kathleen recalls that Rick told the physicians that if the NP does the procedure, the physician cannot bill. Rick requested of the physicians that if they perform the procedure, they needed to document that they had done it. She recalls that the physicians questioned what it meant to perform the procedures. Some of the questions about performing the procedures were answered by Jeri Leong.

Deloitte
Touche
Tohmatsu

A20595

Page 2
Date: June 22, 2001
Re: Kathleen Correia

On July 9, 1999, Rick, Kathleen, and Jeri attended another Hem/Onc division meeting. Kathleen recalls that Drs. Woodruff and Wilkinson, and Dianne were present and Dr. Medeiros came in late. The intent of the meeting was to give the physicians feedback about their level of coding and whether the procedures were documented so that they could be billed. They also spoke with the physicians about charge capture.

September 1, 1999, the CBO took over responsibility for coding Hem/Onc procedures. During the transition time from August 1, 1999 to September 1, 1999, the CBO became aware that the contract coder, Bea, was having difficulty coding. The first week of September 1999, the CBO coder, Kara, was introduced to Drs. Medeiros and Woodruff with the purpose of discussing the PAU documentation form.

Regarding procedure notes, it is the CBO policy that if the NP signs a procedure note, that they will not bill. The physician has to write and sign a note for the procedure to be billed. It is also CBO policy that if the record is illegible they will not bill.

This interview concluded at approximately 3:45 p.m.

A20595(A)

Deloitte & Touche LLP
180 N Stetson
Chicago, 60601
USA

312 946 2581
312 297 2581
www.us.deloitte.com

# Memo

**Deloitte & Touche**

Date:    June 1, 2001

To:      Hem/Onc File

From:    Bob Quillinan, Camille Greco

Subject: Summary of Interview of Amy Schearer and Tracy Methered, Clinical Information System Analysts

The following is a summary of the interviews of Amy Schearer and Tracy Methered held 5/30/01 at approximately 2:00 p.m. The purpose of the interview was to obtain information concerning the billing documentation and other actions of the Nurse Practitioner (NP) assigned to the PAU.

Ms. Schearer has been an employee of the hospital for 14 years.

Ms. Methered has been an employee of the hospital for 21 years.

Both Ms. Schearer and Ms. Methered stated that they had no interaction with the NP and are unaware of where the NP will be documenting with the roll out of the new Clini Comp electronic charting system. They stated that the NP had not attended the charting meetings and they are unfamiliar with the job and documentation responsibilities of the NP.

Ms. Schearer and Ms. Methered met with Dr. Glaser, Cara England, and Kathleen Correia regarding the configuration of the progress notes for PAU but state there was no discussion regarding the documentation guidelines for the NP.

This interview concluded at approximately 2:30 p.m.

Deloitte
Touche
Tohmatsu

A20596

# KMCWC HemOnc Department
## Procedures Performed by Nurse Fochtman Based on Fochtman Procedure Logs
### January 4, 2001 to May 25, 2001

## Summary

An analysis of invasive procedure schedule logs maintained by Hematology/Oncology ("HemOnc") HemOnc nurse Diane Fochtman and related billings records for HemOnc physicians Glaser, Medeiros, Wilkinson and Woodruff was conducted on June 26, 2001. The purpose of this analysis was to determine the number of procedures billed by HemOnc physicians, which Fochtman had identified as having been performed by her.

Deloitte & Touche ("D&T") was retained by Kapi'olani's outside counsel, Dennis M. Warren, to perform the work described in this document. All work associated with this project was undertaken at the direction of Mr. Warren, and/or Kapi'olani's General Counsel, Sharon On Leng, working in concert with Mr. Warren.

## Methodology

First, two sets of HemOnc invasive procedure schedule logs were obtained from Nurse Fochtman, as described in greater detail below, for the time period covering January 22, 2000 to May 25, 2001. During her interviews with D&T staff, Fochtman had reported that she personally maintained these logs and made notations on them for the purpose of identifying procedures performed solely by her; performed by her with the assistance of a physician; and performed solely by a physician.

Fochtman reported that she placed a check mark next to any invasive procedure listed on the schedule that she performed. If the physician had to intervene to assist her, she wrote "unsuccessful" on the schedule sheets. She considered that she performed a procedure if the physician's only contribution was to supervise, make suggestions, or check medications, but did not intervene in the procedure itself. In the event that the physician performed the procedure, no check mark or notation was made on the schedule log.

