

Deloitte & Touche LLP
11 Prudential Plaza
180 N. Stetson
Chicago
USA

Tel: 312-946-3826
Fax: 312-297-3826
www.us.deloitte.com

# Memo

**Deloitte & Touche**

Date: July 23, 2001

To: Hem/Onc File

From: Carmen Wolf, R.N., Camille Greco, R.N., James Vagenas

Subject: Patient CN Case Review

## Purpose Of Interviews

To determine whether Dr. Woodruff was present during and/or participated in the performance of an invasive procedure on Patient CN (4-23-01 Bone Marrow Aspiration and Spinal Tap) performed by Nurse Practitioner Fochtman which Dr. Woodruff later dictated notes and billed.

## Description of Case

Four documents pertaining to a specific case were collected and used to make points of clarification for this interview. The specific case involves Patient CN, Birth date 4/11/99 admitted 4/20/01. On 4/23/01 the patient underwent two surgical procedures:

1. Exenteration of the Right Eye

2. Bone Marrow Aspiration and Spinal Tap

This case is listed on the scheduling tool used by Dianne Fochtman R.N. and has a check mark placed next to it. Fochtman places check marks next to procedures that she performs.[1] Billing reports show that a charge slip was submitted to the CBO for this procedure. The CBO subsequently found this procedure to be non-billable because it did not contain a diagnosis which is necessary in order for it to be billed.

## Description of Records

The four documents are identified as follows:

1. Nursing Operative Record – no date, but stamped with patient name. Times coincide with other documents as identified below including "anes. began: 0825 – anes. end: 1155" completed by D. Buenavista, R.N.

2. Anesthesia Record - Pediatric Record dated 4/23/01 completed by B. Tabata, M.D.

---
[1] Dianne Fochtman Interview Summary

Deloitte
Touche
Tohmatsu

A20621

3. Operative Report - completed by Steven S. Sameshima, M.D.

4. Procedure Note - completed by Kelley A. Woodruff, M.D.

The **nursing operative record** lists D. Fochtman R.N. under the *Remarks* section of the record. C. Nishijima, Lab Tech. is listed in the *Remarks* section as well. The surgeon is listed as S. Sameshima M.D. The anesthesiologist is listed as B. Tabata, M.D. The circulating nurse is listed as D. Buenavista. The instrument nurse is listed as E. Balanta, S.A. The surgical and/or anesthesia assistant is listed as F. Granicosa, R.N. and H. Tankaka is listed as S.A. D. Buenavista writes all handwriting on the record. There is no documentation regarding Dr. Woodruff's presence in the operating room.

The **anesthesia record-pediatric** lists B. Tabata, M.D. as the anesthesia person. The surgeon listed is S. Sameshima, M.D. All handwriting on the record is that of Dr. Tabata. In the *Events* section the following remarks appear, "0900-0925 D. Fochtman LP & BMA & BX 0925- Dr. Sameshima begins c (? - Illegible)". There is no mention of Dr. Woodruff.

The **operative report** lists surgeon Steven Sameshima, M.D. and anesthesiologist Brian Tabata, M.D. In the section titled *Description of Operation* Dr. Sameshima dictated the following, "Prior to the eye surgery bone marrow and spinal tap were accomplished by Dr. Fochman *(sp. is incorrect in the report)*."

The **procedure note** is dictated and signed Kelley A. Woodruff, M.D. The procedure note reads as follows:

> "While under general anesthesia in the OR, his lumbar areas was prepped and draped in the usual manner. 3 cc of clear CSF were obtained without difficulty and sent to the lab for cell count, cytospin, cultures, glucose, and protein. The right iliac crest was then prepped and draped in the usual manner and a bone marrow aspirate was obtained without difficulty. The patient remained in satisfactory condition under general anesthesia. Bone marrow was sent for morphology studies and chromosomes."

There are no handwritten notes by Dr. Woodruff pertaining to this procedure for this date of service.

Based on these four documents it is clear that D. Fochtman was in the O.R. and performed a spinal tap and bone marrow aspiration on CN on 4-23-01 as documented by the circulating nurse, the anesthesiologist and the surgeon. Dr. Woodruff dictates a procedure note without mention of the nurse practitioner.

