Arleen D. Jouxson-Meyers          7223-0
ajouxson@physicianslawfirm.com
Rafael G. del Castillo            6909-0
rdelcastillo@physicianslawfirm.com
Jouxson-Meyers & del Castillo
A Limited Liability Law Company
302 California Ave., Suite 209
Wahiawa, Hawai`i 96786
Telephone: (808)621-8806; Fax: (808)422-8772

Attorneys for Plaintiff
Hawaii Children's Blood And Cancer Group

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| Hawaii Children's Blood and Cancer Group, | Civil No. 03-00708 SOM/LEK |
| Plaintiff, | MEMORANDUM IN SUPPORT OF MOTION |
| vs. | |
| Hawai`i Pacific Health; Kapi`olani Medical Specialists; Kapi`olani Medical Center for Women and Children, | |
| Defendants. | Trial Date: January 29, 2008 |

## MEMORANDUM IN SUPPORT OF MOTION

Plaintiff Hawaii Children's Blood and Cancer Group respectfully submits this Memorandum in support of its Motion to Dissolve Stay filed July 13, 2007. On October 22, 2004, this Court held, "there is sufficient overlap between

the parties and the claims to ensure that HCBCG's interests will be fully protected in the state court. . . ." because the Court apparently saw HCBCG's claims as merely a continuation of Dr. Woodruff's claims in her lawsuit.  That is not the case now, if it ever was.  The primary concern of HCBCG's Complaint is the injury competition will suffer as a result of Defendants' conduct, which has been directed at eliminating **HCBCG** as a competitor, leaving Defendants no competition in Hawaii for pediatric hem-onc services.  Declaration of Robert W. Wilkinson, M.D. ("Wilkinson Decl."); Exhibit 1 at 3.[1]  Plaintiffs' antitrust expert has also determined that, "KMCWC has exercised monopoly power. . . ." Exhibit 1 at 6, and that Defendants' "conduct vis-a-vis HCBCG, has been anticompetitive, and likely motivated to reduce their effectiveness as competitors to KMS's pediatric hematology-oncology physicians. . ." Exhibit 1 at 14.  The monopoly Defendants are intent upon having threatens the vitality of pediatric hem-onc care in Hawaii, and the community's ability to attract new specialists in the field, and has impacted

---

[1] In his "Preliminary Opinion" Report, which Defendants insisted on having in May 2006, David M. Eisenstadt, PhD, HCBCG's antitrust expert found that, "Only two significant groups of board certified pediatric hematology-oncology physicians, HCBCG and KMS, provide services to the general pediatric hematology-oncology population." Exhibit 1 at 3.  "Combined, HCBCG and KMS pediatric hematology-oncology physicians account for the vast majority, probably in excess of 90 percent, of the pediatric hematology-oncology physicians' services provided to pediatric hematology-oncology patients who are neither military dependents nor Kaiser enrollees."  Exhibit 1 at 5.  "Between the two groups, HCBCG and KMS's hematologist-oncologists, HCBCG possesses a 38 percent share and KMS possesses a 62 percent share." Id.

2

adversely on interstate commerce in numerous instances HCBCG has documented but with which the state court has no enforcement concerns. *Id.* Dr. Wilkinson's reputation and status as the principal investigator of the pediatric hematology-oncology clinical trials is the only thing that has stopped Defendants from completely eliminating HCBCG while the stay has been imposed. Unchecked, Defendants will eventually succeed because they have the power and the money.

> In its October 22, 2004 Order, this Court held that:
>
> The court notes that a stay, and not dismissal, is appropriate in this case. *Attwood v. Mendocino Coast Dist. Hosp.*, 886 F.2d 241, 244 (9th Cir. 1989) (in case all issues are not resolved by a state case, "only a stay ensures that the federal court will meet its 'unflagging duty' to exercise its jurisdiction"). HCBCG may reopen these proceedings once the state case is completed, or if changes in circumstances render the state proceedings inadequate to protect HCBCG's interests. "[U]nlike a dismissal, a stay avoids the risk that the federal plaintiff will be time—barred from reinstating the federal suit." *Id.*

Order at 11-12. The circumstances have changed in this matter because Defendants have exercised monopoly power, and their anticompetitive conduct directed at HCBCG (not uniquely at Dr. Woodruff) and any other entity which has contemplated associating with or using HCBCG's services, has increasingly affected interstate commerce on multiple fronts summarized in the May 13, 2006 Preliminary Opinions Report of David M. Eisenstadt, PhD, Plaintiff HCBCG's antitrust expert, and Dr. Wilkinson's Declaration. Furthermore, the now tenuous hold the state court has on the remaining claims is insufficient justification for

delaying Dr. Woodruff unnecessarily in appealing the state court's manifest errors in granting summary judgment on her claims.

