IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| Hawaii Children's Blood and Cancer Group, <br><br> Plaintiff, <br><br> vs. <br><br> Hawai`i Pacific Health; Kapi`olani Medical Specialists; Kapi`olani Medical Center for Women and Children, <br><br> Defendants. <br> _____ | ) Civil No. 03-00708 SOM/LEK <br> ) <br> ) DECLARATION OF ROBERT W. <br> ) WILKINSON, M.D. <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

DECLARATION OF ROBERT W. WILKINSON, M.D.

I, ROBERT W. WILKINSON, M.D., state:

1. I am a medical doctor duly licensed to practice medicine and I am a member of Hawaii Children's Blood and Cancer Group, Plaintiff in the above-entitled matter.

2. I have personal knowledge of the matters set forth herein and, if called upon to do so, could and would testify competently about them.

3. I make this declaration in support of Plaintiff Hawaii Children's Blood And Cancer Group's Motion to Dissolve Stay.

4. This Court's decision to stay this case on the grounds that HCBCG's damages will have to be proven by Woodruff for her to prove her

individual claim to a portion of those damages in the state suit, has never sat well with me because it did not accurately reflect the circumstances and it took my rights as a member of HCBCG and my concerns as the leader of pediatric hematology-oncology in Hawaii too lightly.

       5.     Furthermore, I believe that if the case had proceeded in Federal District Court, it would long ago have been adjudicated to the benefit not only of Plaintiff Hawaii Children's Blood and Cancer Group, but of all of the patients whose welfare I am duty-bound to in my position to defend, and the resolution of the harm Defendants have wrought to free competition in pediatric hematology-oncology in Hawaii.

       6.     We filed HCBCG's action in Federal District Court because it is truly distinct from the Woodruff case, despite what Defendants would have this Court believe.  Granting them consolidation of the case has enabled them to continue their conduct injurious to competition longer than they should have been permitted to do so.

       7.     To understand why this case is distinct from the Woodruff case, and why it should be seen as one whose chief purpose is to protect competition, and not as one to prove Dr. Woodruff's individual damages, it is imperative that this Court take note of the facts that render pediatric hematology-oncology extraordinary in the general scheme of competition and even the scheme of

competition in medicine, and also of Hawaii's very unique circumstances in cancer care.

8. Keeping in mind that we are unnaturally isolated such that the free flow of qualified pediatric hem-onc specialists to and from Hawaii is constrained by distance and inferior salaries, in order for pediatric hematology-oncology to make the kind of progress it enjoys in mainland communities and for us to be able to attract the talent that will sustain an excellent program, the cream in the existing market must be allowed to rise. The doctors must be allowed to compete freely at a professional level for grants and patient referrals, pursuing the areas that professionally interest them, free from Defendants' efforts to direct funds or referrals to any particular specialist they have decided to favor (because they control them).

9. At the time HCBCG filed its suit in Federal Court, three of the pediatric hem-onc physicians in Hawaii were devoted almost entirely to research, sustained by National Cancer Institute grants. Two of the researchers have been unable to sustain continued grant support. (The Court should note that during that time, Dr. Woodruff won a large grant even though she is principally a clinician because she specializes in Thalassemia, a hematologic condition of special interest and importance in Hawaii.) In a normal competitive environment, economic pressures may have forced those researchers to leave Hawaii and find other posts

on the mainland. I would have been sorry to lose them, but that is the natural course of things in pediatric hematology-oncology research, and am believe that they would have been replaced by new blood with new research perspectives to share with the pediatric hem-onc clinicians and other clinical specialists who support them in Hawaii, stimulating our professional intellectual environment.

        10. Instead, Defendants' administrators interfered with the natural competitive process by moving those doctors into clinical care, and diverting referrals to them that they would not otherwise have received because they are not clinicians and had not previously shown any real interest in clinical care. I believe Defendants' interference was motivated by their determination to exclude HCBCG from competition.

