ARLEEN D. JOUXSON-MEYERS    7223-0
RAFAEL G. DEL CASTILLO    6909-0
JOUXSON-MEYERS-MEYERS & DEL CASTILLO
Jouxson-Meyers & del Castillo
A Limited Liability Law Company
302 California Ave., Suite 209
Wahiawa, Hawai`i 96786
Telephone: (808)621-8806; Fax: (808)422-8772

Attorneys for Plaintiff
Kelley Woodruff, M.D. and
Hawaii Children's Blood and Cancer Group

1ST CIRCUIT COURT
STATE OF HAWAII
FILED

2005 FEB 17 PM 1:08

N. ANAYA
CLERK

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| KELLEY WOODRUFF, M.D. and HAWAII CHILDREN'S BLOOD AND CANCER GROUP,<br><br>        Plaintiffs,<br><br>vs.<br><br>HAWAI`I PACIFIC HEALTH; KAPI`OLANI MEDICAL SPECIALISTS; KAPI`OLANI MEDICAL CENTER FOR WOMEN AND CHILDREN; ROGER DRUE; FRANCES A. HALLONQUIST; NEAL WINN, M.D.; SHERREL HAMMAR, M.D.; DELOITTE & TOUCHE LLP; DENNIS M. WARREN, ESQ.; JOHN DOES 1-99; JANE DOES 1-99; DOE ENTITIES 1-20; AND DOE GOVERNMENTAL UNITS 1-10,<br><br>        Defendants. | Civil No. 02-1-0090-01 (BIA)<br>(Other Civil Action)<br><br>SECOND AMENDED COMPLAINT;<br>DEMAND FOR JURY TRIAL; SUMMONS |

## SECOND AMENDED COMPLAINT

Kelley Woodruff, M.D. ("Dr. Woodruff") and Hawaii Children's Blood and

Cancer Group, by and through their attorneys, Jouxson-Meyers & del Castillo AAL, LLLC,

hereby complain against Hawai`i Pacific Health ("HPH"), formerly known as Kapi`olani Health,

I do hereby certify that this is a full, true, and correct copy of the original on file in this office.

Clerk, Circuit Court, First Circuit

Exhibit "A"

Kapi`olani Medical Center for Women and Children ("KMCWC"), Kapi`olani Medical Specialists ("KMS") (collectively, "HPH Defendants"), Roger Drue; Frances A. Hallonquist; Neal Winn, M.D.; Sherrel Hammar, M.D.;Deloitte & Touche LLP ("D&T"), Dennis M. Warren, Esq. ("Warren"), John Does 1-99, Jane Does 1-99, Doe Entities 1-20, and Doe Governmental Units 1-10 (collectively, "DOE Defendants") (all parties complained against are sometimes collectively referred to as "Defendants") and allege as follows:

RELATED PROCEEDINGS, VENUE AND JURISDICTION, PARTIES

      1.    This Second Amended Complaint consolidates a Complaint Dr. Woodruff filed in this Court on January 11, 2002, and a Complaint by Hawaii Children's Blood and Cancer Group under sections 1 and 2 of the Sherman Act and the Lanham Act, 15 U.S.C. 1125, that Hawaii Children's Blood and Cancer Group filed on December 29, 2003.

      2.    The Complaints concern conduct authored by and engaged in by a few profiteering individuals who controlled the HPH Defendants during the period from 1997 to the present, which were driven by an unlawful anticompetitive design to raise entry barriers intended to maintain and secure the HPH Defendants' monopoly over the markets for pediatric and neonatal in-hospital and outpatient care of serious/chronic blood diseases ( the specialty of hematology) and pediatric cancer (the specialty of oncology), and to obtain excessive profits from those markets. The conduct complained of includes conspiracies to restrain trade and reduce competition, the unlawful effects of which are felt in consumer choice, in the quality of care and the advancement of cures in the hematology and oncology ("hem-onc") diseases which seriously impact dozens of families and kill dozens of children annually in Hawaii, and cost the government and private payors millions of dollars. Accordingly, the conduct complained of constitutes unreasonable restraints of trade. On information and belief, the HPH Defendants control or receive over 90% of the millions of dollars spent annually for pediatric hematology and oncology case in Hawai`i, from which the few controlling individuals improperly profited.

2

3.    Dr. Woodruff is board-certified in pediatric hematology/oncology (cancer specialist), duly licensed to practice medicine in the State of Hawai`i, and was, at all relevant times herein, a resident of Honolulu. She trained for many years in order to obtain the right to practice pediatric hematology-oncology. Her skills and experience were hard-won and she loves practicing her profession in Hawai`i, which she has done since 1993.

4.    Hawaii Children's Blood and Cancer Group is an unincorporated medical group consisting of two pediatric hematology-oncology physicians, Dr. Woodruff and Robert W. Wilkinson, M.D., who is also board-certified in pediatric cancer hematology-oncology. Dr. Wilkinson has practiced in Hawai`i for over 30 years. He was honored with American Cancer Society's St. George National Award in November 2003. He has served as the Children's Oncology Group's principal investigator in Hawaii since, through his efforts and those of Dr. Woodruff, the Hawaii pediatric cancer center became a full institutional member of the COG. The Hawaii Children's Blood and Cancer Group physicians have had full medical staff privileges in hem-onc and bone marrow transplantation at Kapi`olani Medical Center for Women and Children since long before 1997 when the HPH Defendants embarked on their unlawful course of conduct against Drs. Woodruff and Wilkinson. The Hawaii Children's Blood and Cancer Group has been doing business in the State of Hawai`i as a pediatric hematology-oncology medical group since April 1, 2002 when Drs. Woodruff and Wilkinson went into competition with the HPH Defendants.

5.    The Hawaii Children's Blood and Cancer Group physicians have had full medical staff privileges in hem-onc and bone marrow transplantation at Kapi`olani Medical Center for Women and Children since long before 1997 when the HPH Defendants embarked on their unlawful course of conduct against Drs. Woodruff and Wilkinson. The Hawaii Children's

3

Blood and Cancer Group has been doing business in the State of Hawai`i as a pediatric hematology-oncology medical group since April 1, 2002 when Drs. Woodruff and Wilkinson went into competition with the HPH Defendants.

    6.  This Second Amended Complaint by Dr. Woodruff and the Hawaii Children's Blood and Cancer Group incorporates

      a. Dr. Woodruff's claims for the damages she suffered due to injuries to her practice and her professional reputation as a result of the unjustified wrongful and unlawful acts and violations of her rights that the Defendants conspired among themselves to commit against her, and then did commit,

      b. Plaintiffs' antitrust and unfair competition claims brought under Hawaii's statutes prohibiting anticompetitive and unfair competition in Chapter 480 (sections 480-4, 480-6, 480-9, 480-2, 480-8, and 480-13) and in the Uniform Deceptive Trade Practice Acts (sections 481A-3 and 481A-4) to restrain the HPH Defendants' unlawful use of their power in one market to restrict competition significantly in another with the purpose of raising entry barriers in the first, and to increase prices and diminish consumer choice, resulting in injury to Plaintiffs' business and property, including lost profits and other damages, causing both actual and potential harm to consumers, and to remedy the effects of their past unlawful conduct, and that of their co-conspirators; and

      c. Dr. Woodruff's claims against the HPH Defendants for effecting no-switching agreements with other parties and Doe Defendants in retaliation against her for filing her lawsuit, to protect Dr. Woodruff's right to practice and for damages arising from Defendants' unlawful and unjustified course of conduct the HPH Defendants and

4

Doe Defendants have engaged in for more than three continuous years to prevent her from practicing her profession of pediatric hematology-oncology.

7.      This Second Amended Complaint presents a clear case of profiteering by a small, excessively powerful group of private individuals controlling and exploiting the non-profit entities that have historically provided essential hospital services to the public in Hawaii, highly-technical specialty care to the public in Hawaii and, in many cases, the Pacific island nations, and campuses for medical residency education. Plaintiffs' injuries reflect the adverse effects of the unlawful competitive conduct described herein, for which there has been no unrelated supervening cause.

8.      Consumers in the markets for pediatric hem-onc physician services and pediatric hem-onc in-hospital and outpatient care are desirous of maintaining a competitive environment that constrains the HPH Defendants' use of their monopoly power in pediatric hem-onc in-hospital and outpatient care to control price and quality; and fosters competition in quality of care and specialization between respective providers of pediatric hem-onc physician services.

9.      The preservation Plaintiff HCBCG against the monopoly rent-seeking conduct will re-establish a procompetitive environment in the market for pediatric hem-onc physician services, constrain the HPH Defendants' monopoly power in the markets for pediatric hem-onc hospital inpatient and outpatient care, and will effectuate the purposes of Hawai`i's antitrust and unfair competition laws.

10.     Venue and jurisdiction reside in this Court for Plaintiffs' claims pursuant to Chap. 480, Haw. Rev. Stat. and Haw. Rev. Stat. §480-21.

11.     The Defendants listed in the caption will be introduced in the following statement of the nature of the case:

5

## NATURE OF THE CASE AND RELEVANT MARKETS

12.     Patients in Hawaii, physicians seeking consultations, the University of
Hawai`i John A. Burns School of Medicine ("JABSOM"), hospitals in Hawai`i and other states
and territories, grantors, Children's Oncology Group, the Cancer Research Center of Hawaii, and
third party payors, including health plans and the plans funded by the Federal and Hawai`i State
governments are all consumers of pediatric hematology/oncology (cancer and diseases of the
blood) (hereinafter "pediatric hem-onc") physician clinical, teaching, and research services, and
no substitute exists for pediatric hem-onc physician services in those markets.

13.     Patients suffering from pediatric cancer and diseases of the blood and their
families or guardians, their third party payors and HMOs, their physicians, JABSOM, the Cancer
Research Center of Hawaii, the Federal and Hawai`i State governments are all consumers of
pediatric and neonatal in-hospital and outpatient care for pediatric hematology-oncology care,
and no substitute exists for those in-patient and outpatient services inn those markets.

14.     The relevant product market is inpatient and outpatient pediatric hem-onc
cancer services delivered in a hospital setting on either an inpatient or outpatient basis.
Physicians' offices typically lack the equipment and expertise needed to adequately treat
pediatric cancer patients.  There are no third party payers in the State who contract with free-
standing physicians' offices in lieu of hospital departments for pediatric hem-onc cancer
services.

15.     The relevant geographic market is confined to the boundaries of the State
of Hawai`i.  Pediatric cancer patients residing outside the State cannot realistically turn to
specialists in Hawai`i for their cancer care.  Additionally, pediatric cancer patients residing
outside Hawai`i rarely travel to the State for cancer care.  Hence, facilities in Hawaii that provide

6

pediatric cancer care are not competitively constrained by facilities outside the State. Because Hawai`i facilities face no feasible competition from facilities outside the State for this service, third party payers contend they must contract with a Hawai`i facility for pediatric cancer services.

16.    Pediatric hem-onc services are frequently acute in nature and are provided to the patient in an inpatient or outpatient hospital setting. The services are always distinct services requiring highly specialized capabilities that are necessary to meet the medical, surgical, and other needs of patients.

17.    To access life-saving, state-of-the-art techniques, medicines, and facilities, patients must be under the care of a board-certified pediatric hem-onc physician in clinical practice. The pediatric hem-onc physician manages and directs the patients' care which is delivered by a number of specialized providers.

18.    The relevant product market is inpatient and outpatient pediatric hem-onc cancer services delivered in a hospital setting on either an inpatient or outpatient basis. Physicians' offices typically lack the equipment and expertise needed to adequately treat pediatric cancer patients. There are no third party payers in the State who contract with free-standing physicians' offices in lieu of hospital departments for pediatric hem-onc cancer services.