The first set of schedule logs received contained information covering the following dates:

- January 22, 2000 – January 26, 2000
- April 3, 2000 – April 7, 2000
- May 8, 2000 – April 13, 2001

Created by Deloitte & Touche

A20597

1

The second set of schedule logs received contained information covering the following dates:

- January 4, 2000 – March 31, 2000
- April 10, 2000 – May 5, 2000    April 17, 2000 – May 25, 2001

No data was received for the following time periods:

- August 10, 2000 to August 20, 2000
- September 8, 2000 to September 17, 2000
- January 20, 2001 to January 28, 2001

We were unable to confirm why these dates were not available.

Next, D&T obtained billings reports prepared by the Kapi'olani Medical Specialist ("KMS") billing office for Glaser, Medeiros, Wilkinson and Woodruff that included information regarding procedures billed by procedure, patient, and date of service.

We then compared the schedule logs to the billing reports in order to determine if the physicians billed for procedures that were checked by Fochtman as having been performed by her.

## Findings

1. 314 procedures included in Fochtman's logs had checks next to them indicating that Fochtman performed the procedure.

2. 101 of the 314 **checked procedures were billed under the** name of a HEM/ONC physician, as listed immediately below:

   - Dr. Glaser      7
   - Dr. Medeiros    9
   - Dr. Wilkinson   0
   - Dr. Woodruff   85

   **Total**        101

3. This determination was made by comparing the 314 checked procedures to the physician billing reports for the following procedures:

   |  | CPT code |
   |---|---|
   | Diagnostic Spinal | 62270 |
   | Bone Marrow Aspiration | 85905 |
   | Bone Marrow Biopsy | 85102 |
   | Chemotherapy Lumbar | 96450 |

A20598

Created by Deloitte & Touche                                    2

4. 213 of the 314 procedures were not billed.

5. 63 procedures were **not** checked in Fochtman's log but were billed under the name of a HemOnc physician, as listed immediately below:

   - Dr. Glaser          18
   - Dr. Medeiros         6
   - Dr. Wilkinson       21
   - Dr. Woodruff        18

      Total             63

## Monetary Impact

The chart below summarizes the procedures by physician that were billed when Fochtman had identified that she had performed them.

**INVASIVE PROCEDURES PERFORMED BY NURSE FOCHTMAN
BASED ON FOCHTMAN PROCEDURE LOGS
HEM/ONC FINDINGS (JANUARY 2000 – MAY 2001)**

### Dr. Glaser - 7 Entries Checked in Nurse Practitioner Log

| Procedure | Instances | Dollar Value |
|---|---|---|
| Bone Marrow Aspiration | 2 | $ 402 |
| Bone Marrow Biopsy | 1 | 247 |
| Chemotherapy ADM | 0 | 0 |
| Chemotherapy Lumbar | 4 | 1,176 |
| Diagnostic Spinal | 0 | 0 |
| Total | 7 | $ 1,825 |

### Dr. Medeiros - 9 Entries Checked in Nurse Practitioner Log

| Procedure | Instances | Dollar Value |
|---|---|---|
| Bone Marrow Aspiration | 3 | $ 603 |
| Bone Marrow Biopsy | 0 | 0 |
| Chemotherapy ADM | 0 | 0 |
| Chemotherapy Lumbar | 5 | 1,470 |
| Diagnostic Spinal | 1 | 166 |
| Total | 9 | $ 2,239 |

Created by Deloitte & Touche

A20599

3

Dr. Wilkinson - 0 Entries Checked in Nurse Practitioner Log

| Procedure | Instances | Dollar Value |
|---|---|---|
| Bone Marrow Aspiration | 0 | $ 0 |
| Bone Marrow Biopsy | 0 | 0 |
| Chemotherapy ADM | 0 | 0 |
| Chemotherapy Lumbar | 0 | 0 |
| Diagnostic Spinal | 0 | 0 |
| Total | 0 | $ 0 |

Dr. Woodruff - 85 Entries Checked in Nurse Practitioner Log

| Procedure | Instances | Dollar Value |
|---|---|---|
| Bone Marrow Aspiration | 12 | $ 2,412 |
| Bone Marrow Biopsy | 12 | 2,964 |
| Chemotherapy ADM | 1 | 11 |
| Chemotherapy Lumbar | 57 | 16,758 |
| Diagnostic Spinal | 3 | 498 |
| Total | 85 | $ 22,643 |

| Grand Total - All Physicians | 101 | $ 26,707 |

Created by Deloitte & Touche

A20600

4