<u>Interview #1 Detail- D. Buenavista R.N.</u>

On July 12, 2001 at approximately 2:30 p.m. HST, Carmen Wolf, R.N. introduced herself and Camille Greco, R.N. as compliance consultants engaged by Kapiolani to assist with a compliance issue. D. Buenavista is a registered nurse working the operating room at Women and Children's Hospital since January 2001.

Mr. Buenavista was asked to clarify the purpose of the circulating nurse record during O.R. procedures. He stated this record is kept as means to document all events that take place during a procedure. He was then asked if this record is more specifically used to identify persons who enter the operating room during a procedure. He stated, "Yes, it should be. That is how I was taught to document."

A20622

Page 3
Date: July 23, 2001
Re: Patient CN

Mr. Buenavista was then shown the nursing operative record for patient CN (admit date 4/20/01, Medical Record Number 51-52-43). Mr. Buenavista was asked to confirm whether the handwriting on the document was his. He stated that it was. He was then asked, based on his documentation practice, whether any other individuals might have entered the room during the case which he may not have documented. He said, "No." He was then asked if Dr. Woodruff was in the O.R. on that day. He stated he did not see her. He further stated it was his understanding that the anesthesiologist or surgeon could supervise D. Fochtman when she came to the O.R. to perform procedures. He said they (the O.R. nurses) always ask who is supervising her (D. Fochtman).

He was then shown the procedure note dictated and signed by Dr. Woodruff. He was then asked again, if Dr. Woodruff performed this procedure. He stated, "No, she wasn't even in the O.R." *He stated he hasn't ever seen an oncologist in the O.R. when Dianne performs procedures and that it was his understanding that the anesthesiologist or surgeon was supervising her.* He was then asked to read the procedure note and give his opinion as to who performed the procedure based on this documentation. He stated, " Dr. Woodruff." He then stated he now understood what the problem was. When asked to clarify what he meant, he stated, it would not be good for the records to conflict but reiterated that Dr. Woodruff was not present for the procedure.

The interview was concluded at 2:45 p.m. HST.

**Interview #1 Detail - Steven S. Sameshima, M.D.**

On July 12, 2001 at approximately 4:15p.m. HST, Carmen Wolf, R.N. introduced herself and Camille Greco, R.N. as compliance consultants engaged by Kapiolani to assist with a compliance issue. Ms. Wolf explained the goal for this interview was to clarify documentation pertaining to the case regarding who performed a particular procedure in which he was the surgeon of record. Dr. Sameshima informed the interviewers that he has been working at Kapiolani Women & Children's Hospital for about 10 years.

First, Ms. Wolf shared the nursing operative record and the anesthesia record to Sameshima, which indicate the involvement of D. Fochtman in the procedure. He was asked if those records would indicate that D. Fochtman has performed the procedure. He stated, "Yes." He was then asked to review the operative report dictated and signed by him for the case. He was directed to the sentence, which reads, "Prior to the eye surgery bone marrow and spinal tap were accomplished by Dr. Fochman." He was asked to clarify if this was to mean that Ms. Fochtman performed the procedure. He stated that she did perform the procedure. He was then asked if Dr. Woodruff was present for the procedure and he stated that she wasn't. He then stated, *"I've been working here for 10 years and I don't recall an oncologist ever coming down, at least I've never seen one."*

Dr. Sameshima was then shown a copy of the procedure report dictated and signed by Dr. Woodruff. He was asked to give his opinion of what that might mean. He looked at it and stated, *"That's not good. Ooo that's bad."* When asked to clarify what he meant, he stated that it looks like Dr. Woodruff was documenting a procedure that she did not perform. He was then asked to reiterate that if 3 persons had documented that D. Fochtman has performed the procedure or at least documented that she was present and not one of the 3 had documented that Dr. Woodruff had been present, would it be reasonable to assume that Dr. Woodruff was not there. He stated, *"Yes."* He again reiterated that Dr. Woodruff's dictation was not representative of identifying who performed the procedure.

This interview concluded at 4:30 HST.