## CHANGED CIRCUMSTANCES

Dr. Woodruff's individual claims for defamation and tortious interference, which this Court referred to in its prior decision, concern conduct Defendants aimed <u>uniquely at her</u>, and the adjudication of those claims to the extent that they sounded in antitrust for the brief period that she was Defendants' sole competitor, do not resolve such that "no issue that would remain for substantive determination in the present action once the state case is concluded."[2]

The antitrust claims in Dr. Woodruff's Complaint, which was filed three days after the termination of her employment, on January 11, 2002, were based on Defendants' attempt to monopolize pediatric hematology-oncology by persuading Dr. Woodruff to bring her thriving pediatric hem-onc practice into Defendant KMS in exchange for permanent membership in a faculty practice, a promise Defendants did not keep, and never intended to keep.  Woodruff Complaint at ¶¶ 26, 29-34.   The theory of the Complaint was that Defendants kept the medical group under their control instead of granting it independence because they could potentially lose control over pediatric hem-onc inpatient care.

---

[2] Dr. Woodruff's HRS § 480-2 claims have no injury-to-competition standing requirement.

Defendants then attempted to complete their monopolization by ejecting Dr. Woodruff from the group without her patients.

Dr. Woodruff resolved to fight to keep her patients. It was not until three weeks after Dr. Woodruff filed her Complaint that Defendants began forcing patients to choose a pediatric hem-onc physician because Dr. Woodruff had refused to comply with their desire that she leave pediatric hematology-oncology, and she had a broad base of support among patients and physicians. At that time, there was no HCBCG, and Dr. Wilkinson was still employed by Defendant KMS. Drs. Wilkinson and Woodruff only became involved in discussions about the prospect of forming a new group later when Defendants wrongfully suspended Dr. Woodruff's privileges and escorted her off of the KMCWC campus under guard. Dr. Wilkinson immediately resigned from KMS in disgust over Defendants egregious use of force to bolster their flagging attempt to destroy Dr. Woodruff's practice.

Drs. Woodruff and Wilkinson formed HCBCG on April 1, 2002. Initially, they were confident that Defendant KMS would not receive many referrals because its pediatric hem-onc doctors were unknown and untested, and that it was only a matter of time before Defendants wearied of paying their physicians full-time salaries for part-time work. Kaiser's pediatric hem-onc physician had invited a proposal for services to be provided at Kaiser. HCBCG

5

also expected support from and possible association with the Cancer Research Center ("CRCH") and possibly The Queen's Health System.  Wilkinson Decl.

Subsequently, both the CRCH and Defendants hired consultants to survey the pediatric hem-onc program, and both recommended that Dr. Wilkinson be permitted to resume leadership of the program.  CRCH began an investigation into establishing a cancer center-based clinical program in pediatric hematology-oncology that promised to increase funding and the number of pediatric hem-onc physician positions in Hawaii.  HCBCG also had encouraging discussions with Dr. Richard Friedman at The Queen's Medical Center about HCBCG establishing an adolescent/young adult cancer program at Queen's.

It was not until after CRCH cancelled its search for a consultant to prepare a business plan for pediatric hem-onc clinical care, and Dr. Friedman's interest was suddenly extinguished, and Defendants had excluded HCBCG from the hospital call schedules and diverted numerous referrals using their control over the natural access to pediatric hem-onc care, that HCBCG decided Defendants would succeed at eliminating it from competition if permitted to continue their anticompetitive acts, and filed its Complaint in this Court twenty months after it was established.  To ensure that HCBCG's concerns about the viability of competition were not subsumed by the ongoing dispute between Defendants and Dr. Woodruff, HCBCG filed in Federal District Court.

State Court Inadequate to Address Central Sherman Act Commerce Issues

HCBCG has documented numerous instances of the following effects on interstate commerce, with which the state court has lesser or no enforcement concerns. HCBCG complained, under the Sherman Act, that Defendants had engaged in a concerted effort to exclude it from pediatric hem-onc physician market, medical education and research, HCBCG Complaint at ¶2; that Defendants had used their control over the natural access the pediatric hem-onc care to interfere with and divert new patient referrals, HCBCG Complaint at ¶3, Exhibit 1 at 14-16;[3] that Defendants had interfered with the free flow of information and employed confusing and misleading information to exclude HCBCG, HCBCG Complaint at ¶23; that Defendants excluded HCBCG from opportunities for faculty and research appointments, directly affecting interstate commerce, HCBCG Complaint at ¶¶3, 42; that Defendants' pediatric oncology center is an essential facility, HCBCG Complaint at ¶31; that if Defendants obtained a monopoly over the pediatric hem-onc physician services, it would be impossible for any other competitor to overcome the barriers to entry, HCBCG Complaint at ¶35; that Defendants organized a boycott of HCBCG, HCBCG Complaint at ¶60; and that the quality of care has been adversely affected due to Defendants' anticompetitive

---

[3] "Although HCBCG doctors received over 50 percent of [direct] referrals made by independent physicians during the period April 2002 - October 2005, they received only 10 percent of the referrals made by HPH personnel over the same period." Exhibit 1 at 16.

conduct, and will be adversely affected if Defendants are permitted to succeed in monopolizing pediatric hem-onc physician services, HCBCG Complaint at ¶¶51-52.