        11. Absent Defendants' improper interference since HCBCG filed its Complaint on December 29, 2003, further instances of which are described below, the clinical service in Hawaii could be functioning optimally with competing independent pediatric hem-onc groups or even competing independent pediatric hem-onc physicians. In normal circumstances, the specialty is organized under the strong central professional leadership of the principal investigator for the clinical trials in which all of the clinicians must have their patients enrolled if they are to provide the recognized standard of care. The Cancer Research Center of Hawaii is the Children's Oncology Group member organization, and I have always

been the designated principal investigator for the clinical trials, to ensure their integrity.

12. To ensure the future vitality of pediatric hem-onc clinical care and research in Hawaii, we must be able to attract new talent. Ultimately, we must be able to attract one of the relatively few pediatric hem-onc physicians with the qualifications and credentials to assume the role of principal investigator when I decide to retire. I am well acquainted with virtually all of those candidates, and I am convinced that as long as Defendants are permitted to interfere with the natural market as they have in the past five years, none of them will have any interest in assuming my role (and the problems Defendants have created).

13. For years Defendants were on their best behavior and committed to meeting the needs of the clinical trials because they did not control whether the clinical facilities for the pediatric hem-onc program continued to be at Kapi`olani Medical Center for Women and Children. That structure benefitted the advancement of pediatric hem-onc care in Hawaii, and helped us attract researchers and young physicians to replace the retiring members of the specialty in the mid-1990s.

14. Defendants' consolidation of control over the referrals to pediatric hem-onc physicians has not enabled them to succeed in marginalizing my practice, but they have otherwise gained complete control over the choice of

facilities, and over patient referrals to pediatric hem-onc clinicians, and they are presently attempting to gain complete control over which specialists manage bone marrow transplants to further consolidate their control.

15. Three outside expert consultants have surveyed the pediatric hem-onc service in Hawaii since 2003. Defendants engaged two of those consultants and the Cancer Research Center of Hawaii engaged the third. All three consultants have strongly recommended that Defendants discontinue their interference with my governance of the program, and have warned that the program quality could be seriously compromised if they do not.

16. Defendants' interference has stymied a development I attempted to carry out that would have aided the Cancer Research Center of Hawaii in attaining Comprehensive Cancer Center status with the National Cancer Institute, an enormously important possibility for Hawaii. The CRCH lost its funding in the 1990s, demonstrating to the community that NCI funding is not guaranteed. The Institution requires the support of the health system community to ensure its continuation, and ultimately it is generally believed that the longer the Institution fails to develop to comprehensive status, the more it risks losing its funding. Dr. Vogel has done a terrific job of attempting to ensure future funding, but his attempts to establish any clinical program have been blocked.

17. After first two the consultants had issued their reports, I approached Dr. Vogel about bringing the pediatric hem-onc clinical program under the CRCH, in which case I believed that we might eventually be successful in attracting sufficient funding to increase the number of pediatric hem-onc physicians in Hawaii, and allowing all of the physicians to engage in more research activity and institute Hawaii-originated clinical trials, benefitting patients and the quality of care, as well as the inflow of additional revenues.

18. Dr. Vogel embraced the idea and began searching for a consultant to formulate a business plan that could sustain the program. While Dr. Vogel was interviewing candidates, HPH Executive Vice President Dew-Anne Langcaon learned of the plan and told Dr. Vogel that Defendants would consider it a "hostile act" by CRCH if he continued implementing the plan. Dr. Vogel believed he had to abandon the effort because Defendants could oppose continued funding and take other actions that might jeopardize the long-term viability of the Institution.

19. I subsequently proposed to Dr. Vogel that CRCH and HCBCG associate in a more limited clinical program, but early in our discussions Ms. Langcaon issued a warning and Dr. Vogel felt he was forced to terminate the discussions. Defendants' interference was based on their fear that HCBCG would

be too strong a competitor for Defendant KMS if HCBCG had the association with CRCH.

20. In an additional effort, CRCH subsequently attempted to appoint Dr. Woodruff to a paid faculty position, but Ms. Langcaon again issued a warning, and CRCH abandoned the effort.

21. I have for several years been attempting to establish an adolescent/young adult oncology program because that population falls through the gap between pediatric hematology-oncology and adult oncology and is underserved. The NCI has strongly encouraged communities and cancer centers to establish AYA programs. I have attempted to persuade The Queen's Medical Center, site of a flourishing adult oncology program, and OncCare, the largest adult oncology group, to join HCBCG in establishing the program, but Defendants have warned them against associating with HCBCG, and we have not succeeded.