19.    Kapi`olani Medical Center for Women and Children ("KMCWC") is the only children's hospital in the State. KMCWC has the State's only pediatric in-patient ward and an outpatient clinic which Drs. Wilkinson and Woodruff built. Other hospitals in the state provide only fragmented primary and secondary pediatric care. KMCWC has a near 100 percent

7

market share in the provision of hem-onc services to pediatric cancer patients.[1] Third party payers confirm they must contract with KMCWC for the provision of hem-onc services to pediatric cancer patients because there are no suitable alternative hospitals in Hawaii that provide such services. Dr. Woodruff is informed and believes and thereon alleges that, at all relevant times herein, Kapi`olani Medical Center for Women and Children was a Hawai`i nonprofit corporation involved in providing hospital and related services to the Hawaii public.

20.     High entry barriers exist in the market for pediatric hem-onc in-patient and outpatient services. The cost of duplicating the facilities and services owned and controlled by the HPH Defendants, and providing alternative medical education, is so prohibitive that even large entities refuse to enter into competition. The limited attempts by alternative hospital providers to establish or contemplate establishment of competing hem-onc services for pediatric cancer patients have been unsuccessful because artificial barriers have been erected by the HPH Defendants. For example, Queen's Medical Center considered the creation of a competing hem-onc service but the plan stalled at the Internal Review Board stage because of the pressure HPH applied to adult care oncologists, KMCWC's control over necessary professional and paraprofessional specialists through employment relationships excluding Queen's, and due to the threats to existing cooperation and contracts between Queen's and KMCWC for services needed by Queen's neonatal and pediatric patients. As a consequence, facilities such as Queen's have determined they cannot profitably provide this service or that entry into the field poses unacceptable threats to other services Queen's is providing and must provide to its patients.

21.     The HPH Defendants thus possess monopoly power in the market for pediatric hem-onc in-patient and outpatient care in Hawai`i. Pediatric cancer patients have no

_____

[1] The market definition excludes military dependents. Non-military dependents cannot realistically seek pediatric hematology or oncology care from military physicians.

8

choice of facility or services. They must obtain their care at KMCWC or go without.

22.    The only choice open to pediatric cancer patients is their choice of which pediatric hem-onc physician will manage their care.

23.    Competition among providers of pediatric hem-onc physician services involves both price and non-price factors. In a freely competitive market,

a.  Patients and their primary care physicians choose and request a particular pediatric hem-onc physician, separate and distinct from any requests for inpatient and outpatient hospital services, to coordinate all of the services the patient requires in combating the disease. Patients form enduring physician-patient relationships with their chosen pediatric hem-onc physician;

b.  Patients form enduring physician-patient relationships with their chosen pediatric hem-onc physician;

c.  The selection of services and facilities that patients and their pediatric hem-onc physicians make are guided by medical necessity and quality and price concerns, and independent of the influence or control of any rent-seeking person or entity interested in promoting the utilization of such services or facilities;

d.  Pediatric physicians seeking a consultation from a pediatric hem-onc physician choose the best-qualified pediatric hem-onc physicians based primarily on non-price factors;

e.  Medical students and residents make their selection of residency programs based, in part, on the component(s) of the program involving pediatric hem-onc education. Thus, the administration of JABSOM selects pediatric hem-onc faculty based upon quality and price concerns, choosing the best-qualified pediatric hem-onc

9

physicians, both clinicians and researchers, to serve as regular faculty, training medical residents and students;

          f.   The selection of research investigators by grantors is guided by quality and price concerns and, generally, the requirement that research physicians be members of the regular medical school faculty; and

          g.   The selection of clinical medical directors by third party entities and government agencies providing services related to particular diseases and disorders is based upon quality and price concerns, evidencing a preference for a pediatric hem-onc physician who specializes in the target disease or condition.

          h.   The selection of pediatric hem-onc physicians by third party HMOs, such as Kaiser Permanente, seeking outside contracts to provide their members with pediatric hem-onc care is based upon quality and price concerns.

          i.   The selection of pediatric hem-onc physicians by third party payors is based upon quality and price concerns.

          j.   The selection of pediatric hem-onc physicians by the Federal and State government to care for their beneficiaries is based upon quality and price concerns.

        24.   Quality and price concerns in the selection of a pediatric hem-onc physician by the above-described consumers include experience, skill, professional distinction, and related matters, independent of the influence or control of any profiteering persons or entities interested in excluding the best-qualified pediatric hem-onc physicians from competition to protect or extend monopoly power, or achieve power over price.

        25.   If monopoly by one entity or the other in pediatric hem-onc physician services is inevitable or is deemed to serve consumers better due to non-price factors, it is the

HPH Defendants' control of such a monopoly that offends the interests promoted by the antitrust laws because of the unlawful actions and tactics the HPH Defendants have employed in their pursuit of the monopoly power and the leverage achieved by securing a monopoly in pediatric and neonatal in-hospital and outpatient care, and in creating high entry barriers for potential competitors in those markets.

      26.     The HPH Defendants are organized as parent and subsidiary for-profit and non-profit entities such that the supracompetitive monopoly profits created by the anticompetitive conduct alleged herein need not be reinvested in improving quality or access to care, but can be channeled to a small control group of individuals through excessive salary and bonuses, and perquisites.

      27.     Defendants engaged in their unlawful and unjustified profiteering in the following circumstances:

      28.     **First**, an optimal pattern of (a) providing services to pediatric hem-onc patients, (b) providing education to medical students and residents, and (c) research developed around the Hawaii Children's Blood and Cancer Group's forty years of experience in diagnosing and treating pediatric cancers.

      a.  Beginning in 1997, Plaintiff Hawaii Children's Blood and Cancer Group's physicians collaborated with the pediatric hem-onc physicians Defendant KMS presently employed in the care of all pediatric and neonatal hem-onc patients. All patients benefited from the knowledge and experience Hawaii Children's Blood and Cancer Group's physicians passed on to pediatric hem-onc physicians that Defendant KMS employed, and to medical students and residents. The collaboration was characterized by an intensive professional dialogue between all of the pediatric hem-onc

11

physicians, in which paraprofessionals, primary physicians, and patient guardians participated, reflecting the gravity of the diseases being treated. The collaboration also provided a richly educational experience for medical school students and residents which attracted students from other states and countries.

b. The patient-sharing collaboration which incorporated all of the HPH Defendants' facilities, staff, and was marketed to the various consumers, chiefly patients and their primary care physicians practicing outside of the HPH Defendants' entities, as "Team Care."

c. The collaboration of the pediatric hem-onc physicians creating "Team Care" made it possible for the Hawaii pediatric cancer center to participate as a member of the Children's Oncology Group, a national network of world class pediatric cancer centers conducting a multi-front war on pediatric cancer; and to provide the national standard of care in Hawai`i, persuading independent primary care physicians to refer all their pediatric patients with serious blood disorders or cancer to the "team," and persuading consumers of pediatric hem-onc care to embrace Team Care as the standard of care pediatric hem-onc patients require.

d. Pediatric hem-onc patients entered Team Care through portals of entry established and monitored by the HPH Defendants; and medical students and residents, and research grants, entered the education experience through portals controlled by the HPH Defendants.

e. Thus, in January 2002 Team Care was an essential facility under the meaning of *Aspen Highlands Skiing Corp v. Aspen Skiing Co.*, 738 F.2d 1509 (10th Cir. 1984), providing all of the pediatric and neonatal hem-onc clinical care, all of the

12

pediatric hem-onc medical education, and receiving all or nearly all of the pediatric hem-onc research grants in Hawai`i.

      f.  Because participation in the pediatric hem-onc division of the JABSOM faculty is essential to any pediatric hem-onc physician to pursue a career in the subspecialty, the hem-onc division regular faculty is also an essential facility under the meaning of *Aspen Skiing*.

      29.    **Second**, on information and belief, at all relevant times herein, the HPH Defendants were receiving substantial public funding and benefits and/or were incorporated into governmental plans for providing hospital facilities to the public.

      30.    The HPH Defendants set price for the separately charged supplies, medication, diagnostic tests, and other commodities required to deliver pediatric hem-onc care, and they have no competition due to their control over the facilities for pediatric cancer care.

      31.    **Third**, the conduct from which Dr. Woodruff's Complaint arose occurred on a background of massive fraud by the HPH Defendants. The conduct was motivated by the HPH Defendants' desire to escape as much liability as possible for that fraud:

      a.  State and Federal authorities brought successful claims against Hawaii Pacific Health's (fka Kapi`olani Health System's) Home Health Division for massive false claims beginning in the mid-1990s when Defendant Roger Drue was hired to run the Kapi`olani organization. The investigation that led to Kapi`olani Health agreeing to pay the State a multi-million dollar fine resulted from a report by a Home Health Division employee who turned to the Attorney General only after her supervisors ignored her reports of double billing and other types of false claims. On information and belief, Defendant Dennis M. Warren negotiated the settlement on behalf of Kapi`olani Health

13

under which it entered into a "Corporate Integrity Agreement" with the Office of Inspector General, United States Department of Health and Human Services which require it to self report any violations.

            b. On information and belief, at all relevant times herein, Dennis M. Warren, Esq., whose professional offices are located at 725 30th Street, Suite 102, Sacramento, California 95816, is an attorney who resides in California, and who was involved in providing various professional services to entities in the State of Hawai'i. On information and belief, Defendant Warren holds himself out as an expert authority on false claims and on the Medicare and Medicaid laws and regulations, and he has been engaged by a number of health entities charged violations of the federal and state false claims acts.

            c. On August 25, 1999, the U.S. Attorney and the Hawai'i Attorney General released the news that Kapi'olani Health paid $3.4 million to settle claims that two subsidiaries filed false claims exceeding $700,000. The report indicated that 65% of the claims filed were false. The release also reported that a "whistleblower" nurse had received a reward totaling $810,000. Importantly, the nurse was said to have repeatedly reported the fraud to company executives but had been ignored. At the time when Defendants began their unlawful course of conduct directed at Drs. Woodruff and Wilkinson, the federal and State authorities were conducting ongoing investigations into the various divisions and departments of Hawai'i Pacific Health based upon indications in the Home Health case that mismanagement and fraud was widespread in the Kapi'olani organization.

       32.   **Fourth**, the HPH Defendants' unlawful conduct arose out of a business

14

plan they pursued to maximize market share and profits by monopolizing pediatric and neonatal

acure care and raising entry barriers to that market by obtaining control over specialty pediatric

physicians.

33.     When Defendant Drue was hired, Kapi`olani Health System consisted of

Kapi`olani Medical Center for Women and Children ("KMCWC"), located at 1319 Punahou

Street in Honolulu, and Kapi`olani Medical Center at Pali Momi, 98-1079 Moanalua Road, Aiea,

Hawaii 96701 (which is not involved in the Complaint). At that time, specialty care physicians

were very autonomous in keeping with the traditional relationship between doctors and hospitals.

Physicians' decisions about the length hospital stays and the amount of services provided to in-

patients, as well as the services provided to patients in the hospital's outpatient clinics were made

independent of any economic concerns of the hospital. KMCWC was a pediatric teaching

hospital carrying on residency programs and the specialty care physicians held faculty

appointments. Specialty care physicians also chose and carried out research independent of any

economic interest Kapi`olani Health System might have in choosing one area of endeavor over

another.

34.     KMCWC possessed a monopoly in pediatric and neonatal acute care

hospital services, but it had potential challengers in The Queen's Medical Center and other

Honolulu hospitals, and in hospitals on the neighbor islands, which from time-to-time attempted

to establish or investigated entering into either of these markets. The HPH Defendants embarked

on a business plan to raise entry barriers to the market for in-hospital and outpatient services by

binding pediatric specialty care physicians to Defendant KMCWC's services and commodities,

preventing the pediatric specialty care physicians from selecting out of Defendant KMCWC's

services and commodities, denying consumers the choice of another facility, and influencing the

15

medical decisions of the pediatric specialty care physicians in their selection of services and commodities, thereby maintaining the HPH Defendants' market power to extract supracompetitive profits from pediatric and neonatal acute care hospital services.

35.    Once the HPH Defendants obtained control over independent specialty physicians, competing hospitals were forced to hire or attract a completely independent complement of pediatric specialty care physicians to offer the hospital services offered by Defendant KMCWC in order to enter the market.