A20623

Page 4
Date: July 23, 2001
Re: Patient CN

### Interview #1 Detail – Brian Tabata, M.D.

On July 11, 2001 at approximately 3:10 p.m. HST, Carmen Wolf, R.N. introduced herself and Camille Greco, R.N. as compliance consultants engaged by Kapiolani to assist with a compliance issue. Ms. Wolf explained the goal for this interview was to clarify documentation on the anesthesia record regarding who performs procedures. Dr. Tabata is an anesthesiologist at Women & Children's Hospital.

Ms. Wolf showed Dr. Tabata an anesthesia record that he had completed with a note on the bottom stated that Dianne Fochtman, NP, performed the procedure. The surgeons listed were Dr. Woodruff and Dianne Fochtman. When asked if he completed the top part of the record where the surgeon and procedure were listed, Dr. Tabata stated that Dianne Fochtman, as is often the case, completed this line on the anesthesia record. He stated that as the anesthesiologist signing the record, he took responsibility for the record. When Ms. Wolf asked who performed the procedure in the room, he stated "Dianne Fochtman." When Ms. Wolf asked about the presence of Dr. Woodruff, Dr. Tabata stated that the presence of the attending oncologist on the note meant, "the physician was aware of the patient and the procedure but the physician was not necessarily in the room." Dr. Tabata stated that for "more than half of the procedures, the physician was not in the room for the entire procedure" and that "if I wrote on the bottom that Dianne did the procedure then she did do the procedure." Dr. Tabata stated that "most of the time they know the patient is in the room" and "usually was there for the entire procedure."

Dr. Tabata was then shown the anesthesia record pertaining to CN. He was asked to review with the interviewer that he had written on the anesthesia record that the surgeon was Dr. Sameshima. He was then directed to documentation in the events section of the record where it is noted that Dianne Fochtman had performed the procedure. He was also shown the operative note dictated by the surgeon as "Dr. Fochtman" performing procedures prior to the surgical procedure. Dr. Tabata stated that by looking at the documentation it appeared that Dianne Fochtman performed the procedure herself. Ms. Wolf asked if Dr. Woodruff would ever come into the O.R. to supervise and assist and Dr. Tabata stated, "Not in the O.R. but maybe outside the O.R., she did not gown up specifically to come in the room". When shown the procedure note dictated by Dr. Woodruff, Ms. Wolf asked Dr. Tabata if he felt this piece of documentation was evidence that Dr. Woodruff had documented a procedure that she had not performed. Dr. Tabata stated, "Yes".

This interview concluded at 3:30 p.m. HST.

### Interview #2 Detail–D. Buenavista, R.N.

The following is a summary of the interview of Dennis Buenavista held July 23, 2001 at approximately 2:00 p.m. The purpose of the interview was to clarify information gathered during Mr. Buenavista's first interview held July 12, 2001.

Ms. Wolf reviewed with him the circulating nurse record for CN. Ms. Wolf stated that the purpose of our interview was to verify that we correctly interpreted what he had told us in the first interview. Ms. Wolf explained that his statements were consistent with what we had been told by both the anesthesiologist and surgeon, but have since been given a different scenario of the case from Dr. Woodruff. Mr. Buenavista's response to this explanation of purpose was, *"If he had been there, I would have documented it."* Ms. Wolf clarified for Mr. Buenavista that Dr. Woodruff was a female. Mr. Buenavista acknowledged that he did not know that.

Ms. Wolf then clarified that it was her understanding from the first interview that Mr. Buenavista, as the circulating nurse, had the responsibility to document each person who enters the operating room. Mr. Buenavista acknowledged that was true. Ms. Wolf then referred to his documentation of Dianne

A20624

Fochtman and a laborotory tech. Mr. Buenavista then offered an example stating that if the laboratory tech. had a person shadowing him/her on that day, he would document the shadow persons presence even though they might not do anything other than walk in and out of the room.

Ms. Wolf then shared the following scenario with Mr. Buenavista stating that the purpose would be to potentially assist him in recalling what may have happened during this case: Dr. Woodruff came to the O.R. to perform the case, but noticed that the consent form was not signed and proceeded to leave the O.R. and meet with the parents to obtain the consent. When she returned, Ms. Fochtman had already started the case, and she supervised it. Mr. Buenasvista shared the following thoughts/questions:

1. Was she observing/supervising in the room? He stated, if Dr. Woodruff would have entered the room he would have written that on the record.