Defendants' enforcement of their boycott against HCBCG by threatening CRCH with retaliation interfered with the potential elevation of CRCH by the National Cancer Institute ("NCI") to Comprehensive Cancer Center status, with increased funding, new positions for additional pediatric hem-onc clinical researchers, and the development of new clinical trials which could affect the discovery of new protocols or even cures for one or more pediatric cancers. Wilkinson Decl. Defendants' enforcement of their boycott against The Queen's Medical Center and the Oncare oncology group wrongfully prevented the establishment of an adolescent/young adult cancer program, pursuant to updated NCI objectives, providing essential services to a gap population which enjoys special programs in mainland cancer centers. Wilkinson Decl. Subsequently, in November 2004, Defendants commenced a concerted effort to exclude HCBCG from providing bone marrow transplant services, by eliminating the requirement for special training in the hospital credentials, and boycotting HCBCG's bone marrow transplant credentialed physicians. Wilkinson Decl.

Defendants' conduct has had an adverse affect on interstate commerce because patients and their families will have to increasingly seek bone marrow

transplant services at mainland centers to better assure their safety and optimal results. The lengthy recuperation periods required by bone marrow/stem cell transplants affect productivity and often require relocation of the family earners to locations near the mainland centers.[4]  The associated costs must be borne by the patient's family because they are not reimbursed by insurance.[5]  Because Hawaii is the only pediatric oncology center in the Pacific Rim, Defendants have used their control over the office of Pacific Island Medical Services to divert referrals from HCBCG to Defendant KMS, resulting in higher charges and reduced choices for patients from the U.S. Territories and Protectorates.  Additionally, interstate commerce in medical education has been adversely affected by Defendants' exclusion of HCBCG from the medical school faculty.

### State Court Circumstances Changed

As set forth in the Declaration of Rafael del Castillo, also attached hereto, the state court entirely disregarded Dr. Woodruff's defamation *per se* claims arising from Defendants' conduct during January through March 2002 in granting summary judgment in Defendants' favor on Dr. Woodruff's defamation

---

[4] "Completion of most pediatric cancer treatment regimens would necessitate a move to the mainland for an extended period.  This would dictate relocation by both the patient and usually at least one parent or responsible party." Exhibit 1 at 2.

[5] "The out-of-pocket cost of travel and re-location expenses, as well as the amount of lost job earnings, makes it prohibitively expensive for most Hawaii families to substitute mainland pediatric hematology-oncology physicians for Hawaii pediatric hematology-oncology physicians." Exhibit 1 at 3.

*per se* claims. The minute order states only that Defendants were entitled to judgment on the defamation claims because their statements in the Voluntary Disclosure Statement were "true."

Although the state court has not yet disposed of Dr. Woodruff's tortious interference and unfair competition claims arising prior to April 2002, the effect of Defendants' complained of conduct was to materially diminish size of the practice Dr. Woodruff was able to contribute to HCBCG by redistributing her patients to Defendants' employed physicians. Those claims thus do not touch upon the injury to competition inherent in Defendants' post-April 2002 actions against HCBCG, further summarized in Dr. Wilkinson's Declaration and Exhibit 1. Those claims constitute a separate case, based upon conduct which Defendants commenced against HCBCG as a medical <u>group</u> by leveling threats against the Cancer Research Center of Hawaii and The Queen's Medical Center if they associated with HCBCG in developing programs during 2004 and 2005, Wilkinson Decl.; attempting to block HCBCG's employment in the Department of Health's Thalassemia screening program in 2005, Wilkinson Decl.; and excluding HCBCG from bone marrow transplants, 2005 to the present. Wilkinson Decl.

## CONCLUSION

For all of the foregoing reasons, this Court should grant Plaintiff Hawaii Children's Blood and Cancer Group's motion for an order dissolving the stay of its claims.

DATED: Honolulu, Hawai`i, July 13, 2007

/s/ Rafael del Castillo
_____
Arleen D. Jouxson
Rafael G. del Castillo

Attorneys for Plaintiff
Hawaii Children's Blood and Cancer Group

11