22. In 2004, Defendants joined with Kaiser Permanente to attempt to circumvent my authority over the clinical trials. Inpatient Kaiser members were being returned to the Kaiser hospital prematurely, and in some instances procedures were being carried out at Kaiser which the clinical trials required to be carried out at KMCWC, which is the only approved facility. Kaiser was motivated to save money and Defendants were motivated to undermine my authority, so they made an unsuccessful attempt to persuade a mainland principal investigator to take

responsibility for the activities. Fortunately, the system was strong enough to ward of f the attack, but the incident illustrates just how far these Defendants will go to consolidate their control pediatric hem-onc care.

23. The Department of Health chose HCBCG and Dr. Woodruff as their designated provider for the very essential function Thalassemia screening in 2005, by arranging funding for a dedicated program. Defendants boldly attempted to exclude HCBCG by spurning the DOH proposal, and only relented when the DOH contacted The Queen's Health System as an alternative provider.

24. Defendants' most recent attack is focused on the provision of pediatric bone marrow transplants at KMCWC. Dr. Woodruff and I initiated the transplant program in the mid-1990s because she was trained in clinical bone marrow transplant care. Dr. Woodruff remains the only clinician in Hawaii with that special training. Until November 2004, Defendants' pediatric hem-onc physicians referred their bone marrow transplant candidates to HCBCG. Subsequently, with the induction of Dr. Wada, formerly a researcher, into the KMS clinical program, Defendants have vigorously interfered with all bone marrow transplant referrals in attempting to exclude HCBCG entirely.

25. HCBCG prevailed on the Medical Staff Chief and the Chief of Pediatrics to insist that Defendants hire a consultant to review the bone marrow transplant situation. In January 2007, Dr. Stephen J. Feig, eminent chief of the

9

pediatric hem-onc program at UCLA which is renowned for training transplant specialists, surveyed the program and published his report in February 2007. Defendants have refused to provide copies of the report to me, but I have been permitted to read it. As with the prior consultants, Dr. Feig's report warns Defendants to cease interfering with the natural order and to allow me to unify the bone marrow program effort so that we can eventually offer bone marrow transplant patients a more viable alternative of receiving all of their care in Hawaii.

26. Until 2005, Defendants excluded HCBCG from the hospital call schedules, and their functionaries interfered with HCBCG's efforts to maintain its own call schedule. Beginning in 2005, Defendants began issuing a call schedule rotating between Defendant KMS physicians and HCBCG, but the schedule is not distributed to anyone who has anything to do with referrals.

27. In connection with the call schedule dispute, Defendants gave the KMS physicians a name designed to create confusion with Hawaii Children's Blood and Cancer Group and to mislead referring physicians who preferred referring to me and Dr. Woodruff.

28. To confuse and mislead the public as to the services they offer, Defendants have also sent out Christmas greetings and videos extolling patient results as if the patients were Kapi`olani patients, when in fact they were HCBCG patients and Defendants omitted to mention anything about HCBCG.

29. All of the foregoing examples of five years' activities were purposed with injuring competition and marginalizing Defendants' only competitor, HCBCG, to garner monopoly control over pediatric hematology-oncology. Those activities are my concern and the attention to Dr. Woodruff's claims and damages which continue to be the focus in the State case counsels strongly for a dissolution of the stay, permit HCBCG to proceed to trial in this Court as a separate matter as the facts and the circumstances which have developed in the pitched dispute between Defendants and HCBCG demand.

30. Protecting competition in pediatric hematology-oncology will ensure a free and unfettered intellectual and professional environment providing the best assurance of the specialty developing and providing better and better care to Hawaii's children in the future, and thus I implore the Court to see and respect this case for the separate matter it is and not a mere continuation of Dr. Woodruff's employment dispute, and to provide the case with an adequate separate forum.

I, Robert W. Wilkinson, M.D., do declare under penalty of law that the foregoing is true and correct.

Dated: Honolulu, Hawai`i, July 13, 2007

_____
ROBERT W. WILKINSON, M.D.