36.    To gain control of specialty physician services, the HPH Defendants induced physicians in various specialties to accept employment with Kapi`olani Medical Specialists ("KMS"), a medical group which they were led to believe would be an autonomous "faculty" practice but which was, in reality, to be wholly-owned and controlled by Kapi`olani Health System. More than 60 specialty care physicians brought their practices into KMS. Dr. Woodruff is informed and believes and thereon alleges that, at all relevant times herein, Kapi`olani Medical Specialists was a Hawai`i nonprofit corporation created in 1995 by Kapi`olani Health to operate a group medical practice of specialty physicians, to market health care to patients of KMCWC and KMCPM, and other HPH facilities, and compete for patients needing outpatient care. KMCWC provides the facilities and support services for KMS in the KMCWC hospital Patient Ambulatory Unit. .

37.    The second phase of the business plan involved a massive consolidation of the health care facilities and services in Hawai`i into Hawai`i Pacific Health, which became the largest health care system in Hawai`i headquartered at 55 Merchant Street in Honolulu. The consolidation merged Kapi`olani Health System (Oahu), Wilcox Health System (Kauai), and Straub Clinic and Hospital (Oahu) on around December 20, 2001. The merger of the three health

16

systems eliminated two major hospitals as potential competitors of KMCWC. Wilcox and Straub both already had large integrated medical groups such that the merger brought approximately 200 physicians under the employ of HPH. Dr. Woodruff is informed and believes and thereon alleges that, at all relevant times herein, Hawai'i Pacific Health ("HPH"), formerly known as Kapi'olani Health, was a Hawai'i nonprofit corporation involved in providing health care services to the Hawaii public, which follows a formal peer review process for the purpose of furthering quality health care. Wherever the Complaint refers to HPH, the reference includes the former name "Kapi' olani Health."

38.    As previously set forth, the HPH Defendants had an economically very significant interest in making sure that patients chose an HPH-employed pediatric hem-onc physician because of the physician's discretion regarding the amount and type of care ordered.

39.    The HPH Defendants' monopoly affords them the power to prevent pediatric hem-onc specialists from practicing in competition with them, and to thwart the physicians' enjoyment of the economic and professional benefits flowing therefrom.

## CHRONOLOGICAL FACTS

40.    The HPH Defendants acquired a monopoly in the market in 1997 by inducing Drs. Woodruff and Wilkinson to bring their pediatric hematology-oncology practices into Defendant KMS in 1997 and accept permanent employment. Drs. Woodruff and Wilkinson had built a practice to which virtually all of the practicing pediatricians in Hawai`i, except military pediatricians, referred all of their hematology and oncology patients. KMS paid no cash consideration for the practice, but offered as consideration permanent employment with KMS, subject only to the doctors remaining eligible to practice medicine in Hawai`i and at KMCWC.

a.   Robert Hee, Vice President of KMS, offered Dr. Woodruff an

17

unconditional written employment contract of employment with KMS, subject only to Dr. Woodruff's acceptance and her satisfactory completion of the KMS credentialing process. Dr. Woodruff satisfactorily completed the credentialing process executed the employment contract on August 21, 1997.

           b. Mr. Hee also arranged for KMCWC to offer Dr. Woodruff a written contract of permanent employment as medical director of the Pediatric Ambulatory Unit ("PAU") which was the KMCWC outpatient clinic over which Dr. Woodruff was already at that time serving as medical director.

           c. The extent to which monopolistic and economic considerations predominated in the establishment of KMS and HPH's venture into pediatric hem-onc physician services was not truthfully disclosed to Dr. Woodruff.

           d. Also not disclosed was the HPH Defendants intention to influence or control Dr. Woodruff's medical decisions to their economic advantage.

           e. In ultimately accepting KMS employment, Dr. Woodruff relied on the faculty practice vision the HPH Defendants portrayed, and the belief that she could remain a KMS physician as long as she held privileges at KMCWC and KMS had a pediatric hem-onc division.

           41. The KMS pediatric hem-onc physicians began noticing in 1999 that the HPH Defendants were pressuring them to *increase* their billings in verbal and written communications. The number of pediatric cancer patients was relatively static, year-after-year, so it was apparent that the pressure was to order more services provided by the HPH Defendants. Written admonitions put at least one of the KMS-employed pediatric hem-onc physicians in fear of being fired. The pressure to increase billings continued through 2000 and was expressed by

18

various verbal and written communications.

42.     The HPH Defendants engaged Defendant Deloitte & Touche LLP in early
2001 connection with the ongoing government investigations.

43.     On information and belief, at all relevant times herein, Deloitte & Touche
LLP was and is a foreign limited partnership organized in the State of Delaware, with local
offices at 1132 Bishop Street, Suite 1200, Honolulu, Hawaii 96813-2870, and was involved in
providing various professional services to the public and entities in the State of Hawai`i.

44.     On information and belief, Defendant Deloitte & Touche was regularly
providing consultation and audit services to health care entities in connection with compliance
with the federal and State false claims acts, and its agents and representatives knew or should
have known that correct determinations regarding which laws and regulations governed claims
for pediatric hem-onc care were part and parcel of the engagement and that incorrect or false
determinations could harm pediatric hem-onc physicians and staff in their professional
reputation.

45.     The HPH Defendants also engaged Defendant Warren in connection with
the ongoing government investigations. Defendant Warren knew or should have known that
correct determinations regarding which laws and regulations governed claims for pediatric hem-
onc care were part and parcel of the engagement and that incorrect or false determinations could
harm pediatric hem-onc physicians and staff in their professional reputation.

46.     Defendant Deloitte & Touche and Defendant Warren knew or should have
determined from their compliance review that the HPH Defendants possessed monopoly power
in pediatric hem-onc care in Hawai`i.

47.     Thus, when, on February 21, 2001, Dr. Woodruff reported billing irregularities to HPH officials, she was engaging in conduct similar to the conduct the previous whistleblower engaged in before she contacted the government authorities to report false claims the HPH Defendants were filing in connection with Kapi`olani Home Health.

48.     Dr. Wilkinson independently reported the same problem to the compliance "hot line" the HPH Defendants were required to set up by their Corporate Integrity Agreement.

49.     Reports of billing irregularities represented the threat of an expanded investigation and potential liability for the pattern of billing involving the nurse practitioner. Defendant Warren subsequently directed an "internal investigation" of the pediatric Hem-Onc Division by Deloitte & Touche attorneys targeting Dr. Woodruff and Dr. Wilkinson. Defendants Warren or Deloitte & Touche reported to an investigation committee personally directed by Defendant Roger Drue with the involvement of Defendant Frances A. Hallonquist. The Deloitte & Touche attorneys concealed the purpose of their investigation and the fact that they were attorneys. The physicians were led to believe that a nurse practitioner was the target of the investigation. Defendants Deloitte & Touche and Warren thus knowingly and intentionally violated the physicians' common law rights to due process by misleading them and not informing them that they were the target of an investigation, or providing the physicians with notice of the charges against them and of their due process rights. The physicians requested an explanation of the investigations from Defendant Hallonquist, and she reassured them that the investigation had no specific targets and no one would be harmed.

50.     On July 17, 2001, Defendant Neal Winn summoned Dr. Woodruff to his office. Dr. Woodruff is informed and believes that at all relevant times herein, Defendant Winn was a resident of the State of Hawaii. With Gail Lerch, an HPH human resources officer present,

20

Defendant Winn demanded that Dr. Woodruff resign her employment with KMS or be terminated for professional misconduct. Defendant Winn and Lerch alleged that Dr. Woodruff had committed unspecified acts of fraud and would lose her KMCWC clinical privileges and be indicted with criminal counts.

51.    Dr. Woodruff categorically denied all of the allegations, and demanded that she be provided with specific charges and incidents. Defendant Winn failed to provide specific charges, and failed to advise Dr. Woodruff that she might have any rights to dispute or refute allegations, or to receive a hearing before a final decision was made on her status. Dr. Wilkinson was also told his employment with KMS would be terminated if he did not resign.

52.    Defendant Winn has published and republished to Dr. Woodruff's medical colleagues the false allegations that she committed acts of Medicaid fraud and billed for a procedure that she was not present for (the "Winn Defamatory Statements").

53.    Defendant Sherrel Hammar also published to Dr. Woodruff's medical colleagues that she committed such acts (the "Hammar Defamatory Statements"). Dr. Woodruff is informed and believes that at all relevant times herein, Defendant Hammar was a resident of the State of Hawaii.

54.    In September 2001, Defendant Warren published false and defamatory statements about Dr. Woodruff in a "Voluntary Disclosure Statement" addressed to the compliance officer assigned to the HPH Defendants Kapi'olani Home Health Corporate Integrity Agreement (Wilcox and Straub are also subject to corporate integrity agreements for false claims they were alleged to have made) in the DHS Office of Inspector General. The "disclosure" admitted that the HPH Defendants had billed the government for the services of an unlicensed nurse practitioner. Defendant Warren defamed Dr. Woodruff's professional reputation and

21

subjected her to the risk that she would be barred from submitting claims to government programs or listed in the federal health care fraud database by blaming her for the false claims. Two other clinical pediatric hem-onc physicians were also accused of submitting false claims.

55.    Defendants had known for several months that government authorities considered the conduct they were alleging occurred to be non-actionable, a fact they actively concealed from Drs. Woodruff and Wilkinson. Therefore, the disclosures Defendants stated in the Voluntary Disclosure Statement were intentionally fraudulent and purposed with:

a.    using Drs. Woodruff and Wilkinson and the other pediatric hem-onc physicians for scapegoats,

b.    cutting off relator rights by publicly disclosing fraudulent claims the HPH Defendants had submitted involving the nurse practitioner's services, which met the requisites for fraudulent intent under the federal and State false claims statutes, and

c.    misdirecting any investigation by government authorities to avoid a determination that the HPH Defendants had the requisite intent to submit false claims:

56.    Defendant Warren falsely certified that Dr. Woodruff had violated **"Medicare"** laws and regulations, and that the remaining pediatric hem-onc physicians were guilty of such infractions to a lesser degree, making these allegations the focus of the disclosure to divert attention from the HPH Defendants' false claims. Defendant Warren's certification constituted fraud because he knew that Dr. Woodruff and the other pediatric hem-onc physicians did not submit claims to the government or any third party payors, and that it was therefore not possible for them to make false claims.

57.    As an attorney, Defendant Warren knew or should have known when he accepted the assignment to direct the investigation that the doctors had a statutory right to due

22

process in the investigation under HRS Chapter 671D: to have notice of the investigation itself and the charges he undertook to prove, to a fair investigation and hearing on those charges with an opportunity to be represented by counsel and to call witnesses and cross examine any witnesses against them. Defendants ran a very high risk that a fair hearing would completely exonerate Dr. Woodruff because she submitted no claims to the government, and therefore these rights were denied to her so that the HPH Defendants could use her as a shield against their certain liability for their fraudulent claims for the nurse practitioner's services.

58.    Defendant Warren knew or should have known that the HPH Defendants possessed monopoly power in pediatric hem-onc care in Hawai'i, and that making false accusations against Drs. Woodruff and Wilkinson would aid the HPH Defendants in preventing Drs. Woodruff and Wilkinson from competing with the HPH Defendants in the market for pediatric hem-onc services.

59.    Defendant Warren subsequently intentionally defamed Dr. Woodruff to the entire staff of the pediatric cancer center which had been assembled for him to provide them with "compliance" instruction in September 2001. Defendant Warren falsely alleged that he had determined that two pediatric hem-onc doctors had intentionally made false claims to the government within the meaning of the federal and state false claims acts. Virtually all of the attendees knew that Defendant Warren was referring to Drs. Woodruff and Wilkinson.

60.    Dr. Woodruff refused to resign from KMS and KMCWC. She knew she had done nothing wrong and that she was entitled to enforce her employment contracts and to retain her JABSOM faculty position.