2. It is his understanding that anesthesiologists supervise Ms. Fochtman when she performs cases in the O.R. therefore, he can't recall an oncologist being present supervising Ms. Fochtman in this or other cases in which he has been involved.

This interview concluded at 2:15 p.m.

### Interview #2 Detail- Dr. Tabata

The following is a summary of the interview of Dr. Tabata held on July 23, 2001 at approximately 3:00 p.m. The purpose of the interview was to clarify information gathered during Dr. Tabata's first interview held July 12, 2001.

Ms. Wolf reviewed with him the anesthesia record for CN. Ms. Wolf stated that the purpose of our interview was to verify that we correctly interpreted what he had told us in the first interview. Ms. Wolf explained that his statements were consistent with what we had been told by both the circulating nurse and surgeon, but have since been given a different scenario of the case from Dr. Woodruff.

*Dr. Tabata stated that he usually documents who's in the room, however, he could not recall for sure if Dr. Woodruff poked her head in the room during the procedure performed on the case in question. He also stated that he never gives presence of the oncologist much thought as he is comfortable supervising Ms. Fochtman when she performs procedures. He had never considered the difference between the clinical practice issues and legal/billing issues before our first interview. Dr. Tabata stated that the Circulating Nurse always documents everybody who's in the room during procedures.*

Ms. Wolf then shared the following scenario with Dr. Tabata stating that the purpose would be to potentially assist him in recalling what may have happened during this case: Dr. Woodruff came to the O.R. to perform the case, but noticed that the consent form was not signed and proceeded to leave the O.R. and meet with the parents to obtain the consent. When she returned, Ms. Fochtman had already started the case, and she supervised it.

Dr. Tabata said that if that was what had happened, he was unaware of it. He can not recall Dr. Woodruff supervising this case. He then stated, "but I'm not always right 100% of the time." Dr. Tabata suggested that we review the time and date recorded on the informed consent to determine whether Dr. Woodruff's story was accurate.

This interview concluded at 3:10 p.m.

# CI COMPLIANCELINE

## Compliance Report
0102-KAP-10005-01

**Kapi'olani Health**
Kapi'olani Hospital
1319 Punahou
Honolulu, HI

### General Information

| | |
|---|---|
| Date: Sunday, February 11, 2001, 11:57:00PM | Call Back: Monday, February 26, 2001 |
| Severity: 3    Status: Open | First Time Caller: Yes    Anonymous Caller: No |
| Communication Tool: Training | Resolution: Pending |

### Category

Billing/Coding

### Caller Information

Dr. Robert Wilkinson
Director of Childrens Blood and Cancer Center
1319 Punahou, Suite 1050
Honolulu, HI, 96826

Home: (808) 734-5470
Business: (808) 942-8144

### Summary

Dr. Wilkinson stated charges for bone marrow and spinal taps are inconsistent.

### Details

Dr. Wilkinson stated charges for bone marrow and spinal taps have been inconsistent in the Children's Blood and Cancer Center. Dr. Wilkinson stated when a doctor performs these procedures, the patient is billed, however, when these procedures are performed by a nurse practitioner, the patient is not billed, which is actually a discount (details withheld). Dr. Wilkinson stated there is no mechanism in place for nurse practitioners to bill for these procedures. Dr. Wilkinson believes these discounts are amounting to approximately $40,000 a year, and have been occurring since 1997 (exact date unknown).

Dr. Wilkinson stated, when he realized what was occurring, he felt it was best to report the issue before the OIG found the department to be inconsistent.

### Sanctions Database Results

| # | First Name | Middle Name | Last Name | Match? |
|---|---|---|---|---|
| 1. | Robert | | Wilkinson | No |

A20626

1

Woodruff E-Mail Memo to Compliance Officer Bob Ching
Dated February 21, 2001

Exact text of February 21, 2001 email, retyped for readability:

-----Original Message-----
**From:** Kelley Woodruff, M.D.
**Sent:** Wednesday, February, 21, 2001 1:28 PM
**To:** Bob Ching
**Cc:** Robert Wilkinson, MD; Neal Winn, M.D.; Bob Hee; Dianne Fochtman; Susan Young; Henny Breen
**Subject:** Suggestion

Dear Mr. Ching,

When I attended Corporate compliance last week, it was asked in Module 1 for any suggested policy changes from employees that would ultimately increase our compliance with the laws. I have a suggestion: KMS should hire our nurse practitioner in Pediatric Hematology-Oncology, Dianne Fochtman, at least as a part-time employee.