61.    Defendants postponed taking action against Dr. Woodruff until after their merger with Straub and Wilcox was complete on December 21, 2001. On January 8, 2002,

23

Defendant Winn informed Dr. Woodruff she was "terminated." This termination constituted a violation of 18 USCS § 1513(e) because Defendants Winn and Drue, and the HPH Defendants terminated Dr. Woodruff's employment based on their suspicions that she had been providing law enforcement officers with truthful information relating to the filing of false claims by the HPH Defendants. The HPH Defendants ceased paying Dr. Woodruff's salaries, and cancelled their funding for her faculty salary. The HPH Defendants could not prevent Dr. Woodruff from continuing to practice at KMCWC because the medical staff had granted her privileges.

62.    The HPH Defendants immediately began attempting to leverage their control of the in-patient and outpatient services at KMCWC to coopt Dr. Woodruff's patients and prevent her from receiving any new patient referrals by tying the services of KMS-employed physicians to the in-patient and outpatient services and excluding her from taking call and from Team Care.

63.    For the first few weeks after the HPH Defendants breached their employment contracts with Dr. Woodruff, the staff and physicians supported her, ignoring the KMS call schedule published to supersede the call schedules with Dr. Woodruff's name on them, and continuing to direct calls and patients to Dr. Woodruff. Dr. Woodruff's practice thrived and she continued receiving new patient referrals and having as many patient encounters as she had before the HPH Defendants breached her employment contracts.

64.    In response, Defendant Winn called meetings with staff at which he made defamatory statements about Dr. Woodruff and made it clear that the HPH Defendants would deal harshly with Dr. Woodruff's supporters. Defendant Winn instructed the staff how to force patients to choose one pediatric hem-onc physician for their care, and how to coerce the patients into choosing KMS-employed physicians.

24

65.     Several patients attempted to choose both the Hawaii Children's Blood and Cancer Group physicians and the KMS-employed pediatric hem-onc physicians, essentially attempting to preserve or refusing to give up Team Care and the collaboration, but the HPH Defendants denied those choices and required the patients to choose.

66.     Various misrepresentations were made to patients to induce them to sever their relationships with Dr. Woodruff:

      a.  Dr. Woodruff was leaving the practice of pediatric cancer;

      b.  Dr. Woodruff had too many patients and was too busy;

      c.  Their costs for care would be higher if they chose to have Dr. Woodruff as their physician;

      d.  Some doctors might not want to work with them if they chose Dr. Woodruff as their physician;

      e.  Some hospital services might not be available when needed if they chose Dr. Woodruff as their doctor; and

      f.  They might be assigned a lower priority in receiving care if they chose Dr. Woodruff; and

67.     In the meantime, Dr. Woodruff filed a Motion for Preliminary Injunction on January 29, 2002 to requesting that the court enjoin the HPH Defendants from interfering with her patients and requiring them to reinstate her on the KMCWC on-call schedule. In connection with the Motion, Dr. Woodruff obtained a copy of the Voluntary Disclosure for the first time. Dr. Woodruff challenged the Voluntary Disclosure on the following grounds, which exposed the HPH Defendants to charges of fraud by the government:

      a.  Greg Jones, the officer in the Office of Inspector General assigned to

monitor the Kapi'olani Health Corporate Integrity Agreement denied that the HPH

Defendants had submitted the Disclosure to the OIG.

            b. Dewey Kim, chief of the Attorney General's Medicaid Fraud Division

denied that the HPH Defendants had submitted the Disclosure to his office or the local

federal officials.

            c. The charge of "Medicare" false claims in the Voluntary Disclosure

was fraudulent on its face.

            d. The HPH Defendants had never paid the refunds Defendant Warren

certified they had made in the Voluntary Disclosure.

        68.     Because the HPH Defendants thus knew that Dr. Woodruff was discussing

her case with the federal and State authorities, and because Dr. Woodruff's practice did not

suffer sufficiently from these efforts, Defendant KMCWC's CEO, Lawrence O'Brien, suspended

her hospital privileges March 18, 2002, and requested that they be terminated by the Medical

Executive Committee and the KMCWC Board of Trustees. O'Brien had Dr. Woodruff escorted

off the KMCWC campus under guard, intentionally humiliating Dr. Woodruff in front of her

medical colleagues and patients and the public as O'Brien and the HPH Defendants intended;

and demonstrating to her supporters the treatment in store for them unless they cooperated with

her exclusion.

        69.     After a thorough investigation of O'Brien's charges, which incorporated

the false claims allegations the HPH Defendants and Defendants Winn, Hammar, and Warren

had published defaming Dr. Woodruff, the Medical Executive Committee determined that

O'Brien's charges were without merit. The Medical Executive Committee exonerated Dr.

Woodruff and reinstated her privileges.

70.     The suspension prevented Dr. Woodruff from seeing her patients for two weeks while the medical staff's executive committee reviewed O'Brien's ridiculous case for suspending her, which it ultimately rejected. The damage to Dr. Woodruff's practice was nonetheless very severe.

71.     Dr. Wilkinson, who had tried to negotiate an amicable separation from KMS, immediately resigned in protest over O'Brien's suspension of Dr. Woodruff. Drs. Woodruff and Wilkinson then formed the Hawaii Children's Blood and Cancer Group to compete with the HPH Defendants in the market for pediatric hem-onc physician services. At that point in time, the vastly superior name recognition that Dr. Wilkinson enjoyed, the significant patient base Drs. Wilkinson and Woodruff still enjoyed at that point, and the fact that the KMS-employed pediatric hem-onc physicians were not credentialed to perform bone marrow transplants, gave Hawaii Children's Blood and Cancer Group a far superior position in the market for pediatric hem-onc physician services.

72.     Shortly after Dr. Woodruff's privileges were reinstated, the HPH Defendants learned that Dr. Woodruff had discovered that Defendant KMCWC had been assessing a "facilities charge" of more than $800 each time a pediatric hem-onc patient was seen in the outpatient clinic, a fact which had not previously been revealed to the pediatric hem-onc physicians. Dr. Woodruff's discovery subjected the HPH Defendants to additional false claims liability and refunds involving hundreds of thousands of dollars, because it meant that the refunds that Defendant Warren stated in the Voluntary Disclosure were a mere fraction of the HPH Defendants' actual liability for the claims they had submitted for the services of the unlicensed nurse practitioner.

73.     In July 2002, Dr. Woodruff learned from a May 2000 report by the Joint

27

Commission on Accreditation for Healthcare Organizations had criticized Defendant KMCWC for permitting paraprofessionals to perform services for which they were not licensed. That fact meant that the HPH Defendants had actual knowledge that the nurse practitioner was unlicensed when they submitted the false claims for her services. Dr. Woodruff's disclosure of this fact subjected the HPH Defendants to additional liability for false claims and they retaliated by terminating Dr. Woodruff's access to the internet where pediatric hem-onc physicians share the thousands of details about various diseases and their comorbidities that aid in treating those conditions; and attempting to bar Dr. Woodruff from the in-patient and outpatient facilities on certain days of the week.

74. The HPH Defendants further retaliated against Dr. Woodruff and attacked Plaintiff Hawaii Children's Blood and Cancer Group's superior market share by organizing and enforcing a boycott of Plaintiff Hawaii Children's Blood and Cancer Group by referring physicians and organizations, and through acts of unfair competition, to prevent Plaintiff Hawaii Children's Blood and Cancer Group from receiving any new patient referrals, research grants, and to prevent Dr. Woodruff from obtaining employment with JABSOM, the Hawaii Permanente Medical Group affiliated with Kaiser Permanente, the CRC, and the Hawai`i Dept. of Health.

75. To facilitate and further the boycott, the HPH Defendants have:

a. Excluded the Hawaii Children's Blood and Cancer Group physicians from the KMCWC call schedule so that the all referrals to the pediatric cancer center coming through the hospital or any other HPH–controlled entities would be referred to the KMS-employed pediatric hematology-oncology physicians.

b. Falsely described the KMS-employed physicians on the KMS-issued call schedules as the "Kapi`olani Children's Blood and Cancer Group" physicians to

28

confuse and mislead physicians and patients.

c.    Excluded Dr. Woodruff from participating in rounds on any patient that the KMS-employed hem-onc physicians assert is their patient.

d.    Rejected Dr. Woodruff's patients from the pediatric ICU on unjustifiable pretexts, forcing them to transfer to the adult ICU at Queen's Medical Center.

e.    Enforced a no-switching agreement requiring JABSOM's Department of Pediatrics to exclude Dr. Woodruff from faculty and remove Dr. Wilkinson as the chair person of the Hematology-Oncology Division of the Department of Pediatrics, replacing him with the most junior pediatric hem-onc physician in the State.

f.    Enforced a no-switching agreement by causing the termination of Dr. Woodruff's research projects and prevented her from receiving new grants because she was no longer faculty and therefore no longer qualified to receive research funds.  Dr. Woodruff is a leading expert on thalassemia, an inherited form of anemia that is significant in Hawai`i.  The HPH Defendants forced the termination of her important thalassemia research in 2002 and most recently refused to permit a DOH-sponsored thalassemia project access to the KMCWC facilities unless the DOH abandons its resolve to employ Dr. Woodruff as the clinical chief of the project.

g.    Enforced a no-switching agreement with the Cancer Research Center of Hawaii with reprisals if it employs to prevent Dr. Woodruff's employment by the CRC on its paid clinical staff and as paid regular faculty, which the Dr. Woodruff was told the CRC must do until she dropped the instant lawsuit against the HPH Defendants, although the CRC declined to deny her any faculty appointment and did appoint her to

29

uncompensated clinical faculty so that she could pursue some research activities in which the CRC was more interested than the potential consequences from the HPH Defendants' opposition to an unpaid faculty appointment.

h.   Used its monopoly power in the markets for in-hospital and outpatient services in pediatric and neonatal cancer care to coerce Kaiser Permanente into refusing to deal with the Hawaii Children's Blood and Cancer Group and refusing to hire Dr. Woodruff part-time on its clinical staff to provide pediatric and neonatal services at Kaiser' hospital and outpatient facilities, and made arrangements with Kaiser Permanente circumventing or violating cancer protocols to induce it to refuse to deal with Hawaii Children's Blood and Cancer Group and to refuse to hire Dr. Woodruff.

i.   Interfered with Plaintiff Hawaii Children's Blood and Cancer Group's attempts to establish an adolescent cancer center at Queen's Medical Center. Hawaii presently has no specialized adolescent cancer center and the HPH Defendants continue to block its formation as part of the retaliation and unfair competition against Plaintiffs.

j.   Attempted to enforce establish/enforce a no-switching policy with the Hawaii State Department of Health by refusing to permit a DOH-sponsored thalassemia project the use of the KMCWC facilities unless the DOH abandoned its resolve to employ Dr. Woodruff as the clinical chief of the project and employed one of the KMS-employed pediatric hem-onc physicians; and then made a 180-degree about face, welcoming the project when the DOH declined to prefer one of the KMS-employed pediatric hem-onc physicians over Dr. Woodruff, and began making arrangements to use the facilities at Queen's Medical Center for the project.

k.   Threatened or attacked the hospital privileges of physicians who were

30

known to be supportive of Hawaii Children's Blood and Cancer Group.

l. Used hospital staff and HPH outreach programs, such as Call-A-Nurse to interdict and redirect existing patients and new patient referrals away from Hawaii Children's Blood and Cancer Group to KMS-employed pediatric hem-onc physicians.

m. Covertly removed the names of the Hawaii Children's Blood and Cancer Group physicians from third party internet websites, programs, and grants in attempting to take control of them, including attempting to coopt the State-funded hemophiliac clinic at KMCWC by covertly removing Dr. Wilkinson's name from the project.

n. Caused KMS-employed physicians to make various misrepresentations to patients, physicians, and any one else concerned with pediatric hem-onc, including misrepresenting that the Hawaii Children's Blood and Cancer Group's physicians are no longer taking patients, or are too busy to take patients, or are no longer interested in practicing pediatric hem-onc, and other false statements.

76. The boycott the HPH Defendants organized has become so well established that the Hawaii Children's Blood and Cancer Group is no longer receiving new patient referrals.

77. The HPH Defendants have engaged in unlawful conduct to coopt the existing patients of the Hawaii Children's Blood and Cancer Group physicians, by causing or inducing the HPH staff to:

a. Intercept telephone calls and reschedule patient appointments with the KMS-employed pediatric hem-onc physicians.

b. Support and facilitate the exclusion of Dr. Woodruff from Team Care.