Dianne is currently a Kapiolani employee. In Peds Hem-Onc, she is trained not only in physical assessment, but in doing the 2 common produres we do: bone marrow studies and spinal taps with chemotherapy. Currently, she does many of these procedures on our patients. The problem is, is that when she does these procedure, the doctors cannot charge for these services. We all understand that the doctors could charge for these services if she were an employee of the doctors (KMS). This has been suggested numerous times over the years as I understand, but there seems to be some sort of hold up on the part of KMS.

So, currently, the MD tries to assist Dianne in the procedures, so the pt./insurance can be billed. However, reality is, that while we are often participating, our clinic is so busy that another routine chemo patient does not get seen. (Bad). Or, the clinic is so busy, or the MD running the clinic has so many other responsibilities (such as conferences, etc.) that the MD cannot participate, and thus Dianne does it (legally, of course) alone, and the pt. cannot be charged. This leads to 2 new problems: 1) we lose on billing that we could otherwise rightfully be collecting on and 2) we are essentially offering these pts a discount on their procedure b/c they will never be billed.

It seems to me that it would be so easy for the hospital, which pays Dianne, to divert some of her salary over to KMS to pay her, and thus she would be a KMS employee. This happens routinely on a KMS/UH scale with the doctors on faculty.

-oOo-

A20627

Woodruff E-Mail Memo to Dr. Neal Winn
Dated April 5, 2001

Exact text of April 5, 2001 email, retyped for readability:

-----Original Message-----
From: Kelley Woodruff, M.D.
Sent: Monday, April 2, 2001 3:39 PM
To: Neal Winn, M.D.; Robert Wilkinson, MD; Bob Ching; Debbie Gaynor; Rick Robel
Cc: Henny Breen; Dianne Fochtman; Carol Kotsubo; Darryl Glaser, M.D.; Desiree Medeiros, M.D.; Wade Kyono; Kathy Hanbai-Lee; Randy Wada, M.D.; 'Bruce Shiramizu'; Mary Gaughran
Subject: PAU visits

Dear all,

After some questions were raised in January as to possible reasons why our Hem-Onc billings are down 20% from last year, many possible reasons were suggested. I do not have those reasons, but I then did a prospective survey of the billings in PAU alone starting at that time. While the results do not explain the decrease in billings (I dod not have the information from a year ago to compare with), I did find some interesting things that I think can be improved upon to increase our billings in the Pau.

Briefly, the results show:

The study went for 32 consecutive PAU days from Jan 23, 01 to Feb 28, 01.

406 patients were seen in PAU. Of these, 371 (91%) were Hem-Onc patients.

271 Heme-Onc pts were seen and billed for by the MD. (This represents 73% of the Hem-Onc pts.)

Reasons Hem-Onc pts were not seen or billed for, in decreasing order:

1. MD in a meeting or apt.                           #35
2. Pt admitted same day                              #13
3. Nurse or MD decision not to be seen              #13
4. Visit for labs only                               #13
5. MD seeing other pts.                              #10
6. Nursing visit only                                #6
7. Social visit only                                 #3
8. Dr. Lau's pt.                                     #3
9. Holiday or after MD's hours                       #2
10. Child not present                                #1
11. Dr. Bob saw but didn't charge                    #1
12. Parental request for no MD visit (# concerns)   #1

A20628

This totals 101 pts, so my "study" is only off by 1 visit.

I believe, that if Dianne were a "part-time" KMS employee, she could be seeing the appropriate pts, and they could be fairly billed. Not only would that solve our obvious corporate compliance problem, but improve pt. care, as all pts. Could be properly seen whether the MD is in one of our hundreds of meetings or not. In this small sample above, we could have planned for her to see all pts above not seen in reasons # 1 and 5. This would have been an additional 45 pts for this time period, and represents 45% of all the pts not seen. The other 55% are probably legitimately not seen pts, or isolated incidents. I think reason # 2 above should be discussed and clarified so we are all following the same guidelines.

Any comments are welcome. Kelley

-oOo-

A20629