31

c. Circulate competing call schedules designed to give the false impression that the KMS-employed physicians are the only pediatric hem-onc physicians on call or taking patients.

d. Make false or misleading representations concerning the Hawaii Children's Blood and Cancer Group to persuade patients and organizations to refuse to deal with the Hawaii Children's Blood and Cancer Group physicians.

78. The KMS pediatric hem-onc physicians conspired with the HPH Defendants to exclude Hawaii Children's Blood and Cancer Group from Team Care and to redirect existing patients and new patient referrals, research grants, faculty positions, and outside employment to themselves. The KMS pediatric hem-onc physicians made false and misleading representations concerning Hawaii Children's Blood and Cancer Group and its physicians, refused to permit Dr. Woodruff to participate in rounds or take hospital call, intercepted patients and telephone calls intended for the Hawaii Children's Blood and Cancer Group physicians, aided in replacing the names of the Hawaii Children's Blood and Cancer Group physicians on third party internet websites with their own.

79. Plaintiffs have named as Defendants in this Second Amended Complaint all of the persons involved in the wrongful actions against them whose identities they know. On information and belief, certain persons and organizations not named in this Second Amended Complaint have facilitated or participated in the boycott of Plaintiffs or refused to deal with them. Accordingly, Defendants John Does 1-99, Jane Does 1-99, Doe Entities 1-20, and Doe Governmental Units 1-10 (collectively "Doe Defendants") are sued herein under fictitious names for the reasons that their true names and identities are presently unknown to Plaintiffs except that they are connected in some manner with Defendants and are or were the agents, principals,

32

officers, directors, servants, employees, employers, representatives, insurers, co-insurers, associates, consultants, assignees, assignors, licensees, licensors of Defendants and are or were in some manner presently unknown to Plaintiff engaged in the activities alleged herein and are or were in some manner responsible for the injuries and damages to Plaintiffs in a manner which was the proximate cause of Plaintiffs' injuries or damages and are or were in some manner related to Defendants, and Plaintiffs pray for relief to certify their true names, identities, capacities, activities and responsibilities when the same are ascertained.

80.     Plaintiffs are informed and believe and thereon allege that, at all relevant times herein, each of the named Defendants was an agent and/or employee and/or co-conspirator of each of the other Defendants, and the named Defendants acted with the actual and/or apparent authority of each other and/or with the actual or constructive knowledge of each other. The acts complained of herein were expressly or impliedly ratified by each of the remaining Defendants, and each of the named Defendants is responsible for the acts of the other Defendants.

## COUNT I
(Injunctive Relief – Restoration of Team Care by by KMS)

81.     Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 80 above as though fully set forth herein.

82.     Plaintiffs will suffer irreparable harm if the Court does not issue an injunction requiring HPH Defendants to to offer all existing and new patients the option of receiving their care from a team that includes Plaintiff's physicians and any board-certified pediatric hem-onc clinical physicians the HPH Defendants have under contract or in their employ, and to remit a stipend of $20,000 monthly to Plaintiff Hawaii Children's Blood and Cancer Group for its physicians' participation in "Team Care"; and appointing a special master to monitor Defendants' compliance with the injunction for 3 years. Defendants shall be entitled

33

bill third party payors for all physician services Plaintiff's physicians provide to "Team Care" patients.

83.     Plaintiffs and the public have no adequate remedy at law for the injuries and damages caused by the monopolization of pediatric hematology/oncology, and the monopolization will continue unless this Court imposes the injunctive relief Dr. Woodruff seeks requiring the HPH Defendants to restore Team Care.

84.     The balance of equities favors Plaintiffs.

85.     The injury that Plaintiffs will suffer the Court does not enjoin their exclusion of Plaintiff and its physicians from Team Care far outweighs the harm that any of the named Defendants will suffer as a result of the injunction. The cost of the stipend will be offset by claims the HPH Defendants are able to submit for the services of Plaintiff Hawaii Children's Blood and Cancer Group's physicians.

86.     The public's interest in access to the essential skills reposed in Plaintiff's physicians will be served by an order enjoining the HPH Defendants' exclusion of Plaintiff Hawaii Children's Blood and Cancer Group's physicians from Team Care, and awarding Plaintiff Hawaii Children's Blood and Cancer Group's reasonable attorneys' fees and costs as provided for in H.R.S. § 480-13(a)(2).

## COUNT II
(Unlawful Combination Restraining Trade and Price-Fixing, Violation of H.R.S. §480-4(a))

87.     Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 86 above as though fully set forth herein.

88.     In furtherance of raising entry barriers to maintain and secure Defendant KMCWC's monopoly in pediatric and neonatal in-hospital and outpatient hem-onc care to prevent competitor hospitals from entering the market, and in furtherance of the HPH

34

Defendants' attempted monopolization of pediatric hem-onc physician services in Hawai`i, the HPH Defendants and Doe Defendants instigated, orchestrated, coerced, and enforced a boycott of Plaintiff Hawaii Children's Blood and Cancer Group by physicians, patients, and JABSOM; and Doe Defendants, including physicians not named as defendants herein conspired with the HPH Defendants to boycott Plaintiff Hawaii Children's Blood and Cancer Group by referring all hem-onc related matters to the HPH Defendants' physicians, and by referring no hem-onc related matters to Plaintiff Hawaii Children's Blood and Cancer Group's physicians.

89.    The HPH Defendants and co-conspirator physicians and Doe Defendants acted in concert to exclude Plaintiff Hawaii Children's Blood and Cancer Group's physicians from competing with the HPH Defendants in the market for pediatric hem-onc physician services in physician clinical, teaching, and research services, and from participation on the JABSOM regular faculty.

90.    Defendants conspired and acted in concert to eliminate Dr. Woodruff from ever competing against Defendant KMS in the market for pediatric hem-onc physician services in physician clinical, teaching, and research by

a.  falsely accusing Dr. Woodruff of violating Medicare laws and regulations to the federal government and publishing false and defamatory allegations that she committed fraud calculated to reach the ears of referring physicians not controlled or employed by the HPH Defendants, government entities, and other third parties with the result that she was prevented from continuing to practice her profession;

b.  cooperating to fix employment terms and to enforce no-switching agreements, impairing the employment market. *See Quinonez v. National Asso. of Sec.*

35

*Dealers, Inc.*, 540 F.2d 824, 828 (5th Cir. 1976) (listing numerous cases holding such agreements violate the antitrust laws).

91.     The KMS-employed physicians conspired with KMCWC to serve their own personal ends of obtaining highly desirable faculty appointments, research grants and assignments, and outside employment to increase their professional statures and reputations, and their income from sources outside their employment with Defendant KMS. (Accordingly, *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), does not apply in this case.)

92.     The HPH Defendants employed their facilities and affiliations with third parties, and every other avenue leading pediatric hem-onc patients to KMCWC to prevent Plaintiff Hawaii Children's Blood and Cancer Group from receiving new patient referrals and to redirect the Plaintiff Hawaii Children's Blood and Cancer Group's existing patients to KMS-employed physicians to establish and facilitate the boycott of Plaintiff Hawaii Children's Blood and Cancer Group.

93.     An unlawful price effect in violation of section 480-4(a) resulted from the HPH Defendants' exclusion of Plaintiff Hawaii Children's Blood and Cancer Group because the quality of care was lowered when the HPH Defendants terminated Team Care, but they did not reduce prices.

94.     The effect of the HPH Defendants' action is the illegal denial of consumer choice. The HPH Defendants foreclosed patient choice by unlawfully tying the services of KMS-employed physicians to hospital in-patient and outpatient services and using the boycott and naked coercion to enforce the exclusion of Plaintiff Hawaii Children's Blood and Cancer Group's physicians.

36

95.     The HPH Defendants' conduct violating section 480-4(a) was a

foreseeable consequence of the fraudulent conduct and conspiracy Defendants Deloitte &

Touche and Dennis M. Warren, Esq. engaged in targeting Drs. Woodruff and Wilkinson.

96.     As a result of the HPH Defendants' and their co-conspirators' violations

of H.R.S. §480-4(a) to extract supracompetitive profits from pediatric cancer care, including the

orchestration, maintenance, and enforcement of a boycott of Plaintiffs' services, and conspiring

to exclude Plaintiffs from Team Care and exclude them from competition, Plaintiffs have been

injured in their business and property and lost profits as a result of Defendants' conduct and

practices forbidden by the antitrust laws, and have sustained special and general damages in

amounts to be proven at trial, including past and future lost income, entitling it to have their

damages trebled, and receive an award of reasonable attorneys' fees and costs of suit, as

provided for in H.R.S. § 480-13(a)(1).

## COUNT III
(Unlawful Attempt to Control Prices and Refusals to Deal, Violation of H.R.S. §§480-4(b), 6)

97.     Plaintiffs repeat, reallege and incorporate by reference the allegations

contained in paragraphs 1 through 96 above as though fully set forth herein.

98.     The HPH Defendants supply and charge separately for commodities

employed in pediatric hem-onc care, including, but not limited to ordinary supplies, medications,

and diagnostic tests.

99.     The HPH Defendants fix, control, and maintain the prices of these

commodities and control the standard of their quality. In some cases, the HPH Defendants charge

more than other entities for essentially identical commodities simply because they controlled

pediatric cancer care.

100.    Refusals to deal with Plaintiff Hawaii Children's Blood and Cancer Group

37

by boycotting physicians and organizations and Doe Defendants furthers the HPH Defendants'
control over the aforementioned commodities, constituting a violation of H.R.S. §480-4(b).

        101.    On information and belief, the HPH Defendants caused patients to be
threatened with diminished care or exclusion from receiving needed commodities and services if
they selected Dr. Woodruff or Plaintiff Hawaii Children's Blood and Cancer Group's physicians
to provide their pediatric hem-onc physician services.

        102.    Refusing to sell any commodity to any other person or persons is unlawful
under H.R.S. §480-6, when the refusal is for the purpose of compelling or inducing the other
person or persons to agree to or engage in acts prohibited by Chapter 480, such as refusing to
deal or cooperating in or engaging in a boycott as set forth above.

        103.    The HPH Defendants' conduct violating H.R.S. §§ 480-4(b) and 480-6
was a foreseeable consequence of the fraudulent conduct and conspiracy Defendants Deloitte &
Touche and Dennis M. Warren, Esq. engaged in targeting Drs. Woodruff and Wilkinson.

        104.    Defendants' violations of H.R.S. §§ 480-4(b) and 480-6 have damaged
consumers and Plaintiff Hawaii Children's Blood and Cancer Group has been injured in its
business and property, and sustained special and general damages in amounts to be proven at
trial, including past and future lost income, entitling Plaintiff Hawaii Children's Blood and
Cancer Group to have its damages trebled, and receive an award of reasonable attorneys' fees
and costs of suit as provided for in H.R.S. § 480-13(a)(1).

<h2 style="text-align:center">COUNT IV</h2>
(Unfair Competition, Violation of H.R.S. § 480-2)

        105.    Plaintiffs repeat, reallege and incorporate by reference the allegations
contained in paragraphs 1 through 104 above as though fully set forth herein.

38

106.    As set forth more fully above, the HPH Defendants compete with Hawaii Children's Blood and Cancer Group in the market for pediatric hem-onc physician services.

107.    The HPH Defendants and the Doe Defendants have and are presently engaged in various policies and practices wrongfully interfering with new and existing pediatric hem-onc patients seeking care from Plaintiff Hawaii Children's Blood and Cancer Group.

108.    The HPH Defendants and the Doe Defendants have and are presently engaged in various policies and practices wrongfully interfering with Plaintiff Hawaii Children's Blood and Cancer Group's relationships with referring physicians, third party grantors, JABSOM, and third parties seeking to employ Plaintiff Hawaii Children's Blood and Cancer Group's physicians for their skills and experience.

109.    The HPH Defendants have employed these unfair methods of competition to secure and maintain Defendant KMCWC's monopolies in the markets for pediatric hem-onc in-hospital and outpatient services and commodities, and to increase their market share in pediatric hem-onc physician services by eliminating Plaintiffs and thereby obtaining a monopoly.

110.    The HPH Defendants' use of unfair methods of competition has caused actual and potential harm to Plaintiffs in their business and property, and to consumers, constituting injury of a type that the antitrust and unfair competition laws were designed to guard against.

111.    The HPH Defendants' and Doe Defendants' conduct has been substantially injurious to consumers because it has increased the cost of obtaining pediatric hem-onc care in Hawai'i, has destroyed Team Care, and prevents patients from accessing the highest quality of care which was available before Defendants embarked on their course of unlawful conduct.

112.    The HPH Defendants' oppression of Plaintiffs is offensive to established public policy against the flagrant oppression of the weak by the strong and against unnecessarily driving up the cost of high quality health care and unjustifiably restricting access to scarce health care resources.

113.    The HPH Defendants have therefore engaged in unfair methods of competition in the markets for pediatric hem-onc physician services and pediatric care.

114.    The HPH Defendants' conduct violating H.R.S. § 480-2 was a foreseeable consequence of the fraudulent conduct and conspiracy Defendants Deloitte & Touche and Dennis M. Warren, Esq. engaged in targeting Drs. Woodruff and Wilkinson.

115.    As a direct and proximate result of the HPH Defendants' unfair methods of competition, Plaintiffs have suffered injuries to their business and property and lost profits, and incurred special and general damages in amounts to be proven at trial; and Plaintiff Hawaii Children's Blood and Cancer Group has lost economic advantage and opportunity due to the HPH Defendants' interference with existing patients and new patient referrals attempts to access care from Plaintiffs.

116.    Plaintiffs are entitled to have their damages trebled, and receive an award of reasonable attorneys' fees and costs of suit as provided for in H.R.S. § 480-13(a)(1).

## COUNT V

(Monopolization of /Attempt To Monopolize Pediatric and Neonatal Acute In-Hospital and Outpatient Care in Pediatric Hematology/Oncology, Violation of H.R.S. § 480-9)

117.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 116 above as though fully set forth herein.

118.    Defendants HPH and KMCWC acquired monopoly power in the market for providing hospital facilities and services for pediatric and neonatal hematology-oncology

40

patients in in-hospital and outpatient care, as set forth above.

119.    The HPH Defendants and Doe Defendants and JABSOM agreed to require as a prerequisite for faculty appointment that pediatric hem-onc physicians be employees of Defendant KMS, thereby fixing employment terms impairing the employment market among non-KMS-employed pediatric hem-onc physicians like Dr. Woodruff, materially and substantially impairing them from practicing the profession they spent years in training to pursue. *See Quinonez v. National Asso. of Sec. Dealers, Inc.*, 540 F.2d 824, 828 (5th Cir. 1976) (listing numerous cases holding such agreements violate the antitrust laws).

120.    To enforce no-switching agreements against Dr. Woodruff for practicing as a Hawaii Children's Blood and Cancer Group physician, and to prevent her from practicing her profession in Hawaii, the HPH Defendants

a.    Excluded Dr. Woodruff from the KMCWC on-call schedule for pediatric hem-onc physicians so that the all referrals to the pediatric cancer center coming through the hospital or any other HPH–controlled entities would be referred to the KMS-employed pediatric hematology-oncology physicians.

b.    Excluded Dr. Woodruff from participating in rounds on any patient that the KMS-employed hem-onc physicians assert is their patient.

c.    Required JABSOM's Department of Pediatrics to exclude Dr. Woodruff from faculty;

d.    Caused the termination of Dr. Woodruff's research projects and preventing her from receiving new grants because she was no longer faculty and therefore no longer qualified to receive research funds;

e.    Required the Cancer Research Center of Hawaii to decline to hire Dr.

41

Woodruff on the CRC's paid clinical staff and as regular paid faculty "until Dr. Woodruff drops her this lawsuit against the HPH Defendants"; and

    f.  Coerced and induced Kaiser Permanente to deny Dr. Woodruff part-time employment on its clinical staff.

    g.  Attempted to prevent the Hawaii State Department of Health from hiring Dr. Woodruff for a part-time clinical position.

    121.  The purpose of the HPH Defendants' unlawful imposition of restrictions in the movement of the physician labor force is to protect its monopoly in the markets for pediatric and neonatal in-hospital and outpatient care in Hawaii.

    122.  The effect of the HPH Defendants' unlawful imposition of restrictions in the movement of the physician labor force is the denial of consumer choice in Hawaii, the reduction of salutatory competition in pediatric hem-onc physician services which has increased the cost of obtaining pediatric hem-onc care in Hawai`i, the destruction of Team Care which assured patients of receiving the highest quality care possible for the lowest price, and the imposition of unlawful restrictions on Dr. Woodruff's free exercise of her rights to engage in commerce and to practice the profession she was trained for and loves.

    123.  The HPH Defendants' and Doe Defendants' conduct has been substantially injurious to consumers because it has increased the cost of obtaining pediatric hem-onc care in Hawai`i, has destroyed Team Care, and prevents patients from accessing the highest quality of care which was available before Defendants embarked on their course of unlawful conduct.

    124.  The HPH Defendants' malicious oppression of Dr. Woodruff is offensive to established public policy against the flagrant oppression of the weak by the strong and against

42

unnecessarily driving up the cost of high quality health care and unjustifiably restricting access to scarce health care resources.

125.    The HPH Defendants' unlawful interference with Dr. Woodruff's free exercise of the right to practice in Hawai`i was a foreseeable consequence of the fraudulent conduct and conspiracy Defendants Deloitte & Touche and Dennis M. Warren, Esq. engaged in targeting Drs. Woodruff and Wilkinson.

126.    The HPH Defendants' monopolies in pediatric and neonatal hem-onc in-hospital and outpatient care enable it, with the Doe Defendants and the entities named above, to control the movement of physician labor in the relevant market for pediatric hem-onc physician services and interfere with the free exercise of the rights of those engaged in those markets, impairing consumer choice and reducing competition in the market for physician services unjustifiably, and unlawfully hindering Dr. Woodruff in pursuing her medical specialties with the result that Dr. Woodruff has been injured in her business and property, and has suffered lost income from employment and economic and professional opportunities which the HPH Defendants employed their monopolies to effect, as a result of which Dr. Woodruff has sustained general and special damages in amounts to be proven at trial, and entitling her to have her damages trebled, and receive an award of reasonable attorneys' fees and costs of suit as provided for in H.R.S. § 480-13(a)(1).

## COUNT VI
(Monopolization of /Attempt To Monopolize the Practice of Pediatric Hematology/Oncology, Violation of H.R.S. § 480-9)

127.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 126 above as though fully set forth herein.

128.    On information and belief, most of the KMS and KMCWC directors and officers also hold directorships in HPH and other HPH-controlled entities.

43

129.   Defendants HPH and KMCWC acquired monopoly power in the market
for providing hospital facilities and services for pediatric hematology/oncology patients in in-
patient and outpatient care, as set forth above.

130.   The HPH Defendants' monopoly power imposes upon them an additional
independent duty to refrain from taking arbitrary actions that tend to increase or preserve that
monopoly power.

131.   The cost of duplicating the facilities and services owned and controlled by
the HPH Defendants, and providing alternative medical education, is so prohibitive that even
large entities refuse to enter into competition with Defendants. The HPH Defendants thus
imposed impossibly high costs on Hawaii Children's Blood and Cancer Group to compete with
them in the markets for pediatric hem-onc physician services.

132.   Defendants Deloitte &Touche and Warren and Doe Defendants conspired
with HPH Defendants to maintain HPH Defendants' monopoly constituting a violation of H.R.S.
§§480-4 and 480-9.

133.   Defendants' conduct constitutes monopolization of the market for
pediatric hematology/oncology physician services and overt acts undertaken to preserve that
monopoly and exclude Plaintiffs from competition, injuring Plaintiffs in their business and
property, as a result of which Plaintiffs have sustained special and general damages in amounts
to be proven at trial, including past and future lost income, entitling them to have their damages
trebled, and receive an award of reasonable attorneys' fees and costs of suit as provided for in
H.R.S. § 480-13(a)(1).

134.   Defendants' conduct constitutes an attempt to monopolize the medical
specialty of pediatric hematology/oncology and pediatric acute care over which they have a high

44

probability of success due to the HPH Defendants' monopoly in the market for pediatric in-

patient care and outpatient services, injuring Plaintiffs in their business and property, as a result

of which Plaintiffs have sustained special and general damages in amounts to be proven at trial,

including past and future lost income, entitling them to have their damages trebled, and receive

an award of reasonable attorneys' fees and costs of suit as provided for in H.R.S. § 480-13(a)(1).

## COUNT VII
(Unlawful Publication of Misleading/Confusing Information, Violation of Chap. 481A)

135.    Plaintiffs repeat, reallege and incorporate by reference the allegations

contained in paragraphs 1 through 134 above as though fully set forth herein.

136.    As set forth above, the HPH Defendants and Doe Defendants published

false and misleading information, and described KMS-employed physicians as the "Kapi`olani

Blood and Cancer Group physicians" in order to mislead and confuse patients and referring

physicians and others involved with directing patients for pediatric hem-onc care.

137.    The HPH Defendants and Doe Defendants interfered with the free flow of

information in the market for pediatric hem-onc services in order to further their goal of

excluding Plaintiff Hawaii Children's Blood and Cancer Group from competition with the HPH

Defendants' physicians in the markets for clinical pediatric hem-onc physician services, medical

education, and research, and to monopolize pediatric hem-onc care.

138.    The publication of false and misleading information designed to pass off

goods or services as those of another, cause the likelihood of confusion or of misunderstanding

as to the source, sponsorship, approval, or certification of goods or services, or confusion or

misunderstanding as to affiliation, connection, or association with, or certification by, another, is

unlawful under section 481A-3.

139.    The free flow of information is essential to choices by patients, physicians, medical students and residents, the University of Hawaii, grantors, and the third party payors because a lack of adequate information and false and misleading information renders these consumers unable to evaluate the services available from competing pediatric hem-onc physicians. False and misleading information disseminated by Defendants influences all of the foregoing consumers in choosing a pediatric hem-onc physician, and such has the capacity to deceive a substantial segment of such consumers.

140.    As a result of the HPH Defendants publication of false and misleading information designed to pass off the services of the KMS-employed physicians for the Hawaii Children's Blood and Cancer Group physicians, patients, referring physicians, physicians seeking consultations, third party grantors, and others have been misled as to the quality and nature of the services they were seeking or received, and as to the availability of the Hawaii Children's Blood and Cancer Group physicians to provide the services they were seeking or received.

141.    Defendants' conduct constitutes an attempt to monopolize the medical specialty of pediatric hematology/oncology and pediatric acute care over which they have a high probability of success due to the HPH Defendants' monopoly in the market for pediatric in-patient care and outpatient services, as a result of which Plaintiffs have suffered injury to their business and property and sustained special and general damages in amounts to be proven at trial, including past and future lost income, entitling them to have their damages trebled, and receive an award of reasonable attorneys' fees and costs of suit as provided for in H.R.S. § 480-13(a)(1).

142.    As a direct and proximate result of the HPH Defendants' and Doe

Defendants violations of section 481A-3, Plaintiff Hawaii Children's Blood and Cancer Group

has suffered injury to its business and property, and has lost economic advantage and opportunity

incurring special and general damages in amounts to be proven at trial, including an award for

the reasonable attorneys' fees and costs of suit incurred as provided for in H.R.S. § 480-13(a)(1).

## COUNT VIII
(Violation Of Right Of Due Process)

143.    Plaintiffs repeat, reallege and incorporate by reference the allegations

contained in paragraphs 1 through 142 above as though fully set forth herein.

144.    Hawai`i's Health Care Quality Improvement Act of 1989 and established

public policy require professional peer review to be fair, and peer review decisions are subject to

judicial review. *Silver v. Castle Memorial Hospital*, 53 Haw. 475, 480 (1972).

145.    Hawai`i's compelling interest in public supervision of actions by

Defendant KMCWC on medical staff membership is heightened because the State has no public

hospital on Oahu providing care to pediatric hematology and oncology patients.

146.    Pursuant to Hawai`i's clearly stated public policy, the definition of peer

review is very broad, comprising any action by a health care entity that adversely affects the

circumstances under which a physician is permitted by that entity to provide medical care.

H.R.S. §671D-4.

147.    The employment of a physician by a hospital or medical group is

encompassed by the statutory definition of clinical privileges, which "includes privileges,

membership on the medical staff or panel, and the other circumstances pertaining to the

furnishing of medical care under which a physician or other licensed health care practitioner is

permitted to furnish such care by a health care entity." *Id.*

47

148.    KMS and KMCWC are both health care entities as that term is defined in
Chap. 671D of the Hawaii Revised Statutes. Both entities conduct peer review and are thus
subject to the statutory due process requirements in peer review, and Dr. Woodruff's
employment contract expressly incorporated a provision for peer review.

149.    The public's overriding interest in quality health care is the same
regardless of the particulars of the arrangement between the health care entity and the physician
under which the physician is permitted to provide medical care in the health care entity's
facilities. The HPH Defendants thus may not diminish or avoid their fiduciary duty simply by
structuring their organization so that physicians must be employed by an HPH entity in order to
provide medical care under certain medical specialties.

150.    Even if Defendant KMS were determined to be independent of Defendant
KMCWC, the statute expressly encompasses medical groups that conduct formal peer review.
*Id.*

151.    Peer review decisions must be non-arbitrary because arbitrary action that
has no relation to the advancement of medical science or the elevation of professional standards
is offensive to the true interests of justice and public policy. *Silver*, 53 Haw. at 480; *and see
Falcone v. Middlesex County Medical Soc.*, 170 A.2d 791, 799 (N.J. 1961).

152.    The HPH Defendants also violated the fiduciary duty imposed upon them
by the public's overriding interest in quality health care.

153.    Defendants Deloitte & Touche, Dennis M. Warren, Esq., Neal Winn,
M.D., Roger Drue, and Frances A. Hallonquist acted in concert with and to further the wrongful
acts of the HPH Defendants to deny Dr. Woodruff of her statutory and common law rights to due
proces with the knowledge and intention of denying her those rights to further the fraudulent

48

nature and object of their investigation and allegations.

154.    Defendants' acts, as set forth above, wrongfully deprived Dr. Woodruff of her rights to due process, and were arbitrary, capricious, unreasonable, discriminatory and unlawful and deprived Dr. Woodruff of, or interfered with, her rights as protected by the Due Process clause of Article 1, § 5 of the Constitution of the State of Hawai`i, Chap. 671D of the Hawaii Revised Statutes, Dr. Woodruff's contract rights set forth in the KMCWC Bylaws, the Kapi`olani Health Standards of Conduct, and common law.

155.    Pursuant to Chap. 671D, Haw. Rev. Stat., Defendants' acts in depriving Dr. Woodruff of her due process rights were arbitrary as a matter of law, and violated their fiduciary duty as a Hawai`i health care entity, and they are thus not entitled to the limited defenses provided in the statute.

156.    Defendants HPH, KMCWC, and KMS are liable, as health care entities under Chap. 671D, for depriving Dr. Woodruff of her due process rights. Defendants Winn, Drue, Hallonquist, Warren and Deloitte & Touche are liable to Dr. Woodruff for their participation in the conspiracy to deprive her of her common law and statutory due process rights which they knew or should have known could prevent her from ever practicing her profession of pediatric hematology/oncology again.

157.    As a direct, proximate and foreseeable result of Defendants' actions as set forth above, Dr. Woodruff has been hindered and prevented from pursuing her medical specialties, has suffered embarrassment and humiliation and injury to her professional reputation, anguish and anxiety, and sustained special and general damages in amounts to be proven at trial, including past and future lost wages and income.

158.    Defendants' actions were wilful, wanton, reckless or done with a
conscious indifference to the consequences so as to entitle Dr. Woodruff to an award of punitive
damages in amounts to be proven at trial.

## COUNT IX
### (Defamation)

159.    Plaintiffs repeat, reallege and incorporate by reference the allegations
contained in paragraphs 1 through 158 above as though fully set forth herein.

160.    Defendant Winn published the Winn Defamatory Statements to one or
more of Dr. Woodruff's medical colleagues.

161.    Dr. Winn knew or should have known that the Winn Defamatory
Statements were either false when made or made with reckless disregard as to their truth or
falsity, and that it was false and/or misleading to imply that such statements were based on a fair
and thorough investigation of the facts, constituting defamation *per se*.

162.    Defendant Winn knowingly and intentionally re-published the Winn
Defamatory statements, constituting malice.

163.    The Winn Defamatory Statements were not subject to any qualified
privilege, and were made in the course of his employment by HPH and KMS.

164.    On November 30, 2001, Dr. Woodruff demanded that Dr. Winn cease
publishing the Winn Defamatory Statements.

165.    Defendant Warren published the Warren Defamatory Statements to a
number of KMS staff members in an open meeting; and in a report to the Office of Inspector
General, DHHS, with the purpose and intent of misleading the OIG about the nature and extent
of the HPH Defendants' fraud.

50

166.    Defendant Warren knew or should have known that Warren's Defamatory Statements were either false when made or made with reckless disregard as to their truth or falsity, and that it was false and/or misleading to imply that such statements were based on a fair and thorough investigation of the facts, constituting defamation *per se*.

167.    The Warren Defamatory Statements were not subject to any qualified privilege, and were made in the course of his employment/agency by Defendants.

168.    Defendant Warren knew that the Warren Defamatory Statements would be repeated and republished throughout the hospital and beyond.

169.    On information and belief, Defendant Hammar published the Hammar Defamatory Statements to one or more of Dr. Woodruff's medical colleagues.

170.    Defendant Hammar knew or should have known that the Hammar Defamatory Statements were either false when made or made with reckless disregard as to their truth or falsity, and that it was false and/or misleading to imply that such statements were based on a fair and thorough investigation of the facts, constituting defamation *per se*.

171.    The Hammar Defamatory Statements were not subject to any qualified privilege, and were made in the course of his employment by HPH and KMS.

172.    Defendant Hammar knew or should have known that the Hammar Defamatory Statements would be republished, yet he made the statements with reckless disregard for the consequences.

173.    Deloitte &Touche published defamatory statements and other information in a report that was eventually provided to the Office Of Inspector General, DHHS ("D&T Defamatory Statements"), with knowledge of Defendant Warren's intention to mislead the OIG, and thus were co-conspirators in Defendant Warren's fraud.

51

174.    Deloitte &Touche knew or should have known that the D&T Defamatory Statements were either false when made or made with reckless disregard as to their truth or falsity, and that it was false and/or misleading to imply that such statements were based on a fair and thorough investigation of the facts, constituting defamation *per se*.

175.    O'Brien, Defendant KMCWC, and the Doe Defendants knew or should have known that O'Brien had no grounds for suspending Dr. Woodruff's privileges.

176.    The Doe Defendants made false allegations against Dr. Woodruff to the medical staff in support of the suspension which the medical staff determined were not credible and did not constitute a violation in any event.

177.    O'Brien's order that resulted in Dr. Woodruff being marched off of the KMCWC campus under guard constituted defamation *per se*. because the order conveyed the impression that Dr. Woodruff was a wrongdoer and that her privileges were properly and lawfully suspended or terminated, which O'Brien knew to be false, and constituted a malicious act committed with wilful, wanton, reckless or a conscious indifference to the consequences to Dr. Woodruff's reputation and her ability to continue practicing her profession.

178.    Defendants' publication of the Defamatory Statements wrongfully and falsely labeled Dr. Woodruff and damaged her professional reputation with her medical colleagues and humiliated her. The HPH Defendants and the Doe Defendants knew that the Defamatory Statements would receive widespread republication throughout the medical community and the community of pediatric cancer patients' families, and other third parties, with the result that Dr. Woodruff would be damaged in her professional reputation.

52

179.    Dr. Woodruff has also been required to repeat and republish the

information that KMS demanded her resignation or would terminate her in her attempts to obtain

malpractice insurance.

180.    The Defamatory Statements are false. Dr. Woodruff is informed and

believes and thereon alleges that the Defamatory Statements have been repeated and republished

by HPH Defendants either without privilege or in abuse of any privilege that may exist.

Defendants are liable for damages for publishing and republishing the Defamatory Statements.

181.    As a direct, proximate and foreseeable result of Defendants' actions as set

forth above, Dr. Woodruff has sustained special and general damages in amounts to be proven at

trial, including past and future lost wages and income, and injury to reputation.

182.    Defendants' actions were wilful, wanton, reckless or done with a

conscious indifference to the consequences so as to entitle Dr. Woodruff to an award of punitive

damages in amounts to be proven at trial.

## COUNT X
### (Retaliatory Discharge)

183.    Plaintiffs repeat, reallege and incorporate by reference the allegations

contained in paragraphs 1 through 182 above as though fully set forth herein.

184.    Defendants Winn and Drue terminated Dr. Woodruff's employment with

KMS in retaliation for, and the termination was proximately caused by, Dr. Woodruff's

expressions of concern about HPH Defendants' failure to bill for the services of the Nurse

Practitioner, which was somehow related to compliance issues Defendants had not properly or

effectively addressed previously, thereby constituting a violation of 18 USCS § 1513(e).

185.    Defendants Deloitte & Touche and Warren conspired with Defendants

Drue and Hallonquist to cover up the compliance issues or shift the blame for the irregularities

53

from HPH and KMS management to Dr. Woodruff in violation of public policy within the

meaning of *Parnar v. American Hotels*, Inc., 65 Haw. 370 (1982).

186.    By reason of the Defendants' acts and omissions as set forth above, Dr.

Woodruff has lost opportunities, lost wages and benefits, and experienced pain, suffering, and

mental and emotional distress. Dr. Woodruff has been damaged thereby and is entitled to

damages in such amounts as shall be shown at trial.

187.    The unlawful conduct and omissions of Defendants Winn and Drue and

the HPH Defendants in terminating Dr. Woodruff's employment and the conduct of Defendant

Deloitte &Touche and Defendant Warren was willful, wanton, reckless, or made with a

conscious indifference to the consequences so as to entitle Dr. Woodruff to an award of punitive

damages in an amount to be shown at trial.

## COUNT XI
(Promissory Estoppel)

188.    Dr. Woodruff repeats, realleges and incorporates by reference the

allegations contained in paragraphs 1 through 187 above as though fully set forth herein.

189.    KMS assured Dr. Woodruff that HPH Defendants intended her

employment by KMS to be for as long as she wished to continue practicing her specialty and

maintained her licensure and privileges in good standing; and that accepting employment with

KMS would not adversely affect her ability to practice her medical specialties of hematology and

pediatric oncology in Hawai`i, or thwart her enjoyment of the associated economic and

professional benefits.

190.    KMS expressly incorporated the KMCWC Medical Staff Bylaws into Dr.

Woodruff's employment contract, which modified the contract with promises of due process and

fair treatment should KMS undertake any adverse action affecting the circumstances under

54

which she was permitted to provide medical care to KMS patients.

191.    HPH promised Dr. Woodruff in the KH Training Manual and the KH Standards of Conduct that any disciplinary action concerning compliance issues would be undertaken on a fair and equitable basis

192.    HPH Defendants' representations to Dr. Woodruff, as set forth above, were promises that Dr. Woodruff relied upon in accepting their offer of a full-time pediatric hematology/oncology position with KMS.

193.    HPH Defendants intended for Dr. Woodruff to rely on their representations.

194.    Dr. Woodruff did rely upon HPH Defendants' representations in accepting and continuing her employment by KMS.

195.    HPH Defendants' representations therefore ought, in equity, to be enforced.

196.    By reason of their conduct and omissions as set forth above, HPH Defendants materially breached their promises and representations to Dr. Woodruff.

197.    Dr. Woodruff has lost economic opportunities and experienced pain, suffering and mental and emotional distress as a result of detrimentally relying upon HPH Defendants' representations.  Dr. Woodruff has been damaged thereby in amounts to be proven at trial.

## COUNT XII
### (Breach of Contract)

198.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 197 above as though fully set forth herein.

199.    The HPH Defendants breached Dr. Woodruff's permanent contracts of

55

employment with Defendants KMS and KMCWC.

200.    Defendants have falsely contended that Dr. Woodruff's employment contract was an "at-will contract" that permitted them to terminate her employment at any time for any reasons. Dr. Woodruff's employment contract was excepted from the at-will doctrine for the following reasons:

a.    Defendants expressly incorporated Dr. Woodruff's due process rights under the KMCWC Medical Staff Bylaws into her employment contract and promised in the KH Standards of Conduct that any discipline related to compliance issues would be undertaken on a fair and equitable basis.

b.    Dr. Woodruff's employment contract was also subject to statutory protections provided by the due process requirements in Chap. 671D because adverse actions affecting her employment with KMS affect the circumstances under which she is permitted to provide medical care to KMS patients and in KMCWC.

c.    The doctrine of additional consideration recognized by the court in *Kinoshita* applies in Dr. Woodruff's case because she transferred her practice to HPH and KMS as additional consideration when she accepted her employment contract, as additional consideration for permanent employment. *See id.*

d.    The public policy exception recognized by our court in *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 380 (1982) also applies in Dr. Woodruff's case because excluding her from competition deprives the public of access to her skills and expertise; and because depriving Dr. Woodruff of her due process rights in terminating the circumstances under which she is permitted to provide medical care violates a clear mandate of public policy.

201.    HPH Defendants promised Dr. Woodruff raises and promotions as an employee of KMS, and that she would not be terminated from her employment with KMS or KMCWC except if she did not maintain her licensure and privileges in good standing, which promises constitute a contract of employment in law.

202.    HPH Defendants expressly incorporated the KMCWC Bylaws into Dr. Woodruff's employment contract with KMS, and issued the KH Standards of Conduct, thereby creating an environment of established policies, to be fairly and consistently applied and establishing procedures relating to discipline, creating an environment of job security and fair treatment – "instinct with an obligation."

203.    KMS thereby became bound by the terms of the KMCWC Bylaws, which required that KMS provide Dr. Woodruff with notice and a hearing prior to deciding upon any course of action that might adversely affect the circumstances under which she was providing medical care to pediatric hematology and oncology patients for KMS and/or in the KMCWC.

204.    Defendant Winn materially breached Dr. Woodruff's contracts of employment when he demanded that she resign her position or be terminated before she had been provided any semblance of due process in the issues he raised. In January 2002, Dr. Woodruff was fulfilling the requirements of her employment contract with KMCWC and her employment contract with KMS.

205.    When Defendants Winn and Drue, and KMS terminated Dr. Woodruff's contract of employment with KMS on January 8, 2002, they unjustifiably breached that contract and violated 18 USCS § 1513(e) which prohibits interference with the lawful employment or livelihood of any person for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense.

57

206.    When Defendant Drue and KMCWC terminated Dr. Woodruff's contract of employment with KMCWC on approximately January 13, 2002, they unjustifiably breached that contract and violated 18 USCS § 1513(e).

207.    The HPH Defendants also materially breached the KMCWC Bylaws when they deprived Dr. Woodruff of pre-deprivation notice and a hearing.

208.    By reason of the wrongful and unlawful conduct as set forth herein, Dr. Woodruff has suffered damages in amounts to be proven at trial, including a reasonable amount for attorneys' fees and costs

## COUNT XIII
(Breach of Implied Covenant of Good Faith and Fair Dealing in the KMCWC Bylaws)

209.    Plaintiffs' repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 208 above as though fully set forth herein.

210.    An implied covenant of good faith and fair dealing exists in the KMCWC Bylaws that is imposed upon all parties in the performance of their obligations thereunder. Such a duty exists for the HPH Defendants in their obligations to perform their obligations under the KMCWC Bylaws.

211.    HPH Defendants' wrongful conduct described above constitutes a breach of the duty of good faith and fair dealing owed to Dr. Woodruff under the KMCWC Bylaws.

212.    By reason of HPH Defendants' conduct as set forth herein, Dr. Woodruff has suffered damages in amounts to be proven at trial.

## COUNT XIV
(Tortious Interference with Economic Advantage)

213.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in paragraphs 1 through 211 above as though fully set forth herein.

214.    HPH Defendants knew that they would obtain a monopoly on the practice

of pediatric hematology/oncology by persuading Drs. Wilkinson and Woodruff to accept employment with KMS; and that Dr. Woodruff would be prevented from continuing to practice her medical specialties in Hawai`i, or would only be able to enter private practice again at great economic cost, if KMS thereafter terminated her employment at any time, unless KMS restored her prior practice and referral system to her upon termination.

215. HPH Defendants made no provisions for restoring Dr. Woodruff's private practice and referral system to her or compensating her for her potential economic losses when they deprived her of any semblance of due process in connection with Dr. Winn terminating her employment with KMS.

216. As a matter of law, HPH Defendants were not privileged to terminate Dr. Woodruff's employment with KMS without paying adequate compensation and/or restoring her to the position she was in before she accepted KMS' offer of employment, because Defendants deprived Dr. Woodruff of due process in determining whether she committed acts of professional misconduct sufficient to justify her termination and the loss of her fundamental right to practice her medical specialties in Hawai`i and to enjoy the associated economic and professional benefits.

217. Defendants' deprivation of Dr. Woodruff's rights to due process was wrongful.

218. As a result of the Defendants' intentional interference with Dr. Woodruff's right to practice her medical specialties, Dr. Woodruff has been damaged in the amount to be proven at trial.

219. Defendants' conduct was willful, wanton, reckless or done with a conscious indifference to the consequences so as to entitle Dr. Woodruff to an award of punitive

damages against Defendants in amounts which shall be proven at trial.

## COUNT XV
### (Prima Facie Tort)

220.    Plaintiffs repeat, reallege and incorporate by reference the allegations

contained in paragraphs 1 through 218 above as though fully set forth herein.

221.    Defendants' wrongful conduct described above was unwarranted and

unjustified under the circumstances, and intentionally caused Dr. Woodruff harm, or was

undertaken intentionally without regard to the harm Dr. Woodruff might suffer as a result.

222.    By reason of Defendants' wrongful conduct, Dr. Woodruff has suffered

damages in amounts to be proven at trial.

223.    The Defendants' conduct was willful, wanton, reckless or done with a

conscious indifference to the consequences so as to entitle Dr. Woodruff to an award of punitive

damages against Defendants in amounts to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants and

in favor of Plaintiffs as follows:

A.    For injunctive relief, as set forth in Count I above;

B.    That this Court adjudge and decree that Defendants and co-conspirators

have entered into unlawful contracts, combinations, or conspiracies which unreasonably restrain

trade in interstate commerce, in violation of H.R.S. §§ 480-4(a) and 480-6.

C.    That this Court adjudge and decree that Defendants have unlawfully

acquired or attempted to acquire and maintain a monopoly in the market for pediatric hem-onc

physician services, constituting violations of H.R.S. §480-4(a)

60

D.    For special and general damages in an amount to be proven at trial for lost

opportunities, lost income, and damage to reputation;

E.    For treble damages pursuant to Haw. Rev. Stat. §480-13;

F.    For punitive damages in an amount to be shown at trial;

G.    For their attorneys' fees and costs of suit pursuant to Haw. Rev. Stat.

§§480-13, 481A-4, and 607-14; and

H.    For any and all other relief that this Court may deem is just and proper.

Dated:  Honolulu, Hawai`i, February 15, 2005

Respectfully submitted,

_____
ARLEEN D. JOUXSON
RAFAEL G. DEL CASTILLO

Attorneys for Plaintiff
Kelley Woodruff, M.D. and
Hawaii Children's Blood and Cancer Group

ARLEEN D. JOUXSON-MEYERS        7223-0
RAFAEL G. DEL CASTILLO          6909-0
JOUXSON-MEYERS-MEYERS & DEL CASTILLO
Jouxson-Meyers & del Castillo
A Limited Liability Law Company
302 California Ave., Suite 209
Wahiawa, Hawai`i 96786
Telephone: (808)621-8806; Fax: (808)422-8772

Attorneys for Plaintiffs
Kelley Woodruff, M.D. and
Hawaii Children's Blood and Cancer Group

## IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

## STATE OF HAWAII

| | |
|---|---|
| KELLEY WOODRUFF, M.D. and HAWAII CHILDREN'S BLOOD AND CANCER GROUP, | ) Civil No. 02-1-0090-01 (BIA) ) (Other Civil Action) ) ) DEMAND FOR JURY TRIAL |
| Plaintiffs, | ) ) ) |
| vs. | ) ) ) |
| HAWAI`I PACIFIC HEALTH; KAPI`OLANI MEDICAL SPECIALISTS; KAPI`OLANI MEDICAL CENTER FOR WOMEN AND CHILDREN; ROGER DRUE; FRANCES A. HALLONQUIST; NEAL WINN, M.D.; SHERREL HAMMAR, M.D.; DELOITTE & TOUCHE LLP; DENNIS M. WARREN, ESQ.; JOHN DOES 1-99; JANE DOES 1-99; DOE ENTITIES 1-20; AND DOE GOVERNMENTAL UNITS 1-10, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## DEMAND FOR JURY TRIAL

Plaintiffs Kelley Woodruff, M.D. and Hawaii Children's Blood and

Cancer Group, by and through their attorneys, Jouxson-Meyers & del Castillo, hereby

demand a trial by jury on all issues so triable in the above-entitled action.

DATED:  Honolulu, Hawai`i, February 15, 2005

ARLEEN D. JOUXSON
RAFAEL G. DEL CASTILLO
Attorneys for Plaintiff
Kelley Woodruff, M.D. and
Hawaii Children's Blood and Cancer Group

| **STATE OF HAWAI'I** CIRCUIT COURT OF THE FIRST CIRCUIT | **SUMMONS TO ANSWER SECOND AMENDED CIVIL COMPLAINT** | CASE NUMBER **02-1-0090-01 (BIA)** |
|---|---|---|

| PLAINTIFF                                vs. | DEFENDANT |
|---|---|
| KELLEY WOODRUFF, M.D. and HAWAII CHILDREN'S BLOOD AND CANCER GROUP | Hawai`i Pacific Health; Kapi`olani Medical Specialists; Kapi`olani Medical Center for Women and Children; Roger Drue; Frances A. Hallonquist; Neil Winn, M.D.; Sherrel Hammar, M.D.; Deloitte & Touche LLP; Dennis M. Warren, Esq.; John Does 1-99; Jane Does 1-99; DOE Entities 1-20; and DOE Governmental Units 1-10 |

PLAINTIFF'S ADDRESS (NAME, ADDRESS, TEL. NO.)

Kelley Woodruff, M.D.
HAWAII CHILDREN'S BLOOD AND CANCER GROUP
c/o JOUXSON-MEYERS & DEL CASTILLO
302 California Ave.
Suite 209
Wahiawai, Hawai`i 96786

    You are hereby summoned and required to serve upon Plaintiffs' attorney, whose address is stated above, an answer to the Second Amended Complaint, which is attached. This action must be taken within 20 days after service of this Summons upon you, exclusive of the day of service.

    If you fail to make your answer within the twenty day time limit, judgment by default will be taken against you for the relief demanded in the Second Amended Complaint.

        **This summons shall not be personally delivered between 10:00 p.m. and 6:00 a.m. on premises not open to the general public, unless a judge of the above-entitled court permits, in writing on this summons, personal delivery during those hours.**

        **A failure to obey this summons may result in an entry of default and default judgment against the disobeying person or party.**

| DATE ISSUED FEB 1 7 2005 | CLERK  N. ANAYA | SEAL CIRCUIT COURT CLERK | |
|---|---|---|---|

I do hereby certify that this is a full, true, and correct copy of the original on file in this office.

1C-P-306